# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

BHARATKUMAR G. THAKKER;
ADEBODUN ADEBOMI IDOWU;
COURTNEY STUBBS; RIGOBERTO
GOMEZ HERNANDEZ; RODOLFO
AGUSTÍN JUAREZ JUAREZ;
MEILING LIN; HENRY PRATT; JEAN
HERDY CHRISTY AUGUSTIN;
MAYOWA ABAYOMI OYEDIRAN;
AGUS PRAJOGA; MANSYUR;
CATALINO DOMINGO GOMEZ
LOPEZ; and DEXTER ANTHONY
HILLOCKS,

              Petitioners-Plaintiffs,

vs.

CLAIR DOLL, in his official capacity as
Warden of York County Prison;
ANGELA HOOVER, in her official
capacity as Warden of Clinton County
Correctional Facility; CRAIG A. LOWE,
in his official capacity as Warden of Pike
County Correctional Facility; SIMONA
FLORES-LUND, in her official capacity
as Field Office Director, Enforcement and
Removal Operations, U.S. Immigration
and Customs Enforcement; MATTHEW
ALBENCE, in his official capacity as
Acting Director, U.S. Immigration and
Customs Enforcement; and CHAD
WOLF, in his official capacity as Acting
Secretary, U.S. Department of Homeland
Security,

              Respondents-Defendants.

Case No. _____

**INTRODUCTION**

COVID-19, the disease caused by a novel coronavirus, is rampaging across the world like an out-of-control wildfire. It has become a global pandemic with lethal consequences, especially for the elderly and people with certain pre-existing medical conditions. As of March 23, more than 332,900 individuals have already tested positive for the virus, and 14,510 have died. Ex. 1 (Amon Decl.) at ¶ 5. The death toll in the United States, and Pennsylvania, is steadily rising. *Id*. There is no vaccine against COVID-19, and there is no known cure. No one is immune. *Id*. at 6. It is no longer a question of whether and when, but how many victims and who dies.

Plaintiffs are a diverse group of individuals from around the world who are held in *civil detention* by Immigration and Customs Enforcement (ICE) at York County Prison, Clinton County Correctional Facility, and Pike County Correctional Facility while they await disposition of their immigration cases. They are united by the fact that they are older adults and/or they have serious pre-existing medical conditions, including lung disease, heart disease, diabetes, severe asthma, chronic kidney disease, immunosuppression, liver disease, chronic hepatitis B, spinal cord injury, high blood pressure, and cancer.

While COVID-19 infects anyone who comes into contact with it, the highest risk of serious illness and death is in individuals who, like plaintiffs, are age 45 and

over or have one of the pre-existing medical conditions. Amon Decl. at ¶¶ 8-11. Epidemiological studies indicate that about 15% in this group will die. Golub Decl.at ¶ 4. For others, the COVID-19 virus can cause severe damage to lung tissue, sometimes leading to a permanent loss of respiratory capacity, and can damage tissues in other vital organs including the heart and liver. *Id.* at ¶ 9. Patients with serious cases of COVID-19 require advanced medical support, including positive pressure ventilation and extracorporeal mechanical oxygenation in intensive care. *Id.* at ¶ 8. Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurological damage and loss of respiratory capacity. *Id.* at ¶ 9.

Because COVID-19 spreads exponentially, meaning that a single infection can grow into hundreds in a matter of days, Amon Declaration at ¶ 5, the only known measure to mitigate the widespread contagion is to deprive COVID-19 of the fuel it needs by allowing people to keep safe distances from one another to reduce the number of infections and ease the strain on overwhelmed local health systems. *Id.* at ¶¶ 23, 26. This is why public health officials around the world have implemented extraordinary measures, like closing schools, courts, sporting events, theaters and other congregate settings. 50 states, 7 territories, and the District of Columbia have taken some type of formal executive action in response to the COVID-19 outbreak, including ordering people to stay inside. Over the past week,

Pennsylvania Governor Tom Wolf declared a state of emergency, which includes orders to close non-essential businesses and, just yesterday, issued an order to residents of Bucks, Chester, Delaware, Monroe and Montgomery counties to stay at home. Philadelphia had already issued such an order. *Id.* at ¶ 24.

Immigration detention facilities are enclosed environments, much like the cruise ships that were the site of the largest concentrated outbreaks of COVID-19, and because carceral facilities also include security restrictions they pose the highest public health risk to the spread of COVID-19. People live in close quarters and are subject to security measures which prohibit successful "social distancing" that is needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection. Staff arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection.

Current conditions and procedures in place at the three ICE facilities, as described by plaintiffs' declarations, cannot be seen as sufficient to prevent the introduction of COVID-19 or to prevent its rapid transmission among both detainees and staff. Based upon the plaintiffs' declarations, none of the ICE facilities are following CDC guidance in relation to social distancing. This failure puts all detainees, and especially those at high risk of severe disease and death, in

jeopardy. The only viable public health strategy available, given the lack of a vaccine for prevention or effective treatment at this stage of the pandemic, is to release individuals who can be considered at high risk of severe disease if infected with COVID-19.

Plaintiffs' public health and medical experts attest that the crowded conditions at the three prisons make the most vital preventative measure, social distancing, impossible. Based on descriptions in 13 Plaintiff declarations about conditions within the three facilities, some Plaintiffs are triple-celled and others are packed into open spaces where they literally can touch people sleeping next to them. Sixty people share a handful of sinks and showers in communal bathrooms that are cleaned infrequently. They eat sitting right next to each other on meals prepared and served in unsanitary conditions. The prisons' medical practices are inconsistent with CDC guidelines. Two plaintiffs, and many other detainees, have COVID-19 symptoms, but the prisons refuse to test them. They are neither quarantined nor isolated. Based on the inability to practice CDC-recommended social distancing and good hygiene practice, the unhygienic feeding and bathrooms situations, and contra-indicated medical practices, Plaintiffs' experts testify that the conditions greatly heighten likelihood of contagion, putting Plaintiffs at grave risk of serious illness and death.

Clustering vulnerable individuals under these circumstances and waiting for COVID-19 to explode in detention centers is not just a humanitarian crisis, it is a constitutional one. Courts have long recognized that the Eighth Amendment's prohibition on cruel and unusual punishment forbids the government from leaving them to suffer and die from infectious disease. The nature of the pandemic and the conditions of confinement at the three prisons make it impossible for Defendants to protect vulnerable Plaintiffs from risk of infection. That risk of harm, which includes a one-in-seven chance of death, is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

There is growing recognition among courts and even prison systems that release from detention is the only way to protect vulnerable detainees from COVID-19. The Ninth Circuit recently ordered the release of an immigrant from ICE detention in light of the dangers posed by the COVID-19 crisis. *See, e.g., Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (Order) ("[I]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers, the court *sua sponte* orders that Petitioner be immediately released from detention and that removal of Petitioner be stayed pending final disposition by this court."). *See also In re Extradition of Alejandro Toledo Manrique*, No. 19-71055, 2020 WL 1307109, at

*1 (N.D. Cal. Mar. 19, 2020) (explaining that "the government's suggestion that [the plaintiff] should wait until there is a confirmed outbreak of COVID-19 in [the facility] before seeking release is impractical.  By then it may be too late.").

This Court has the authority and the obligation to order Defendants to comply with the Fifth Amendment and release Plaintiffs from civil detention. For the reasons discussed below and in the accompanying legal memorandum, this Court should immediately issue a temporary restraining order or preliminary injunction requiring ICE to temporarily release Plaintiffs from custody so that they have a chance to avoid infection and the likely serious illness, and even death, from COVID-19. The wildfire is entering the prisons.  These are extraordinary times that call for extraordinary measures. Plaintiffs implore this Court to issue an order saving those who are most vulnerable to severe illness and death from the oncoming calamity.

## JURSIDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. § 2241 (habeas jurisdiction), and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause).

2.     Venue lies in the United States District Court for the Middle District of Pennsylvania because Plaintiffs are detained by respondents at three county prisons

– located in York, Pike and Clinton counties – all of which are located within the Middle District. 28 U.S.C. § 2242. Venue is proper in the Middle District of Pennsylvania because a substantial portion of the relevant events occurred in the District and because several defendants reside in the District. 28 U.S.C. § 1391(b), (e)(1).

## PARTIES

### Petitioners/Plaintiffs

3.     Petitioner-Plaintiff Bharatkumar G. Thakker is a 65-year-old male citizen of India who has been detained by ICE at Pike County Correctional Facility for 27 months.[1] He suffers from several serious health conditions, including respiratory problems, declining kidney function, high blood pressure, high cholesterol, and a history of seizures. During this detention, he has twice required hospitalization. His age and serious health conditions place him at high risk of severe illness or death if he contracts COVID-19. Two days ago, Mr. Thakker's cell mate, who sleeps three feet away, started coughing, had chills and felt achy. As of March 23, Mr. Thakker also began coughing and feeling dizzy. The prison has neither tested nor quarantined either man. Ex. 3 (Thakker Decl.).

---

[1] Mr. Thakker recently filed a writ of habeas corpus before this honorable court. *See Thakker v. Lowe*, 1:19-cv-00664-JEJ-EBC (M.D. Pa).

4.     Petitioner-Plaintiff Adebodun Adebomi Idowu is a 57-year-old man from Nigeria who is detained by ICE at Clinton County Correctional Facility.[2] Mr. Idowu suffers from Type II diabetes, high blood pressure, and high cholesterol. He receives medication for these conditions, including insulin and metformin, and has been hospitalized three times because the facility failed to provide him with insulin. As a consequence of his age and health conditions, he is at a high risk of severe illness or death if he contracts COVID-19.  Ex. 4 (Idowu Decl.).

5.     Petitioner-Plaintiff Courtney Stubbs is a 52-year-old male citizen of Jamaica who has been detained by ICE at Pike County Correctional Facility. Mr. Stubbs receives treatment for multiple medical conditions.  He is a kidney-transplant patient who receives a regimen of medications, suffers from Type II diabetes, and has heart stents. These serious maladies and his age place Mr. Stubbs at a high risk of severe illness or death if he contracts COVID-19. Ex. 5 (Stubbs Decl.).

6.     Petitioner-Plaintiff Meiling Lin is a 45-year-old female citizen of China who is detained by ICE at York County Prison. Ms. Lin has chronic hepatitis B. She also suffers from severe chronic pain, liver disease, and other medical complications as a result of her forced sterilization surgery in China. As a consequence of her health

---

[2] Mr. Idowu currently has a writ of habeas corpus pending before this honorable court. *See Idowu v. Clinton County Correctional Facility*, et al., 1:20-cv-00146-JEJ-EBC.

conditions, she is at a high risk of severe illness or death if she contracts COVID-19. Ex. 9 (Lin Decl.).

7.     Petitioner-Plaintiff Jean H.C. Augustin is a 34-year-old male citizen of Haiti who is detained by ICE at York County Prison. He suffers from diabetes, high blood pressure, chronic anemia, and nerve issues. He also was the victim of a gunshot wound that caused permanent partial disability and suffers myriad health issues stemming from the injury. During his detention he has required multiple hospitalizations. As a consequence of his health conditions, he is at a high risk of severe illness or death if he contracts COVID-19. Ex. 11 (Augustin Decl.).

8.     Petitioner-Plaintiff Rodolfo Agustín Juarez Juarez is a 21-year-old male citizen of El Salvador who is detained by ICE at York County Prison. Mr. Juarez suffers from diabetes.  He has had a fever, persistent cough, and trouble breathing for the past week. The facility has told him it cannot test him for COVID-19 because it does not have tests. Mr. Juarez is at a high risk of severe illness or death if he contracts or has contracted COVID-19 because of his serious health conditions. Ex. 8 (Juarez Decl.).

9.     Petitioner-Plaintiff Catalino Domingo Gomez Lopez is a 51-year-old male citizen of Guatemalan who is detained by ICE at York County Prison. Since being detained in November 2018, Mr. Gomez Lopez has had the flu four times. Most recently, in February of 2020, he was so ill that he was coughing blood. He has

not been tested for COVID-19. Mr. Gomez Lopez is at a high risk of severe illness or death if he contracts or has contracted COVID-19 because of his age and serious health conditions. Ex. 15 (Gomez Lopez Decl.).

10. Petitioner-Plaintiff Rigoberto Gomez Hernandez is a 52-year-old male Mexican national who is detained by ICE at Pike County Correctional Facility. Mr. Gomez Hernandez has multiple chronic health issues. He is diabetic and currently receiving treatment for an ulcer. His detention has also caused him mental anguish. As a consequence of his age and health conditions, Mr. Gomez Hernandez is at a high risk of severe illness or death if he contracts COVID-19. Ex. 7 (Gomez Hernandez Decl.).

11. Petitioner-Plaintiff Henry Pratt is a 50-year-old male citizen of Liberia. He is detained by ICE at Clinton County Correctional Facility. Mr. Pratt suffers from Type II diabetes and high blood pressure, for which he receives medication. Mr. Pratt is at a high risk of severe illness or death if he contracts or COVID-19 because of his age and serious health conditions.[3] Ex. 10 (Pratt Decl.).

12. Petitioner-Plaintiff Mayowa Abayomi Oyediran is a forty-year-old male citizen of Nigeria who is detained by ICE at York County Prison. Mr. Oyediran has severe asthma and has an infection in his lungs. Yet while in detention, he has

---

[3] Mr. Pratt currently has a writ of habeas corpus pending before the middle district, although the last docket entry is from June 10, 2019. *See Pratt v. Doll, et al.*, 3:19-cv-00342-RDM-CA.

not been given an inhaler or any other kind of treatment for his asthma. He has not been treated for the lung infection either. As a consequence of his age and health conditions, Mr. Oyediran is at a high risk of severe illness or death if he contracts COVID-19. Ex. 12 (Oyediran Decl.).

13. Petitioner-Plaintiff Mansyur is a 41-year-old male citizen of Indonesia. He is detained by ICE at Pike County Correctional Facility. Mr. Mansyur has diabetes, thyroid issues, and high blood pressure. Mr. Mansyur is at high risk of severe illness or death if he contracts COVID-19 because of his serious health conditions. Ex. 14 (Mansyur Decl.).

14. Petitioner-Plaintiff Agus Prajoga is a 48-year-old male citizen of Indonesia who is detained by ICE at Pike County Correctional Facility. Mr. Prajoga has diabetes, cholesterol, high blood pressure, and hepatitis B. As a consequence of his age and serious health conditions, Mr. Prajoga is at a high risk of severe illness or death if he contracts COVID-19. Ex. 13 (Prajoga Decl.).

15. Petitioner-Plaintiff Dexter Anthony Hillocks is a 54-year-old male lawful permanent resident from Trinidad & Tobago. He is detained at Pike County Correctional Facility. Mr. Hillocks suffers serious health problems, including diabetes, high blood pressure, high cholesterol, and anemia. He also was recently diagnosed with leukemia. Mr. Hillocks is at high risk of severe illness or death

because of his age and serious health conditions if he contracts COVID-19. Ex. 16 (Hillocks Decl.).

**Respondents/Defendants**

16.     Respondent-Defendant Simona Flores-Lund is the Field Office Director for Enforcement and Removal Operations ("ERO") in the Philadelphia Field Office of Immigration and Customs Enforcement ("ICE"), an agency within the U.S. Department of Homeland Security. ERO is a division of ICE that manages and oversees the immigration detention system.  In her capacity as Field Director for ERO, Defendant Flores-Lund exercises control over and is a custodian of immigration detainees held at all of the correctional facilities in Pennsylvania that house ICE detainees, including the three at issue in this case, namely, the York County Prison, the Clinton County Correctional Facility, and the Pike County Correctional Facility. At all times relevant to this Complaint, Defendant Flores-Lund was acting within the scope and course of her employment with ICE.  She is sued in her official capacity.

17.     Respondent-Defendant Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. Defendant Albence is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants. Defendant Albence is a legal custodian of Plaintiffs. At

all times relevant to this complaint, Defendant Albence was acting within the scope and course of his position as an ICE official. He is sued in his official capacity.

18. Respondent-Defendant ICE is a federal law enforcement agency within the Department of Homeland Security. ICE is responsible for the criminal and civil enforcement of immigration laws, including the detention and removal of immigrants. ERO, a division within ICE, manages and oversees the immigration detention system. Defendant ICE is a legal custodian of Plaintiffs.

19. Respondent-Defendant Chad Wolf is sued in his official capacity as the Acting Secretary for DHS. In this capacity, he has responsibility for the administration of immigration laws pursuant to 8 U.S.C. § 1103(a), has authority over ICE and its field offices, and has authority to order the release of Plaintiffs. At all times relevant to this complaint, Mr. Wolf was acting within the scope and course of his position as the Acting Secretary for DHS. He also is a legal custodian of Plaintiffs.

20. Respondent-Defendant Clair Doll is the Warden of the York County Prison in York, Pennsylvania, where Plaintiffs Lin, Juarez, Augustin, Gomez Lopez, and Oyediran are detained. Defendant Doll is the immediate, physical custodian of these Plaintiffs. He is sued in his official capacity.

21. Respondent-Defendant Angela Hoover is the Warden of the Clinton County Correctional Facility in McElhattan, Pennsylvania, where Plaintiffs Idowu,

Stubbs and Pratt are detained. Defendant Hoover is the immediate, physical custodian of these Plaintiffs. She is sued in her official capacity.

22.     Respondent-Defendant Craig A. Lowe is the Warden of the Pike County Correctional Facility in Lords Valley, Pennsylvania, where Plaintiffs Thakker, Prajoga, Mansyur, Gomez Hernandez, and Hillocks are detained. Defendant Lowe is the immediate, physical custodian of these Plaintiffs. He is sued in his official capacity.

## STATEMENT OF FACTS

### A. COVID-19 Poses A Grave Risk of Harm, Including Serious Illness or Death, to Persons Age 45 and Over and Those with Certain Medical Conditions.

23.     COVID-19 is a disease caused by coronavirus that has reached pandemic status. According to the World Health Organization, as of March 23, more than 332,900 people have been diagnosed with COVID-19 in 190 countries or territories around the world and 14,510 have died as a result. Amon Decl. at ¶ 5. In the United States, about 41,000 people have been diagnosed with the disease and 479 people have died thus far. *Id.* In Pennsylvania, there are at least 644 confirmed cases and five deaths. *Id.*

24.     The rates of infection are exponential, not linear, meaning that, for each person infected one day, the next day we should expect to see not one, but many more instances of infection. *Id.* Without effective public health interventions, CDC

projections indicate about 200 million people in the United States could be infected over the course of the pandemic, with as many as 1.5 million people dying from this infection. Ex. 2 (Golob Decl.) at ¶ 11.

25.     Outcomes from COVID-19 vary from asymptomatic infection to death. Individuals who are at low risk may experience mild symptoms, while high risk individuals may suffer respiratory failure from the disease. Amon Decl. at ¶ 6. In the highest risk populations, the fatality rate is about 15 percent, meaning that out of 100 vulnerable people infected, fifteen will die. Golob Decl. at ¶ 4.  In other words, more than one in every seven people in this high-risk group are likely to die, and an even higher percentage will suffer serious illness.

26.     Those who do not die may experience long-term harm. COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity.  Golob Decl. at ¶ 9.

27.     COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle.  Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work. *Id*

28. Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. *Id,*

29. Individuals aged 65 and older and those of any age with serious underlying medical conditions are at the *highest risk* of severe disease and death if they are infected with COVID-19. Amon Decl. at 9. According to the Centers for Disease Control (CDC), these underlying conditions include: blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, neurological and neurodevelopmental conditions, and current or recent pregnancy. Amon Decl. at ¶ 8.

30. While patients over 65 are at the highest risk, the risks of severe disease from infection increase starting at age 40. Amon Decl. at ¶ 7. CDC data suggests that individuals aged 45 and older are considered *high risk* for disease, with those age 54 and older considered high risk for severe disease and death. Amon Decl. at ¶¶ 8, 10.

31. There is no vaccine to prevent COVID-19. There is no known cure or anti-viral treatment for COVID-19 at this time. The only way to protect vulnerable people from serious health outcomes, including death, is to prevent them from being infected with the coronavirus. Amon Decl. at ¶ 6.

32.     COVID-19 infects people who come into contact with respiratory droplets that contain the coronavirus. Such contact can occur at a distance of six feet. It is also possible that an individual can become infected by touching a surface with the virus and then touching their mouths. Thus, the only known means of minimizing the risk of infection are social distancing and increased sanitization. Amon Decl. at ¶ 23.

33.     Increasingly, research shows that social distancing is the primary means of risk mitigation. Distancing must occur before individuals display symptoms, as they may be contagious before they are symptomatic. The CDC recommends a social distance of at least 6 feet to minimize the risk of spread. Amon Decl. at ¶ 23; Golob Decl. at ¶ 10.

34.     In response to this research, countries around the world have sought to make social distancing into public policy. Italy has enacted a national lock-down, prohibiting people from leaving their homes. Amon Decl. at ¶27. Fifty states, seven territories, and the District of Columbia have all taken formal executive action to contain the outbreak. *Id.* at 24. California's governor, for example, issued a shelter-in-place order closing businesses and requiring residents to stay at home. New York's governor issued a similar order. *Id.* at ¶ 25. Thus far, six counties in Pennsylvania have these kinds of orders in place. *Id.* at ¶ 24. Nationwide, a total of 165 million people are under such stay-at-home-orders. *Id.* at ¶ 24-25. Pennsylvania

has banned people from congregating and has shut down all non-essential businesses where people might come into contact with each other. *Id.* at ¶ 25. The idea behind these actions is that, by "flattening the curve," those most vulnerable will be least likely to become infected and, if they do, the numbers of infected individuals will be low enough that medical facilities will have enough beds, masks, and ventilators for those who need them. *Id.* at ¶ 26.

## B. Conditions in Pennsylvania's Immigration Detention Facilities Increase the Risk of COVID-19 Infection.

35.    The conditions in Pennsylvania's immigrant detention facilities contravene all medical and public health directives for risk mitigation. People live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Nor is such social distancing a possible solution, given the crowding of the facilities and the limitations on space. Amon Decl. at ¶¶ 29, 30.

36.    At York, dorms are filled with between 50 and 60 people, all in a single room. Everyone in the dorm sleeps on bunkbeds so close that two people cannot fit between each set of beds. Augustin Decl. at ¶ 16; Lin Decl. at ¶ 13. It is literally impossible for people to get more than 6 feet apart from each other in these dorms. *Id.*

37.    At Clinton, over 70 people are housed in a single dorm, where they sleep on bunk beds that line the room in 6 or 7 rows, with five bunks per row and a

knee-high divider between the sides of the room. Pratt Decl. at ¶ 7; Idowu Decl.at ¶ 11. The bunk beds are so close together that individuals can reach out and touch each other from their beds. Pratt Decl. at ¶ 6. Individuals at Clinton are thus forced to sleep in close proximity—much less than 6 feet apart. *Id.*

38.     At Pike, individuals are divided into blocks of nearly 50 people, where they are *triple celled* in cells that are about 8 feet by 12 feet and contain a bunk bed, single bed, and shared toilet and sink. Thakker Decl. at ¶ 11. Cellmates cannot get more than five feet apart from each other at any time while in their cells. Stubbs Decl. at ¶ 13.

39.     Other aspects of detention also preclude the CDC-recommended social distancing, and increase transmission opportunities. Shared use of common facilities generate further opportunities for infection. Toilets, sinks, and showers are shared, without disinfection between use. Amon Decl. at ¶ 42. Food preparation and food service is communal, with little opportunity for surface disinfection. Amon Decl. at ¶ 30

40.     For instance, at Clinton, individuals must crowd around tables, with eight or nine people sitting shoulder to shoulder at each of the six round tables. Idowu Decl.at ¶ 12. The day space is so limited that some people end up eating in their beds, which are separated from the day space by only a knee-high divider. Pratt at ¶ 8. At York, all 50-60 people in a unit eat together, at tables of four, so close to

each other that people struggle to navigate around the tables. Augustin Decl. at ¶ 17. People eat from open trays in these crowded spaces. Lin Decl. at ¶ 14. Here, too, individuals cannot practice social distancing because there is simply nowhere for them to go. Thus, even where utmost care is taken, these detention centers cannot physically space people 6-feet apart at all times.

41.     Shared bathrooms with poor sanitization provide another locus for infection. At York, there are six toilets and six showers for a unit of nearly sixty. Augustin Decl. at ¶ 20; Lin Decl.at ¶ 16. Detainees have limited access to running water, and must use bathroom sinks that are for hand washing and brushing teeth to access water for food they prepare in their dorms. Ruiz Decl. at ¶ 5. At Clinton, there are four sinks and four showers for over seventy people. Idowu Decl. at ¶ 13. Prisoners at Clinton are sometimes tasked with cleaning these facilities with no gloves. Idowu Decl. at ¶ 13. Because of failures with the washing machines at Clinton, people have also been forced to use the bathroom sinks to wash the two sets of jail-issued clothing that they wear daily. Pratt Decl.at ¶ 11. At Pike, inmates must use the bathroom and shower with a limited soap ration provided once per day. Stubbs Decl. at ¶ 16. Hallways also pose risks of contagion: at York, all blocks share a hallway, and everyone, including quarantined individuals, must use the hallway to access services. Augustin Decl. at ¶ 19.

42.     These crowded conditions, in both sleeping and social areas, and the shared objects (bathrooms, sinks, etc.) maximize the likelihood that COVID-19 will spread rapidly across the facilities, infecting vulnerable detainees. Amon Decl. at ¶ 42.

43.     We have already seen this kind of spread in other facilities. In New York City, for example, where the testing began earlier than in Pennsylvania, jails have become an epicenter of infectious spread. At the Rikers Island Jail in New York City, 21 inmates and 17 correctional staff tested positive for coronavirus as of March 23, 2020. Amon Decl. at ¶ 38.

44.     There is growing evidence of contagion and inadequate medical care within the facilities where Plaintiffs are detained. Even before the quarantine, plaintiffs from each facility reported having issues receiving adequate medical care. See Augustin Decl. at ¶ 12; Pratt Decl. at ¶ 4-5; Stubbs Decl. at ¶¶ 9, 10. Since COVID-19 has become a known public health threat, the facilities have failed to take precautions. New individuals have been admitted without screening at Clinton, creating a heightened risk that the virus will be introduced into the facility. Pratt Decl. at ¶ 13; Idowu Decl. at ¶ 16. Mr. Augustin was assigned to work in admissions at York, where he comes into physical contact with people being brought into the facility who may be infected and contagious but asymptomatic. Augustin Decl. at ¶

15; Golob Decl. at ¶ 6. At Pike, individuals have been transferred into new units, risking transmission across units. Stubbs Decl. at ¶ 18.

45.     Where measures are taken, they are insufficient to prevent spread across the facility. For example, Pike had a quarantine unit, but the unit housed about 50 people, threatening to spread infection more widely. Thakker Decl. at ¶ 15.  York had two quarantine units, called "cohort," with 60-70 inmates in each, living in a large unit as described above.  Baranoski Decl. at ¶ 6. Also, in York, one inmate was given the job of serving food to a sick person in the quarantine unit, and would move in and out of that unit and back to his dorm, without personal protective equipment. Augustin Decl. at ¶ 18. At all three facilities, guards in regular contact with detained individuals have not worn gloves or masks. Augustin Decl. at ¶ 14; Thakker Decl. at ¶ 17; Idowu Decl. at ¶ 15. Even medical workers sometimes are not wearing masks at York. Juarez Decl. at ¶ 15. Plaintiffs are concerned that guards may be infected and may be spreading the illness through the facility: at Clinton, a guard came in sick recently and has since been out for 4-6 days. Pratt Decl. at ¶ 14; Idowu Decl. at ¶ 15.

46.     The failure to perform tests of staff who have ongoing community contacts presents a daily risk of introduction of the virus into the detention facility. The possibility of asymptomatic transmission means that monitoring fever of staff or detainees is also inadequate for identifying all who may be infected and

preventing transmission. This is also true because not all individuals infected with COVID-19 report fever in early stages of infection. Amon Decl. at ¶ 42.

47.     A lack of proven cases of COVID-19 where there is little to no testing is functionally meaningless for determining if there is a risk for COVID-19 transmission in a community or institution. Golob Decl. at ¶ 7. In other jurisdictions where testing has been made available to correctional officers who enter and leave facilities regularly, the rates of infection are high.  Amon Decl. at ¶¶ 38, 39. These officers are further vectors of the virus: like detainees, they may be asymptomatic while still contagious. As a result, it is a question of when, not if, the virus will be introduced into these immigration detention facilities.

48.     Once introduced, it will be impossible to stop the spread of the virus within the facility, where social distancing measures are impossible. CDC guidance specifically recommends implementing social distancing strategies to increase the physical space between incarcerated and detained persons, "ideally 6 feet between all individuals, regardless of the presence of symptoms," but Defendants continue to hold Plaintiffs in conditions where they sleep an arm's reach away from each other in a room full of people with whom they share bathrooms and eating spaces. Amon Decl. ¶¶ 47-48.

49.     Even were the Defendants to implement the specific ICE guidance for cohorting stringently across the facilities – which they have not done -- these actions

will not prevent the introduction of the virus and its spread within the facility because of the potential for asymptomatic transmission from facility staff or other individuals in ICE custody. Amon Decl. at ¶ 45. Moreover, the size of the cohort that Defendants used at the Pike facility—a block of 48 men—threatens to expose many individuals to the virus. Thakker Decl. York has a similar practice, "cohorting" the entire block, which is about 60 people. Baranoski Decl. at ¶ 6. Given that York's housing is dormitory style and open, this practice puts the entire block is at risk of exposure.

## C. Continued ICE Detention is Unsafe for Those Most Vulnerable to COVID-19.

50.     Without a vaccine or cure for COVID-19, mitigating the risk of contracting virus is the only known way to protect those who are most vulnerable to serious harm from infection. Golob Decl. at ¶ 10; Amon Decl. at ¶ 23.

51.     Because the risk of infection is at its zenith in detention centers where social distancing measures are impossible to implement, where people share common spaces that are not regularly sanitized, and where individuals are regularly exposed to potential vectors of infection, public health experts with experience in detention and correctional settings have recommended release of vulnerable individuals from custody.  Golob Decl. at ¶ 14; Amon Decl. at ¶¶ 48-49.

52.     High risk individuals who become infected will not receive adequate treatment. Immigration detention facilities lack adequate medical care infrastructure to address the strain of an outbreak. Amon Decl. at ¶ 35. As a result, detained

individuals who are age 45 and over or are any age with medical conditions that put them at high risk of illness if infected by COVID-19 are at grave risk of severe illness and death and should be released.

53.     If they are not released before the virus spreads through the prison, ill detainees will likely be unable to access necessary medical care, including positive pressure ventilation and, in extreme cases, extracorporeal mechanical oxygenation. *See* Golob Decl. at ¶ 8. This is because an outbreak among detainees and corrections staff will strain the limited medical infrastructure in the rural counties in which these detention facilities are located. Once infection spreads throughout the detention center, the burden of caring for these individuals will shift to local medical facilities. The few facilities will likely not be able to provide care to all infected individuals with serious cases, increasing the likelihood that these individuals will die. Amon Decl. at ¶ 41.  Thus, high risk individuals should be released from detention centers before it is too late.

**D. Plaintiffs Must Be Released from ICE Custody Because They Are Particularly Vulnerable to Serious Illness or Death If Infected by COVID-19.**

54.     Plaintiffs in this case are all individuals who are especially vulnerable to serious illness and death if they are infected with COVID-19, but ICE nonetheless continues to detain at York County Prison, Pike County Correctional Facility, and

Clinton County Correctional Facility while they await the adjudication of their immigration cases.

55.    **Bharatkumar G. Thakker**. Mr. Thakker is a 65-year-old citizen of India. He has been detained by ICE at Pike County Correctional Facility for the last 27 months. Thakker Decl. at ¶¶ 1, 4.

56.    Mr. Thakker has lived in the United States since 1973 and has three children, all of whom are U.S. citizens. His wife and mother are also U.S. citizens. ICE detained Mr. Thakker after a shoplifting incident. *Id.* at ¶ 3.

57.    Mr. Thakker has significant health issues. He has a heart stent put in over ten years ago, but continues to have health issues, including respiratory issues. He also continues to have trouble with breathing. His kidneys are declining in health – the most recent reading showed his kidneys were functioning at 30% to 35% -- and he will soon need dialysis. He also has high blood pressure, high cholesterol, and a history of seizures. He takes 11 medications a day. *Id.* at ¶¶ at 6-8.

58.    Since being detained, Mr. Thakker twice has been sent from the prison to the community hospital, once in March or April 2018 and again in July 2019. *Id.* at ¶ 10. Both times he reported feeling dizzy and short of breath. The second time, they told him he may have suffered a heart attack. *Id.* at ¶¶ at 9-10. Two days ago, one of his cell mates began coughing and feeling dizzy. On March 23, Mr. Thakker

began experiencing the same symptoms. Despite the early onset of symptoms, neither person has been tested for COVID-19. *Id.* at ¶ at 18.

59.     Mr. Thakker is critically vulnerable to severe illness or death from COVID-19 because of his age and significant health issues.  Amon Decl. at ¶ 12.

60.     **Courtney Stubbs.** Mr. Stubbs is a 52-year-old citizen of Jamaica who has lived in the United States since 1991. Stubbs Decl. at ¶ 1. He has a U.S. fiancée and 9-year-old son. *Id.* at ¶ 2; Arizzi Decl. at 1. Mr. Stubbs has been detained by ICE at Pike County Correctional Facility since June 2019. Stubbs Decl. at ¶ 7. ICE detained him despite his continued compliance with his Order of Supervision (OSUP), which he was on for 14 years. *Id.* at ¶¶ 5-6. ICE has been unable to remove him because Jamaica has repeatedly refused to accept him after reviewing his medical records. *Id.* at ¶ 7; Arizzi Decl. at ¶ 5.

61.     Mr. Stubbs takes 12 pills a day for his various medical ailments. Stubbs Decl. at ¶ 3. Some pills are because he had a kidney transplant in 2014 and he needs medicine to ensure his body does not reject the transplant. *Id.* at ¶ 4.  He also has Type II diabetes and heart stents. *Id.*

62.     Mr. Stubbs is critically vulnerable to severe illness or death from COVID-19 because of his diabetes, kidney condition, and his other serious health issues. Amon Decl. at ¶ 13.

63.     Last week, Mr. Stubbs' fiancé contacted prison officials, ICE, and the Governor about Mr. Stubbs' health conditions and his high risk of severe illness or death. Arizzi Decl. at ¶¶ 6-8. The ICE officer assigned to Mr. Stubbs' case told her he was not a doctor and did not know what the facility was doing to protect detainees. Id. at 6. Prison officials did not respond to her. *Id.* at ¶¶ 7-8.

64.     **Meiling Lin.** Ms. Lin is a 45-year-old citizen of China. Lin Decl. at ¶ 1. She is detained by ICE at York County Prison. *Id.* She fled China after being forcibly sterilized by the Chinese government and was detained on arrival in the United States. *Id.* ¶¶ 2, 5. She is appealing a decision by an Immigration Judge denying her asylum to the Board of Immigration Appeals. *Id.* at ¶ 2.

65.     Ms. Lin has chronic hepatitis B, which she has had for over ten years and suffers from severe chronic pain and other medical complications as a result of her forced sterilization surgery. *Id.* at ¶ 4-8.

66.     Ms. Lin is critically vulnerable to severe illness or death from COVID-19 because of her of her hepatitis B, liver disease and other significant health problems. Amon Decl. at ¶ 14.

67.     **Jean H.C. Augustin.** Mr. Augustin is a 34-year-old citizen of Haiti. Augustin Decl. at ¶ 1. He is detained by ICE at York County Prison. *Id.* at ¶ 2. He came to the U.S. when he was 15 years old and has been living in the U.S. for the

past 18 years. *Id.* He is seeking relief under the Convention Against Torture (CAT). *Id*. at ¶ 3.

68.　　Mr. Augustin suffers from diabetes, high blood pressure, chronic anemia, nerve issues. *Id*. at ¶¶ 4-6. at Mr. Augustin also has a myriad of health issues stemming from a gunshot injury, with pieces of the bullet still lodged in his body. *Id.* at ¶ 6. He has had a number of medical emergencies while at York County Prison and as a result has had to be hospitalized multiple times. *Id.* at ¶¶ 10-11.

69.　　Mr. Augustin is critically vulnerable to severe illness or death from COVID-19 because of his significant health problems. Amon Decl. at ¶ 14a.

70.　　**Rodolfo Agustín Juarez Juarez.** Mr. Juarez is a 21-year-old asylum seeker from El Salvador. Juarez Decl. at ¶ 1. He is detained by ICE at York County Prison. His asylum application is before the Executive Office for Immigration Review ("EOIR"). *Id.* at ¶ 4.

71.　　Mr. Juarez suffers from diabetes and has had a fever, persistent cough, and trouble breathing for the past week. *Id.* at ¶¶ 5-6. He has not been tested for COVID-19 and has been told by correctional officers that COVID-19 tests are not available at York. *Id.* at ¶ 11.

72.　　Mr. Juarez is critically vulnerable to severe illness and death from COVID-19 because of his significant health problems. Amon Decl. at ¶ 15.

73. **Adebodun Adebomi Idowu.** Mr. Idowu is a 57-year-old from Nigeria. Idowu Decl. at ¶ 1. He is detained by ICE at Clinton County Correctional Facility.[4] He has lived in the United States since 2012 and has a U.S. citizen wife. *Id*. at ¶ 2. He is applying for relief under the Convention Against Torture (CAT) and has been detained for 17 months. *Id*. at ¶¶ 2-3.

74. Mr. Idowu suffers from Type II diabetes, high blood pressure, and high cholesterol. *Id*. at ¶ 4. He receives medication for these conditions, including insulin and metformin. *Id*.

75. Mr. Idowu has been hospitalized three times while at Clinton. Each hospitalization was after Clinton failed to provide him with his diabetes medication. *Id*. at ¶ 5. His most recent hospitalization was in December 2019 and after he was not provided insulin for two days. *Id.* at ¶ 8. His sugar spiked to a dangerous level of 600/mL. *Id*. Mr. Idowu lost consciousness and was taken to the emergency room. *Id*. He spent two nights at the hospital before being brought back to Clinton County Correctional Facility. *Id*.

76. Mr. Idowu is critically vulnerable to severe illness or death from COVID-19 because of his chronic health conditions. Amon Decl. at ¶ 16.

---

77.     **Catalino Domingo Gomez Lopez.** Mr. Gomez Lopez is a 51-year-old Guatemalan national detained by ICE at York County Prison. Gomez Lopez Decl. ¶ at 1. He is seeking relief under the Convention Against Torture (CAT). *Id.* His case is pending before the Third Circuit Court of Appeals. *Id.*

78.     Since being detained in November 2018, Mr. Gomez Lopez has had the flu four times. *Id.* ¶ 5. The most recent time was beginning in mid-February 2020; he was ill for four weeks, during which time he had a fever and a persistent cough. *Id*. at. ¶ 5.   He had trouble sleeping because of the cough and coughed so much he started to cough blood. *Id.*

79.     Mr. Gomez Lopez is critically vulnerable to severe illness and death from COVID-19 because of his persistent viral infections. Amon Decl. at ¶ 16a.

80.     **Rigoberto Gomez Hernandez.** Mr. Gomez Hernandez is a 52-year-old Mexican national. Gomez Hernandez Decl. at ¶ 1. He was granted non-LPR cancellation of removal on January 16, 2020, but remains detained by ICE at Pike County Prison because the government appealed the decision to the Board of Immigration Appeals (BIA).

81.     Mr. Gomez Hernandez has multiple chronic health issues. He is diabetic and currently receiving treatment for an ulcer. *Id*. at ¶ 4.

82.     Mr. Gomez Hernandez is critically vulnerable to severe illness and death from COVID-19 because of his diabetes. Amon Decl. at ¶ 18.

83.     **Henry Pratt.** Mr. Pratt is a 50-year-old citizen of Liberia. Pratt Decl. at ¶ 1. He is a lawful permanent resident and has been detained for three years. *Id*. at ¶ 2.  He was placed into proceedings after fraud, forgery, and theft charges. *Id.* He is detained by ICE at Clinton County Correctional Facility.

84.     Mr. Pratt suffers from Type II diabetes and high blood pressure. *Id*. at ¶ 4. He receives medication for these conditions. *Id*.

85.     Mr. Pratt is critically vulnerable to severe illness and death from COVID-19 because of his diabetes.  Amon Decl. at ¶ 19.

86.     **Mayowa Abayomi Oyediran.** Mr. Oyediran is a forty-year-old asylum seeker from Nigeria. Oyediran Decl. at ¶¶ 1-3. He has been detained by ICE since November 7, 2019. He is awaiting a decision on his asylum case, which was heard by an immigration judge on March 10, 2020. *Id*. ¶ at 3.

87.     Mr. Oyediran has severe asthma and has an infection in his lungs. *Id*. ¶¶ at 3-7. York County Prison has not provided him with an inhaler or treatment for the lung infection. *Id*. at ¶¶ 5-6. He also has a history of high blood pressure and high cholesterol. *Id*. at 8.

88.     Mr. Oyediran is critically vulnerable to severe illness and death from COVID-19 because of his severe asthma. Amon Decl. at ¶ 20.

89.     **Mansyur.** Mr. Mansyur is a 41-year-old citizen of Indonesia. Mansyur Decl. He has been detained by ICE at Pike County Prison since December 19, 2019.

He is a Christian Indonesian who is seeking relief from removal. *Id.* at ¶ 2. The Board of Immigration Appeals (BIA) recently granted an Emergency Stay of Removal; his Motion to Reopen before the BIA is pending. *Id.*

90. Mr. Mansyur has diabetes, thyroid issues, and high blood pressure. *Id.* at ¶ 3. He receives medication for these medical issues. *Id.* at ¶ 4.

91. Mr. Mansyur is critically vulnerable to severe illness and death from COVID-19 because of his diabetes. Amon Decl. at ¶ 21.

92. **Agus Prajoga.** Mr. Prajoga is a 48-year-old citizen of Indonesia. Prajoga Decl. at ¶ 2. He has been detained by ICE at Pike County Prison since January 13, 2020. He has a Motion to Reopen pending based on changed country conditions regarding the treatment of Christians in Indonesia. *Id.*

93. Mr. Prajoga has diabetes, cholesterol, high blood pressure, and hepatitis B. *Id.* at ¶ 3. He takes medication for these conditions. *Id.* at ¶ 4.

94. Mr. Prajoga is critically vulnerable to severe illness and death from COVID-19 because of his diabetes and hepatitis, as well as other health problems. Amon Decl. at ¶ 22.

95. **Dexter Anthony Hillocks.** Mr. Hillocks is a 54-year-old lawful permanent resident who has lived in the United States since 2000. Hillocks Decl. at ¶ 2. He is a citizen of Trinidad & Tobago. *Id.* He is currently detained at Pike County Correctional Facility where he has been detained by ICE since 2015. *Id.* He was

placed into proceedings after a conviction for criminal use of a communication facility under 18 Pa.C.S. § 7512. *Id*. at ¶ 3. Despite a recent Third Circuit Court of Appeals decision that reversed and vacated his order of removal, he remains detained pending further proceedings. *Id*. at ¶ 4.

96.     Mr. Hillocks has several serious health problems. Seven months ago, he was diagnosed with leukemia. *Id*. at ¶ 6. He does not yet know the full extent of his cancer diagnosis. *Id*. He also has diabetes, high blood pressure, high cholesterol, and anemia. *Id*. at ¶¶ 5, 7-8. He takes insulin for his diabetes and also takes medication for his high blood pressure and cholesterol. *Id*.

97.     Mr. Hillocks is critically vulnerable to severe illness and death from COVID-19 because of his significant health problems. Amon Decl. at ¶ 17.

## E. ICE Continues to Expose Plaintiffs to Dangerous Conditions of Confinement Despite Being Advised of These Dangers

98.     Public health measures across the country, including in Pennsylvania, demonstrate the widespread recognition that the only clinically recommended course of action to protect individuals who have medical conditions that make them vulnerable to serious illness or death from COVID-19 is to practice social distancing and increased hygiene. Only these practices mitigate the risk of contracting this novel virus that has no cure. Golob Decl. at ¶ 10; Amon Decl. at ¶ 23.

99.     CDC guidance for detention centers and prisons specifically recommends implementing social distancing strategies to increase the physical

space between people, "ideally 6 feet between all individuals, regardless of the presence of symptoms". Amon Decl. at ¶ 47.

100. None of the ICE facilities are following CDC guidance in relation to social distancing, putting all detainees, and especially those at high risk of severe disease and death, in jeopardy. Amon Decl. at ¶ 48. Plaintiffs are forced to sleep in crowded dorms that do not allow six feet of distance from each other, *see* Pratt Decl. at ¶ 7; Idowu Decl. at ¶ 11; Augustin Decl. at ¶16, or are housed three to an eight-foot-by-twelve-foot cell, with two people sharing a bunk bed, and with a shared toilet and sink between all three, Thakker Decl. at ¶ 11.

101. Nor will the policy of "cohorting" prevent the spread of the virus to Plaintiffs. Contrary to CDC recommendations to cohort individually, ICE cohorts many people together, 48 to a room at Clinton and 60 to a room at York. Even if ICE is to implement this policy at the facilities, asymptomatic transmission will allow individuals to infect others before showing the signs that would trigger the cohorting measures.

102. CDC guidance on correctional and detention facilities emphasizes that there are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including from staff and transfer of incarcerated/detained persons. Amon Decl. at ¶ 46. ICE claims to be following CDC guidance at its facilities. *Id.* But asymptomatic transmission of the virus means that monitoring fever of staff or

detainees is inadequate for identifying all who may be infected and preventing transmission.

103.    Defendants also expose Plaintiffs to unsanitary conditions that increase the risk of infection and spread. They must use common toilets and showers, Augustin Decl. at ¶ 20; Idowu Decl. at ¶ 13, which individual detainees clean for a dollar a day. They have no control over their soap rations or access to other sanitization products. *See* Stubbs Decl.at ¶ 16.

104.    Defendants have been aware of the serious hygiene issues at their facilities, including York. Stakeholders sent a detailed letter to Ms. Flores-Lund and Warden Doll in July 2019 detailing various deficiencies in hygiene, sanitation and medical care, and thus these officials are or should have been aware of these serious problems at York County Prison. See Ruiz Decl. at ¶ 3. To date, York Country Prison has not implemented any changes. *Id*. at ¶ 12.

105.    On March 13, 2020, as infection rates began to increase in Pennsylvania at an alarming rate, the American Civil Liberties Foundation (ACLU) of Pennsylvania sent a letter to Defendant Flores-Lund, and other agency officials, alerting them to the high risk of COVID-19 infection in detention facilities and the dangerous health outcomes of an infection for vulnerable individuals. Ex. 20.

106.   Neither Ms. Flores-Lund nor any other agency official has responded to the letter, and there has been no indication that ICE has released or is releasing vulnerable persons.

107.   CDC guidance recognizes that incarcerated/detained persons are at "heightened" risk for COVID-19 infection once the virus is introduced. Amon Decl. at ¶ 46. All of the risks are present here, where Plaintiffs cannot practice social distancing, share common spaces and touch common surfaces, and where new individuals and staff come into the facility each day.

108.   Yet ICE continues to detain Plaintiffs, and many other medically vulnerable people, in contradiction of medical advice. Even if ICE has implemented the screening measures the agency claims to be implementing, which they have not, these measures are insufficient to prevent introduction of the virus into a setting where it will spread like wildfire.

## LEGAL FRAMEWORK

A. **Immigrant Detainees are Entitled to Constitutional Due Process Protections Against Exposure to Infectious Disease.**

109.   Immigrant detainees, even those with prior criminal convictions, are civil detainees entitled to the same Fifth and Fourteenth Amendment due process

protections as any other pretrial detainee. *See Zadvydas v. Davis,* 533 U.S. 678, 690 (2001); *E. D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019).[5]

110.    Due process rights for civil detainees mean that they are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Aruanno v. Johnson*, 683 F. App'x 172, 175 (3d Cir. 2017) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982); *see also Bell v. Wolfish,* 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished.").

111.    "To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees.'" *Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). Put differently, to assess whether a condition constitutes impermissible punishment, "[w]e must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes." *Hubbard*, 538 F.3d at 232. Conditions must be assessed in their totality. *Id.* at 233.

---

[5] The Fifth Amendment requires the federal Defendant-Respondents to provide due process protections to Plaintiffs. The Fourteenth Amendment requires the state Defendant-Respondents to provide the same due process.

112.    The government has an affirmative duty to provide conditions of reasonable health and safety to the people it holds in its custody, and violates the constitution when it "fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety" for those in custody. *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *see also Union County Jail Inmates v. Di Buono*, 713 F.2d 984, 999, 1008 (3d Cir. 1983) (explaining that conditions are cruel and unusual when they "deprive inmates of the minimal civilized measure of life's necessities," such as the "necessity" of "habitable shelter," as measured under "contemporary standards of decency").

113.    Courts in this Circuit have repeatedly found such "unsanitary, unsafe, or otherwise inadequate conditions" sufficient to state a Due Process claim. *Petty v. Nutter*, No. 15-3430, 2016 WL 7018538, at *2 (E.D. Pa. Nov. 30, 2016); *see Grohs v. Lanigan*, No. 16-7083, 2019 WL 150061, at *11 (D.N.J. Apr. 5, 2019) (allegations of exposure to "extreme heat combined with lack of potable water, as well as generally unsanitary conditions" sufficient to state a conditions-of-confinement claim under the Fourteenth Amendment).

114.    Conditions that would violate the Eighth Amendment are more than enough to also violate a civil detainee's due process rights. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (explaining that the Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth

Amendment protections available to a convicted prisoner'") (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

115.    To prevail on a claim that conditions of confinement violate the Eighth Amendment, Plaintiffs must meet two requirements: (1) the deprivation alleged must be, objectively, "sufficiently serious," and (2) the "prison official must have a sufficiently culpable state of mind," such as deliberate indifference to the detainee's health or safety.  *See Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

116.    The Supreme Court has recognized that it violates the Eighth Amendment to crowd prisoners into cells with others who have "infectious maladies," "even though the possible infection might not affect all of those exposed." *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (citing *Hutto v. Finney,* 437 U.S. 678, 682 (1978)); *see also Stewart v. Kelchner*, No. 06-2463, 2007 WL 9718681, at *13 (M.D. Pa. May 11, 2017), *report and recommendation adopted*, 2007 WL 9718672 (M.D. Pa. June 1, 2017).

117.    Plaintiffs can establish deliberate indifference based on circumstantial evidence that the risk is obvious.  The obviousness of the risk the Plaintiffs face, by itself, is enough to allow a factfinder to conclude that defendants know of the risk. *Phillips v. Superintendent Chester SCI*, 739 F. App'x 125, 129 n.7 (3d Cir. 2018) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).  Put another way, deliberate

indifference may be shown through circumstantial evidence. *Farmer*, 511 U.S. at 842 (explaining that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence").

118. Due process rights may be violated even before a detainee is exposed to disease. Because the Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety[,]'" *Helling v. McKinney*, 509 U.S. at 33. (quoting *DeShaney*, 489 U.S. at 200), "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them[.]" *Id.*

**B. Defendants Are Violating Plaintiff's Constitutional Due Process Rights.**

119. The conditions at the ICE Facilities described above, *supra* ¶¶ 35-49, are sufficient to demonstrate that Plaintiffs' constitutional due process rights are being violated. Keeping at-risk Plaintiffs detained in such close proximity to one another and without the sanitation necessary to combat the spread of the virus serves no legitimate purpose. Nor is detention under these circumstances rationally related to the enforcement of immigration laws.

120.   Plaintiffs' due process rights are also being violated because their conditions of confinement place them at serious risk of being infected with COVID-19 and Defendants are being deliberately indifferent to this critical safety concern.

121.   There is no question that COVID-19 poses a serious risk to Plaintiffs. COVID-19 is highly contagious, and can cause severe illness and death.  *See supra* ¶¶ 23-28.  Plaintiffs are at a heightened risk because of their age and/or underlying health conditions.  *See supra* ¶¶ 29-31, 59, 62,66, 69, 72, 76, 79, 82, 85, 88, 91, 94, 97.

122.   Defendants are aware of and have completely disregarded the serious risk that COVID-19 poses to Plaintiffs.  *See supra* ¶ 105 (ACLU March 13, 2020 letter).

123.   The risk that COVID-19 poses to Plaintiff is also obvious, including to Defendants.  Medical experts for the Department of Homeland Security have also identified the risk of COVID-19 spreading to ICE detention centers.[6] John Sandweg, a former acting director of ICE, has written publicly about the need to release nonviolent detainees because ICE detention centers "are extremely susceptible to outbreaks of infectious diseases" and "preventing the virus from being introduced

---

[6]   *See* March 19, 2020 letter from Scott A. Allen, MD, FACP and Josiah Rich, MD, MPH to House and Senate Committees on Homeland Security, available at https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-Congress.pdf.

into these facilities is impossible."[7] Prisons and jails around the country are ***already*** releasing non-violent detainees because the risk of contagion is overwhelming.[8]

124.  The circumstances of this case make clear that release is the only means to ensure compliance with Plaintiffs' due process rights.  Public health information makes clear that the only way to prevent infection is through social distancing and increased hygiene, and that these measures are most imperative to protect individuals with underlying medical conditions.  *See supra* ¶¶ 32-34.  The only course of action that can remedy these unlawful conditions is release from the detention centers where risk mitigation is impossible.

### C. ICE Regularly Uses Its Authority To Release People Detained In Custody Because They Suffer Serious Medical Conditions.

125.  ICE has a longstanding practice of prosecutorial discretion, which demonstrates that the agency understands that its authority extends to— and includes— humanitarian releases from custody. The agency has routinely exercised

---

[7]    *See* John Sandweg, "I Used to Run ICE. We Need to Release the Nonviolent Detainees."  *The Atlantic* (March 22, 2020), available at https://www.theatlantic.com/ideas/archive/2020/03/release-ice-detainees/608536/.

[8]    *See* Order, Supreme Court of New Jersey, Docket No. 084230 (March 22, 2020) (ordering release of most county jail detainees), available at https://njcourts.gov/notices/2020/n200323a.pdf?c=4EF; *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (concluding that the "unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" constituted compelling circumstances to adjust a defendant's bail conditions and release him, even though there was "not yet a known outbreak among the jail and prison populations" when the order was issued).

its authority to release particularly vulnerable detainees. As former Deputy Assistant Director for Custody Programs in ICE Enforcement and Removal Operations Andrew Lorenzen-Strait explains, "ICE has exercised and still exercises discretion for purposes of releasing individuals with serious medical conditions from detention." Strait Decl. at ¶ 3.

126.  ICE has a range of highly effective tools at its disposal to ensure that individuals report for court hearings and other appointments, including conditions of supervision. For example, ICE's conditional supervision program, called ISAP (Intensive Supervision Appearance Program), relies on the use of electronic ankle monitors, biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting to supervise participants. A government-contracted evaluation of this program reported a 99% attendance rate at all immigration court hearings and a 95% attendance rate at final hearings.  *See* Lorenzen-Strait Decl. ¶ 15.

127.  This exercise of discretion comes from a long line of agency directives explicitly instructing officers to exercise favorable discretion in cases involving severe medical concerns and other humanitarian equities militating against detention. *See* Strait Decl. at ¶¶ 10-14. For example, under 8 C.F.R. § 212.5(b)(1), ICE has routinely exercised its discretion to release particularly vulnerable detainees. *Id.* at 4-11.

128. ICE's discretion applies regardless of the statutory basis for a noncitizen's detention. *See* Strait Decl. at ¶ 11.

129. While ICE officers may be exercising discretion less frequently in recent years, the statutory and regulatory authority underlying the use of prosecutorial discretion in custodial determinations remains in effect. *See* Straight Decl. at ¶ 13.

130. Consistent with the Due Process clause of the Fifth Amendment to the U.S. Constitution, ICE must release detainees where civil detention has become punitive and where release is the only remedy to prevent this impermissible punishment. The fact that ICE has the authority to release immigrants from custody and has exercised this authority in the past indicates that the remedy Plaintiffs request is neither unprecedented nor unmanageable for the agency.

### D. This Court Has Authority to Order Plaintiffs' Release to Vindicate Their Fifth Amendment Rights, and Such Relief Is Necessary Here.

131. Courts have broad power to fashion equitable remedies to address constitutional violations in prisons, *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978), and "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." Brown v. Plata, 563 U.S. 493, 511 (2011).

132.   This authority extends to "placing limits on a prison's population" when necessary to ensure compliance with the Constitution. *Brown v. Plata*, 563 U.S. 493, 511 (2011); *see also Duran v. Elrod*, 713 F.2d 292, 297-98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap).

133.   The circumstances of this case make clear that release is the only means to ensure compliance with the Fifth Amendment's prohibition against punitive detention. Plaintiffs' medical conditions put them at grave risk of severe illness or death if they contract COVID-19. Public health information makes clear that the only way to prevent infection is through social distancing and increased hygiene, and that these measures are most imperative to protect individuals with pre-existing medical conditions. Yet defendants are detaining vulnerable Plaintiffs under conditions where they are forced into close contact with many other detainees and officers. By continuing detention in these circumstances, Defendants are subjecting Plaintiffs to unreasonable harm. The only course of action that can remedy these unlawful conditions is release from the detention centers where risk mitigation is impossible.

## CLAIM FOR RELIEF

## Violation of Fifth Amendment Right to Substantive Due Process
## (Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement)

134. The forgoing allegations are re-alleged and incorporated herein.

135. The Fifth Amendment of the Constitution guarantees that civil detainees, including all immigrant detainees, may not be subjected to punishment. The federal government violates this substantive due process right when it fails to satisfy its affirmative duty to provide conditions of reasonable health and safety to the people it holds in its custody, and violates the constitution when it fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety for those in custody. The federal government also violates substantive due process when it subjects civil detainees to cruel treatment and conditions of confinement that amount to punishment.

136. By detaining Plaintiffs in the ICE Facilities, Defendants are subjecting Plaintiffs to a heightened risk of contracting COVID-19, for which there is no vaccine and no cure. Plaintiffs are particularly vulnerable to serious medical complications from COVID-19 infection and are risk of illness and death as long as they are held in detention. By subjecting Plaintiffs to this risk Defendants are maintaining detention conditions that amount to punishment and fail to ensure safety and health in violation of Plaintiffs' due process rights.

137. Likewise, the continued detention of Plaintiffs at the ICE Facilities is deliberately indifferent to Plaintiffs' serious medical needs because only releasing Plaintiffs from custody can adequately protect them from COVID-19. Defendants are both aware of the serious risk posed by COVID-19 and are failing to take the only action that can respond to Plaintiffs' medical needs, which is to release Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court grant the following relief:

a. Issue a Writ of Habeas Corpus on the ground that their continued detention violates the Due Process Clause and order Plaintiffs' immediate release, with appropriate precautionary public health measures;

b. In the alternative, issue injunctive relief ordering Defendants to immediately release Plaintiffs, with appropriate precautionary public health measures, on the grounds that their continued detention violates Plaintiffs' constitutional due process rights;

c. Issue a declaration that Defendants' continued detention in civil immigration custody of individuals at increased risk for severe illness, including all people over ages forty-five and older and persons of any age with underlying medical conditions that may increase the risk of serious COVID-19, violates the Due Process Clause;

d. Award Plaintiffs their costs and reasonable attorneys' fees in this action

under the Equal Access to Justice Act ("EAJA"), as amended, 5 U.S.C. § 504

and 28 U.S.C. § 2412, and on any other basis justified under law; and

e. Grant any other and further relief that this Court may deem fit and proper.

Dated: March 24, 2020

Respectfully Submitted,

*/s/ Will W. Sachse*
Will W. Sachse, Eq. (PA 84097)
Thomas J. Miller, Esq. (PA 316587)
Kelly Krellner, Esq. (PA 322080)*
Carla G. Graff, Esq. (PA 324532)
**DECHERT, LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
T: 215-994-4000
E: will.sachse@dechert.com
E: thomas.miller@dechert.com
E: kelly.krellner@dechert.com
E: carla.graff@dechert.com

David Fathi (WA 24893)*
Eunice H. Cho (WA 53711)*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, NATIONAL PRISON
PROJECT
915 15th St. N.W., 7th Floor
Washington, DC  20005
T: 202-548-6616
E: dfathi@aclu.org
E: echo@aclu.org

Michael Tan (NY 4654208)*
Omar C. Jadwat (NY 4118170) *

*/s/ Witold J. Walczak*
Witold J. Walczak (PA 62976)
**AMERICAN CIVIL LIBERTIES UNION**
**OF PENNSYLVANIA**
247 Ft. Pitt Blvd., 2d Fl.
Pittsburgh, PA 15222
T:  412-681-7864
E:  vwalczak@aclupa.org

Vanessa L. Stine (PA 319569)
Muneeba S. Talukder (CA 326394)*
Erika Nyborg-Burch (NY 5485578)*
**AMERICAN CIVIL LIBERTIES UNION**
**OF PENNSYLVANIA**
P.O. Box 60173
Philadelphia, PA 19102
T:  215-592-1513
E:  vstine@aclupa.org
E:  mtalukder@aclupa.org
E: enyborg-burch@aclupa.org

American Civil Liberties Union
Foundation, Immigrants' Rights
Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2600
E: mtan@aclu.org
E: ojadwat@aclu.org

*Petition for permission to file pro hac vice forthcoming*