# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BHARATKUMAR G. THAKKER, et al.,

    Petitioners-Plaintiffs,

vs.

CLAIR DOLL, in his official capacity as Warden of York County Prison, et al.,

    Respondents-Defendants.

Case No. 1:20-cv-00480-JEJ

**Judge John E. Jones III**

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

NOTICE TO DEFENDANTS ................................................................................4

FACTUAL BACKGROUND..................................................................................4

I.     COVID-19 Poses Grave Risk of Serious Illness or Death to Older
       Adults and Those with Certain Underlying Medical Conditions. .................6

II.    COVID-19 Is Overwhelming Local Healthcare Systems and Rural
       Health Systems are Particularly Vulnerable....................................................9

III.   People Detained at the ICE Facilities Are at Increased Risk of
       COVID-19. .......................................................................................................9

IV.    Continued ICE Detention is Unsafe for Those Vulnerable to COVID-
       19. ...................................................................................................................15

V.     Plaintiffs Must Be Released from Custody Because They are
       Vulnerable to Serious Illness or Death If Infected by COVID-19 ...............17

VI.    Defendants are Aware that Releasing Detainees is the only Viable
       Option to Protect Vulnerable Individuals from COVID-19..........................23

VII.   ICE has Discretion to Release Inmates for Medical Reasons ......................23

LEGAL STANDARD............................................................................................25

ARGUMENT ........................................................................................................26

I.     Plaintiffs Meet their Burden to Show the Need For A Temporary
       Restraining Order and Preliminary Injunction. ...........................................26

       A.     Plaintiffs Are Likely to Succeed on the Merits of Establishing a
              Constitutional Violation. ....................................................................27

              1.     Plaintiffs' Continued Detention at the ICE Facilities
                     Violates Their Due Process Rights. .........................................27

              2.     Defendants' Deliberate Indifference to Plaintiffs' Health
                     and Safety Violates Even the Stricter Eighth Amendment
                     Standards. .................................................................................31

       B.     Infection With a Lethal Virus That Lacks Any Vaccine or Cure
              Constitutes Irreparable Harm. ...........................................................37

# TABLE OF CONTENTS
### (continued)

**Page**

    C.      There is a Strong Public Interest in Minimizing the Spread of COVID-19 through Social Distancing and Hygiene Practices that are Impossible at the ICE Facilities. ...........................................39

    D.      The Balance of Equities Favors Releasing the Plaintiffs over Continued Detention While In the Midst of this Public Health Crisis.................................................................................................41

II.    The Court Should Not Require Plaintiffs to Provide Security Prior to Issuing a Temporary Restraining Order. ......................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aruanno v. Johnson*,
   683 F. App'x 172 (3d Cir. 2017) ......................................................26

*Austin v. Pa. Dep't of Corr.*,
   No. 90-7497, 1992 WL 277511 (E.D. Pa. Sept. 29, 1992)................38

*Bell v. Wolfish*,
   441 U.S. 520 (1979)..........................................................................26

*Boone v. Brown*,
   No. 05-0750, 2005 WL 2006997 (D.N.J. Aug. 22, 2005)..................38

*Brigaerts v. Cardoza*,
   952 F.2d 1399 (9th Cir. 1992) ..........................................................37

*Brown v. May*,
   No. 2:16-cv-01973, 2019 WL 5445923 (E.D. Pa. Oct. 23, 2019)......30

*Brown v. Plata*,
   563 U.S. 493 (2011)....................................................................26, 27

*Buck v. Stankovic*,
   485 F. Supp. 2d 576 (M.D. Pa. 2007).................................................39

*Cerro Fabricated Prod. LLC v. Solanick*,
   300 F. Supp. 3d 632 (M.D. Pa. 2018).................................................25

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989)...........................................................................32

*E. D. v. Sharkey*,
   928 F.3d 299 (3d Cir. 2019) ........................................................26, 28

*In re Extradition of Alejandro Toledo Manrique*,
   No. 19-71055, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020)...........3, 16, 36, 42

*Farmer v. Brennan*,
   511 U.S. 825 (1994)...........................................................................34

*Grohs v. Lanigan*,
    No. 16-7083, 2019 WL 1500621 (D.N.J. Apr. 5, 2019) ...................................30

*Hargis v. Atlantic Cty. Justice Facility*,
    No. 10-1006, 2010 WL 1999303 (D.N.J. May 18, 2010) ..................................30

*Helling v. McKinney*,
    509 U.S. 25 (1993).....................................................................................32, 39

*Hinerman v. Karnes*,
    No. 14-0408, 2015 WL 268761 (M.D. Pa. Jan. 21, 2015) ..........................33, 36

*Hubbard v. Taylor*,
    538 F.3d 229 (3d Cir. 2008) .............................................................................28

*Hutto v. Finney*,
    437 U.S. 678 (1978).........................................................................................25

*Idowu v. Clinton Cty. Corr. Facility*,
    No. 1:20-cv-00146 (M.D. Pa.)..........................................................................19

*Inmates of Northumberland Cty. Prison v. Reish*,
    No. 08-cv-0345, 2009 WL 8670860 (M.D. Pa. Mar. 17, 2006).......................31

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996) ...............................................................................38

*Miller v. Skumanick*,
    605 F. Supp. 2d 634 (M.D. Pa. 2009).................................................................25

*Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*,
    834 F.2d 326 (3d Cir. 1987) .............................................................................37

*Natale v. Camden Cty. Corr. Facility*,
    318 F.3d 575 (3d Cir. 2003) .............................................................................26

*Padilla v. U.S. Immigration & Customs Enforcement*,
    387 F. Supp. 3d 1219 (W.D. Wash. 2019) .........................................................38

*Petty v. Nutter*,
    No. 15-3430, 2016 WL 7018538 (E.D. Pa. Nov. 30, 2016)..............................30

*Phillips v. Superintendent Chester SCI*,
    739 F. App'x 125 (3d Cir. 2018) ........................................................34

*Pratt v. Doll*,
    3:19-cv-00342-RDM-CA (M.D. Pa.) ..................................................22

*S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*,
    145 F. Supp. 446 (D.N.J. 2001) .........................................................43

*Simcox v. Delaware County*,
    No. 91-6874, 1992 WL 97896 (E.D. Pa. May 5, 1992) .....................43

*Stewart v. Kelchner*,
    No. 06-2463, 2007 WL 9718681 (M.D. Pa. May 11, 2007) ..............33

*Temple Univ. v. White*,
    941 F.2d 201 (3d Cir. 1991) .........................................................42, 43

*Thakker v. Lowe*,
    1:19-cv-00664 (M.D. Pa.) ..................................................................18

*Thomas v. Tice*,
    948 F.3d 133 (3d Cir. 2020) ..............................................................32

*Union Cty. Jail Inmates v. Di Buono*,
    713 F.2d 984 (3d Cir. 1983) ..............................................................32

*United States v. Barkman*,
    Case No. 3:19-cr-0052, 2020 U.S. Dist. LEXIS 45628 (D. Nev.
    Mar. 17, 2020)........................................................................3, 17, 36

*United States v. Fellela*,
    No. 3:19-cr-79, 2020 U.S. Dist. LEXIS 49198 (D. Conn. Mar. 20,
    2020) ..............................................................................................3, 36

*United States v. Raihan*,
    No. 20-cr-68, Dkt. No. 20 (E.D.N.Y. Mar. 12, 2020) ..................17, 36

*United States v. Stephens*,
    No. 15-cr-95, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) .............3, 16, 35, 36

*Wagner v. County of Montgomery*,
    No. 10-2513, 2014 WL 4384493 (E.D. Pa. Sept. 4, 2014)................30

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)................................................................................25

*Xochihua-Jaimes v. Barr*,
  Order, No. 18-71460.................................................................3, 16, 36

*Zadvydas v. Davis*,
  533 U.S. 678 (2001)............................................................................26

**Other Authorities**

*Coronavirus (COVID-19)*, Pennsylvania Department of Health,
  https://www.health.pa.gov/topics/disease/coronavirus/Pages/Coron
  avirus.aspx (last visited Mar. 24, 2020)..............................................9

Chief Justice Mike McGrath, Letter to Montana Courts of Limited
  Jurisdiction (Mar. 20, 2020), *available at*
  https://courts.mt.gov/Portals/189/virus/Ltr%20to%20COLJ%20Jud
  ges%20re%20COVID-19%20032020.pdf?ver=2020-03-20-
  115517-333 ......................................................................................17

Fed. R. Civ. P. 65 ........................................................................................42

*ICE detainee tests positive for COVID-19 at Bergen County Jail*, U.S.
  Immigration & Customs Enforcement (Mar. 24, 2020),
  https://www.ice.gov/news/releases/ice-detainee-tests-positive-
  covid-19-bergen-county-jail ........................................................15, 35

*ICE Guidance on COVID-19*, U.S. Immigration & Customs
  Enforcement, *available at* www.ice.gov/covid19 ............................13

J. David McSwane, *ICE Has Repeatedly Failed to Contain
  Contagious Diseases, Our Analysis Shows. It's a Danger to the
  Public*, Pro Publica, Mar. 20, 2020, https://bit.ly/3bqm2VT ............16

John Sandweg, *I Used to Run ICE. We Need to Release the Nonviolent
  Detainees*, The Atlantic (Mar. 22, 2020),
  https://www.theatlantic.com/ideas/archive/2020/03/release-ice-
  detainees/608536/ ......................................................................16, 35

Nathaniel Lash and Brett Sholtis, *Demand for ICU beds will greatly outstrip availability if coronavirus hits Pa. hard*, Bucks County Courier Times (Mar. 20, 2020), https://www.buckscountycouriertimes.com/news/20200320/demand-for-icu-beds-will-greatly-outstrip-availability-if-coronavirus-hits-pa-hard ........................................................................................40

Order, Supreme Court of New Jersey, Docket No. 084230 (March 22, 2020), *available at* https://njcourts.gov/notices/2020/n200323a.pdf?c=4EF..............................17, 35

Priscilla DeGregory, *Coronavirus shuts down some NYC and NJ immigration courts*, New York Post (Mar. 24, 2020), https://nypost.com/2020/03/24/coronavirus-shuts-down-some-nyc-and-nj-immigration-courts/..............................................................................35

Scott A. Allen, MD, FACP and Josiah Rich, MD, MPH, Letter to House and Senate Committees on Homeland Security (Mar. 19, 2020), *available at* https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-Congress.pdf ......................................................................24, 35

*Coronavirus disease (COVID-19) Pandemic*, World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited Mar. 24, 2020) ....................................................6

## INTRODUCTION

COVID-19, the disease caused by a novel coronavirus, is an out-of-control wildfire raging across the United States.  In just weeks, the number of cases has exploded.  There are no vaccines, no cures, and no one is immune.  The question now is what we can do to protect the most vulnerable individuals—older adults and others with underlying serious medical conditions—from contracting COVID-19 and fanning the further spread of the disease.  And the only answer, according to public health experts, is to deprive COVID-19 of the fuel it needs by allowing people to keep safe distances from one another, to reduce the number of infections and ease the strain on overwhelmed local health systems.

The Plaintiffs in this case are civil detainees of Immigration and Customs Enforcement ("ICE") in York County Prison, Clinton County Correctional Facility, and Pike County Correctional Facility (collectively "ICE Facilities"), who are currently housed in conditions that put them right in the path of the fire.  They are a mix of older and younger adults, all with pre-existing medical conditions, such as heart disease, diabetes, chronic kidney disease, immunosuppression, hepatitis B, liver disease, and hypertension, which make them particularly vulnerable to serious complications or death from COVID-19.  They are being held in cramped conditions where "social distancing" and adequate hygiene are impossible.  Indeed, two

Plaintiffs already exhibit symptoms associated with COVID-19, but they have not been tested or released to get medical treatment.

Clustering vulnerable individuals into a tinderbox and waiting for COVID-19 to explode through detention centers is not just a humanitarian crisis, it is a constitutional one.  Courts have long recognized that the Eighth Amendment prohibition on cruel and unusual punishment forbids the government from leaving the incarcerated to suffer and die from infectious disease.  As civil detainees, the Plaintiffs are entitled to due process protections even greater than what the Eighth Amendment requires.  The Defendants, the wardens of ICE Facilities in Pennsylvania and U.S. government officials with authority over those facilities, are public officials charged to uphold the Constitution and protect the Plaintiffs.  And the Constitution demands that these Defendants must act *before* the COVID-19 wildfire sweeps through the ICE Facilities, not wait until it is too late.

Because the Defendants have been unwilling to protect the Plaintiffs' health and constitutional rights, the Court must intervene.  There is growing recognition among courts and even prison systems that releasing vulnerable detainees is the only way to protect them.  Just yesterday, a panel of the Ninth Circuit *sua sponte* ordered the immediate release from civil detention of an immigrant who is in removal proceedings.  This order was necessary "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact

2

immigration detention centers." *Xochihua-Jaimes v. Barr*, Order, No. 18-71460 (9th Cir. Mar. 23, 2020). Other courts have taken similar actions. In another immigration matter, the court ordered the release of a 74-year old detainee and concluded, "the government's suggestion that [the plaintiff] should wait until there is a confirmed outbreak of COVID-19 in [the facility] before seeking release is impractical. By then it may be too late." *In re Extradition of Alejandro Toledo Manrique*, No. 19-71055, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020). Another court ordered the release of a diabetic criminal defendant who was awaiting sentencing on federal charges, even though there had been no COVID-19 cases in the facility and the court credited the government's representations about the precautions taken to prevent the spread of coronavirus. *United States v. Fellela*, No. 3:19-cr-79, 2020 U.S. Dist. LEXIS 49198, at *1 (D. Conn. Mar. 20, 2020); *see also United States v. Stephens*, (reconsidering bail determination and releasing pretrial detainee; "[a]lthough there is not yet a known outbreak among the jail and prison populations, inmates may be at heightened risk of developing COVID-19 should an outbreak develop."); *United States v. Barkman*, Case No. 3:19-cr-0052, 2020 U.S. Dist. LEXIS 45628, at *1, *3 (D. Nev. Mar. 17, 2020) (suspending confinement order and noting, "conditions of pretrial confinement create the ideal environment for the transmission of contagious disease").

The Court should join the growing chorus of judges around the country who recognize that this public health crisis demands immediate intervention.  For the reasons discussed below, the Court should immediately issue a temporary restraining order or preliminary injunction requiring ICE to temporarily release Plaintiffs from custody so they have a chance to avoid infection and potential death from COVID-19.  The Court has the authority to do so, and both the Constitution and public interest demand it in these extraordinary times.

## NOTICE TO DEFENDANTS

Counsel for the Plaintiffs emailed the U.S. Attorney's Office for the Middle District of Pennsylvania to advise it of the emergency reasons requiring them to seek a temporary restraining order and/or preliminary injunction.  In addition, the Plaintiffs' Counsel e-mailed a copy of the Petition for a Writ of Habeas Corpus and Complaint and Motion for Temporary Restraining Order and/or Preliminary Injunction, together with exhibits, to Assistant U.S. Attorney Joanne Sanderson.

## FACTUAL BACKGROUND

As the Court is undoubtedly aware, COVID-19 is a disease that has reached pandemic status.  Nevertheless, to support this motion and provide a broader context for the requested relief, the Plaintiffs have submitted a host of declarations from corrections, medical, and public health experts:

- **Exhibit 1**[1] is the declaration of Dr. Joseph Amon [hereafter, "Amon Decl."], a public health expert and epidemiologist who is the Director of the Office of Global Health at Drexel University's Dornsife School of Public Health. Amon Decl. ¶ 1.  Dr. Amon previously worked as an epidemiologist at the Centers for Disease Control and Prevention (CDC) and has served on advisory committees for the World Health Organization (WHO).  *Id.* at ¶ 2. One of his "main areas of research focus relates to infectious disease control, clinical care, and obligations of government related to individuals in detention settings." *Id.* at ¶ 4.

- **Exhibit 2** is the declaration of Dr. Jonathan Louis Golob [hereafter, "Golob Decl."], a specialist in infectious diseases and internal medicine, subspecializing in infections in immunocompromised patients, who is an Assistant Professor at the University of Michigan School of Medicine.  Golob Decl. ¶ 1.  Dr. Golob obtained his medical degree and completed his residency at the University of Washington School of Medicine in Seattle, where he also completed a Fellowship in Internal Medicine Infectious Disease.  *Id.*  Dr. Golob currently is "actively involved in planning and care for patients with COVID-19." *Id.*

- **Exhibit 17** is the declaration of Andrew Lorenzen-Strait [hereafter, "Lorenzen-Strait Decl."], an expert on ICE enforcement and removal policies and practices, who is an Executive Director for Health and Wellness at Lutheran Social Services of the National Capital Area overseeing migrant support services. Lorenzen-Strait Decl. ¶ 1.  Mr. Lorenzen-Strait, who previously worked at ICE in various roles, including most recently as the Deputy Assistant Director for Custody Programs until May 2019, oversaw health and welfare programs and services in immigration detention, including innovative programs to serve vulnerable populations.  *Id.*  His relevant responsibilities included "overseeing field level enforcement decisions in cases involving parents as primary caretakers, and monitoring compliance with [Enforcement and Removal Operations] processes and standards." *Id.* at ¶ 2.

---

[1] All references to numbered Exhibits (*e.g.*, Exhibit 1, Exhibit 2, etc.) refer to the Exhibits attached to the Declaration of Witold J. Walczak dated March 24, 2020 (Dkt. No. 2).  References to TRO-Exhibits (e.g., TRO-Exhibit 1, TRO-Exhibit) are being separately filed with this motion attached to the Declaration of Witold J. Walczak dated March 25, 2020.

I.   **COVID-19 Poses Grave Risk of Serious Illness or Death to Older Adults and Those with Certain Underlying Medical Conditions.**

According to the World Health Organization, as of March 24, 2020, there are 334,981 confirmed cases of COVID-19 worldwide and 14,652 confirmed deaths.[2] In the United States alone, there are 41,000 confirmed cases and 479 confirmed deaths.  Amon Decl. ¶ 5.  These numbers are growing exponentially.  *See id*.

People over the age of 45 and those with certain medical conditions face a greater risk of serious illness or death from COVID-19.  Golob Decl. ¶ 3; Amon Decl. ¶¶ 7-10.  The medical conditions that increase the risk of serious complications from COVID-19 include lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, and developmental delay.  Golob Decl. ¶ 3; Amon Decl. ¶¶ 7-10.  All of the Plaintiffs have one or more of these conditions and are at an increased risk of developing serious complications or dying from COVID-19, regardless of their age.  Amon Decl. ¶¶ 11-22.

---

[2] *See* TRO-Ex. 1, *Coronavirus disease (COVID-19) Pandemic*, World Health Organization,   https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited Mar. 24, 2020).

In many people, COVID-19 causes fever, cough, and shortness of breath.  But for people over the age of 45[3] or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe.  Golob Decl. ¶ 5.  COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity.  COVID-19 may also cause inflammation of the heart muscle.  *Id.* at ¶¶ 8-9.  This is known as myocarditis; it can affect the heart muscle and electrical system, reducing the heart's ability to pump.  *Id.*  This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.  *Id.*  Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury.  *Id.* These complications can develop at an alarming pace.  *Id.* at ¶¶ 6, 8.  Patients can show the first symptoms of infection within two days after exposure, and their condition can seriously deteriorate in five days or sooner.  *Id.*

---

[3] Even some younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.  Golob Decl. ¶ 5.

The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 than from influenza. *Id.* at ¶ 4. According to recent estimates, the fatality rate of people with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems. *Id.* For people in the highest risk populations, the fatality rate of COVID-19 is about 15 percent. *Id.*

Patients in high-risk categories who do not die from COVID-19 should expect a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurologic damage, and the loss of respiratory capacity. *Id.*

There is no vaccine against COVID-19 and there is no known medication to prevent or treat COVID-19. *Id.* at ¶ 10. The only known effective measures to reduce the risk for vulnerable people from injury or death from COVID-19 are to prevent them from being infected in the first place. *Id.* Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including washing hands with soap and water, are the only known effective measures for protecting vulnerable people from COVID-19. *Id.*

Projections by the CDC indicate that over 200 million people in the United States could be infected with COVID-19 over the course of the epidemic without

effective public health intervention, with as many as 1.5 million deaths in the most severe projections.  *Id.* at ¶ 11.

## II.   COVID-19 Is Overwhelming Local Healthcare Systems and Rural Health Systems are Particularly Vulnerable

Most people in higher risk categories who contract COVID-19 need advanced support.  Golob Decl. ¶ 8.  This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. *Id.*  The extensive degree of support that COVID-19 patients need can quickly exceed local health care resources.  *Id.*  When healthcare systems are overwhelmed, doctors and public health authorities are inevitably left to allocate scarce resources about who receives care.

## III.   People Detained at the ICE Facilities Are at Increased Risk of COVID-19.

York County Prison is located in York, Pennsylvania.  Pike County Correctional Facility is located in Lords Valley, PA.  Clinton County Correctional Facility is located in McElhattan, PA.  As of March 24, 2020, there were 851 confirmed cases of COVID-19 and seven COVID-19-related deaths in Pennsylvania (including eighteen in York County and four in Pike County).[4]  The coronavirus

---

[4]  TRO-Ex. 2, *Coronavirus (COVID-19)*, Pennsylvania Department of Health, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Coronavirus.aspx  (last visited Mar. 24, 2020).

outbreak has resulted in unprecedented health measures to facilitate and enforce social distancing, including in Pennsylvania.  Amon Decl. ¶¶ 24-28.  It is highly likely that COVID-19 will reach the ICE Facilities.  *See* Amon Decl. ¶¶ 29-48. Sadly, COVID-19 may already be in the ICE Facilities; two Plaintiffs, Rodolfo Agustín Juarez Juarez and Bharatkumar G. Thakker, have exhibited symptoms consistent with COVID-19, but as of yesterday, neither of them had been tested or quarantined.  Amon Decl. ¶¶ 12, 15; Ex. 8, Declaration of Rodolfo Agustín Juarez Juarez ¶¶ 6, 11 [hereafter "Juarez Decl."]; Ex. 3, Declaration of Bharatkumar G. Thakker at ¶18 [hereafter "Thakker Decl."]

Vulnerable people who live in institutional settings (such as immigration detention centers) are at grave risk of severe illness and death if infected by COVID-19. *See* Amon Decl. ¶¶ 29-35, 42-50.  This is because the disease is transmitted mainly between people who are in close contact with one another (within about 6 feet) via respiratory droplets produced when an infected person coughs or sneezes. *Id.* at ¶¶23-24.  Immigration detention facilities are "congregate settings," or places where people live or sleep in close proximity. Infectious diseases that are communicated by air or touch are more likely to spread in these environments.  This presents "ideal incubation conditions" for the rapid spread of COVID-19 if and when it is introduced into a facility.  *See* Amon Decl. ¶¶ 28, 30.  Enclosed group environments, like cruise ships or nursing homes, have become the sites for the most

severe outbreaks of COVID-19.  Amon Decl. ¶¶ 28, 30.  The highest known person-to-person transmission rate for COVID-19 took place in a skilled nursing home facility in Kirkland, Washington, and on afflicted cruise ships in Japan and off the coast of California.  Golob Decl. ¶12.

The conditions of immigration detention facilities pose a heightened public health risk for the spread of COVID-19 that is even greater than in non-carceral institutions, like cruise ships and nursing homes.  Amon Decl. ¶ 29.  Immigration detention facilities have even greater risk of infectious spread because of crowding, the proportion of vulnerable people detained, security-related restrictions, and often scant medical care resources.  *Id*. at ¶ 30. People live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19.  *Id*.  They may be unable to maintain the recommended distance of six feet from others, and may share or touch objects used by others.  *Id*. at ¶¶ 23, 30-35, 47.  Toilets, sinks, and showers are shared, without disinfection between each use.  *Id*. at ¶ 30.  Food preparation and service is communal with little opportunity for surface disinfection.  *Id*.  Staff arrive and leave on a shift basis, and there is limited ability to adequately screen staff for new, asymptomatic infection.  *Id*.  Many immigration detention facilities lack adequate medical infrastructure to address the spread of infectious disease and treatment of people most vulnerable to illness in detention.  *Id*.

Declarations from Plaintiffs and lawyers familiar with the ICE Facilities attest to severely overcrowded living conditions where recommended social distancing is impossible.  For example, immigrants at York are generally housed in dormitory style blocks, with a capacity of about 60 people per block, where the space is roughly divided in half between communal living space and sleeping bunks. Ex. 18, Declaration of Andrew Baranoski ¶ 8 [hereafter "Baranoski Decl."].  Detainees eat meals, congregate, make phone calls and watch television in the open communal space.  *Id.*  The population at York has ranged from about 400 to nearly 800 over the last year.  *Id.* at ¶ 6.  Detainees at York also face crowded, close conditions, where they are divided into pods and packed "60 people to a pod."  Ruiz Decl. 7; *see also* Amon Decl. 32.  Similarly at Clinton, inmate bunks are often not more than two feet apart, literally less than an arm's-length, with 72 people in a dormitory.  Ex. 10, Declaration of Henry Pratt ¶ 6 [hereafter "Pratt Decl."].  Likewise at Pike, 48 men reside in a housing block, with eight-by-ten or twelve foot cells shared by three people with a bunk bed, a single bed, sink, and shower also occupying the space. Thakker Decl. ¶ 11.  Inmates at Pike are usually within two feet of someone else, even in the common area where benches seat about 6 men each without extra space. *See id.* at ¶ 12; Ex. 13, Declaration of Agus Prajoga ¶ 8 [hereafter "Prajoga Decl."].

Delivery of meals and opportunities for necessary hygiene are also grossly deficient at the ICE Facilities.  The Clinton facility is reported to have bugs, rats,

mice, chronically broken laundry facilities, and only four sets of sinks/showers for 72 men.  Pratt Decl. ¶¶ 9-11.  Similarly, Pike inmates must buy their own soap, are not given hand sanitizer or even adequate instructions about preventing virus spread and are forced to share cleaning supplies with the entire block.  Thakkar Decl. ¶ 14; Prajoga Decl. ¶ 9.  At York, not even the medical staff wear gloves. Ex. 11, Declaration of Jean Herdy Christy Augustin ¶ 14 [hereafter "Augustin Decl."].  Correctional officers at York have been overheard saying that they actually "hope that we get corona, so we can get it over with."  Augustin Decl. ¶ 14.  At meal times, inmates at York are herded three times a day into the dining area, sitting at small tables of four people each, leaving maybe three feet of space between people.  *Id*. at ¶ 17.

While Defendants are likely to argue that they have adequate protocols in place to address the epidemic, in a March 15 guidance ICE acknowledged the risks of coronavirus infection and COVID-19 to those in civil detention.[5]  Apparently intended as a response to these acknowledged risks, the guidance is impractical and does not reflect the reality of the overcrowded conditions at the ICE Facilities.  Although the ICE guidance suggests that "Detainees who meet CDC criteria for

---

[5] *See* TRO-Ex. 3, *ICE Guidance on COVID-19* ("ICE Guidance"), U.S. Immigration & Customs Enforcement, *available at* www.ice.gov/covid19 [hereafter, "ICE COVID-19 Guidance"].

epidemiologic risk of exposure to COVID-19 are housed separately from the general population," the reality is that this practice is not being implemented.  Amon Decl. ¶¶ 45-48. Close quarters, lack of testing, and inability to enforce social distancing are an urgent problem.  *Id*.

Similarly, although the ICE guidance suggests it will "place detainees with fever and/or respiratory symptoms in a single medical housing room, or in a medical airborne infection isolation room specifically designed to contain biological agents, such as COVID-19," Plaintiff's medical expert, Dr. Amon, concluded that cohorting vulnerable detainees together ***increases*** the risk of coronavirus infection and COVID-19.  Amon Decl. ¶¶ 44–45.  Tellingly, the ICE guidance acknowledges that the options to safeguard vulnerable detainees "depend on available space."  *Id*. at ¶ 44.  The reality and horror unfolding at the three prisons shows that the ICE Facilities do not have that space, and therefore are incapable of protecting Plaintiffs and other detainees from the risks of COVID-19.

Given the shortage of COVID-19 testing in the United States, it is likely that detention facilities are unable to conduct aggressive, widespread testing to identify all positive cases of COVID-19.  *See id*. at ¶¶ 42-48.  For this reason, a lack of proven cases of COVID-19 in context where testing is unavailable is functionally meaningless to determine whether there is a risk of COVID-19 transmission in an

institution.  Golob Decl. ¶ 7.  Even so, the risk is already present: an ICE detainee in Bergen County Jail tested positive for COVID-19.[6]

## IV.    Continued ICE Detention is Unsafe for Those Vulnerable to COVID-19.

Release from detention is the ***only*** option to protect vulnerable adults from COVID-19 because of the above-described conditions at the ICE Facilities.  That fact has been recognized by public health experts and prison administrators alike. Dr. Amon has concluded that "the release of individuals who can be considered at high-risk of severe disease if infected with COVID-19 is a key part of a risk mitigation strategy."  Amon Decl. ¶ 48. For that reason, Dr. Amon recommends the "release of high risk people from detention" as a priority and also consider releasing even those not identified as high risk because doing so will reduce the number of individuals in the facility, facilitating social distancing.  Amon Decl. ¶¶ 48-49.  In the event that vulnerable detainees have been exposed to COVID-19, Dr. Amon recommends testing where possible and the release of detainees to a quarantine setting outside of detention in coordination with local health authorities.  *Id.* at ¶ 50.

Other public officials have likewise called for the release of eligible individuals from detention.  The former Acting Director of ICE, John Sandweg, has

---

[6] TRO-Ex. 4, *ICE detainee tests positive for COVID-19 at Bergen County Jail*, U.S. Immigration & Customs Enforcement (Mar. 24, 2020), https://www.ice.gov/news/releases/ice-detainee-tests-positive-covid-19-bergen-county-jail.

stated that "ICE can, and must, reduce the risk [COVID-19] poses to so many people, and the most effective way to do so is to drastically reduce the number of people it is currently holding."[7]  TRO-Ex. 6, *See also* J. David McSwane, *ICE Has Repeatedly Failed to Contain Contagious Diseases, Our Analysis Shows. It's a Danger to the Public*, Pro Publica (Mar. 20, 2020), https://bit.ly/3bqm2VT.

For this reason, courts around the country have ordered the release of people from detention and prison because of COVID-19.  *See, e.g.*, *Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) ("[I]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers, the court sua sponte orders that Petitioner be immediately released from detention and that removal of Petitioner be stayed pending final disposition by this court.").  *See also Stephens*, 2020 WL 1295155, at *3 (explaining that "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent" and that "inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop"); *In re Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, at *1-3 (N.D. Cal. March 19, 2020) (ordering release on bond despite government assertions that

---

[7] *See* TRO-Ex. 5, John Sandweg, *I Used to Run ICE. We Need to Release the Nonviolent Detainees*, The Atlantic (Mar. 22, 2020), https://www.theatlantic.com/ideas/archive/2020/03/release-ice-detainees/608536/.

facility has preparedness plan in place and no cases have been confirmed); *Barkman*, 2020 U.S. Dist. LEXIS 45628, at *10-11 (modifying intermittent confinement as a condition of probation due to the COVID-19 pandemic); *United States v. Raihan*, No. 20-cr-68, Dkt. No. 20 at 10:12-19 (E.D.N.Y. Mar. 12, 2020) (deciding to continue a criminal defendant on pretrial release rather than remand to the Metropolitan Detention Center in part due to risk of COVID-19).

Some courts have started to take more sweeping action. The New Jersey Supreme Court has ordered the release of most county jail detainees. *See* TRO-Ex. 7, Order, Supreme Court of New Jersey, Docket No. 084230 (March 22, 2020), *available at* https://njcourts.gov/notices/2020/n200323a.pdf?c=4EF. Similarly, the Chief Justice of the Montana Supreme Court, in a March 20, 2020 letter, urged Montana judges to "review your jail rosters and release, without bond, as many prisoners as you are able, especially those being held for non-violent offenses." TRO-Ex. 8, Chief Justice Mike McGrath, Letter to Montana Courts of Limited Jurisdiction (Mar. 20, 2020), *available at* https://courts.mt.gov/Portals/189/virus/ Ltr%20to%20COLJ%20Judges%20re%20COVID-19%20032020.pdf?ver=2020-03-20-115517-333.

**V.   Plaintiffs Must Be Released from Custody Because They are Vulnerable to Serious Illness or Death If Infected by COVID-19**.

All Plaintiffs have underlying medical conditions or are of an age that increases their risk of serious illness or death if exposed to COVID-19. Amon Decl.

¶¶ 11-22.  They are detained at the ICE Facilities as they await adjudication of their civil immigration cases.

Petitioner-Plaintiff Bharatkumar G. Thakker is a 65-year-old male citizen of India who has been detained by ICE at Pike County Correctional Facility for 27 months.[8]  He suffers from several serious health conditions, including respiratory problems, declining kidney function, high blood pressure, high cholesterol, and a history of seizures.  During this detention, he has twice required hospitalization.  His age and serious health conditions place him at high risk of severe illness or death if he contracts COVID-19.  Two days ago, Mr. Thakker's cell mate, who sleeps three feet away, started coughing, had chills and felt achy.  As of March 23, Mr. Thakker also began coughing and feeling dizzy.  The prison has neither tested nor quarantined either man.  *See* Thakker Decl. ¶ 18.

Petitioner-Plaintiff Adebodun Adebomi Idowu is a 57-year-old man from Nigeria who is detained by ICE at Clinton County Correctional Facility.[9]  Mr. Idowu suffers from Type II diabetes, high blood pressure, and high cholesterol.  He receives medication for these conditions, including insulin and metformin, and has been hospitalized three times because the facility failed to provide him with insulin. As a

---

[8] This Court recently decided Mr. Thakker's petition for writ of habeas corpus.  *See Thakker v. Lowe*, 1:19-cv-00664 (M.D. Pa.).

[9] Mr. Idowu currently has a writ of habeas corpus pending before this Court.  *See Idowu v. Clinton Cty. Corr. Facility*, No. 1:20-cv-00146 (M.D. Pa.).

consequence of his age and health conditions, he is at a high risk of severe illness or death if he contracts COVID-19.   *See* Ex. 4 Declaration of Adebodun Adebomi Idowu ¶¶ 3-9 [hereafter "Idowu Decl."].

Petitioner-Plaintiff Courtney Stubbs is a 52-year-old male citizen of Jamaica who has been detained by ICE at Pike County Correctional Facility.   Mr. Stubbs receives treatment for multiple medical conditions.   He is a kidney-transplant patient who receives a regimen of medications, suffers from Type II diabetes, and has heart stents.   These serious maladies and his age place Mr. Stubbs at a high risk of severe illness or death if he contracts COVID-19.   *See* Ex. 5, Declaration of Courtney Stubbs  ¶¶ 3-4, 8-9 [hereafter "Stubbs Decl."]; Ex. 6, Declaration of Danielle Arizzi ¶¶ 3-4 [hereafter "Arizzi Decl."].

Petitioner-Plaintiff Meiling Lin is a 45-year-old female citizen of China who is detained by ICE at York County Prison.   Ms. Lin has chronic hepatitis B.   She also suffers from severe chronic pain, liver disease, and other medical complications as a result of her forced sterilization surgery in China.   As a consequence of her health conditions, she is at a high risk of severe illness or death if she contracts COVID-19. *See* Ex. 9, Declaration of Meiling Lin ¶¶ 4-5, 11 [hereafter "Lin Decl."].

Petitioner-Plaintiff Jean H.C. Augustin is a 34-year-old male citizen of Haiti who is detained by ICE at York County Prison.   He suffers from diabetes, high blood pressure, chronic anemia, and nerve issues.   He also was the victim of a gunshot

wound that caused permanent partial disability, and suffers myriad health issues stemming from the injury. During his detention he has required multiple hospitalizations. As a consequence of his health conditions, coupled with the fact that he is responsible for processing new detainees every day in admissions, he is at a high risk of severe illness or death if he contracts COVID-19. *See* Augustin Decl. ¶¶ 13, 15, 22.

Petitioner-Plaintiff Rodolfo Agustín Juarez Juarez is a 21-year-old male citizen of El Salvador who is detained by ICE at York County Prison. Mr. Juarez suffers from diabetes. He has had a fever, persistent cough, and trouble breathing for the past week. The facility has told him it cannot test him for COVID-19 because it does not have tests. Mr. Juarez is at a high risk of severe illness or death if he contracts or has contracted COVID-19 because of his serious health conditions. *See* Juarez Decl. ¶¶ 6-7, 10-11.

Petitioner-Plaintiff Catalino Domingo Gomez Lopez is a 51-year-old male citizen of Guatemalan who is detained by ICE at York County Prison. Since being detained in November 2018, Mr. Gomez Lopez has had the flu four times. Most recently, in February of 2020, he was so ill that he was coughing blood. He has not been tested for COVID-19. Mr. Gomez Lopez is at a high risk of severe illness or death if he contracts or has contracted COVID-19 because of his age and serious

health conditions.  *See* Ex. 15, Declaration of Catalino Domingo Gomez Lopez ¶¶ 4-5 [hereafter "Lopez Decl."].

Petitioner-Plaintiff Rigoberto Gomez Hernandez is a 52-year-old male Mexican national who is detained by ICE at Pike County Prison. Mr. Gomez Hernandez has multiple chronic health issues.  He is diabetic and currently receiving treatment for an ulcer.  As a consequence of his age and health conditions, Mr. Gomez Hernandez is at a high risk of severe illness or death if he contracts COVID-19.  *See* Ex. 7, Declaration of Rigoberto Gomez Hernandez ¶¶ 3-5 [hereafter "Hernandez Decl."].

Petitioner-Plaintiff Henry Pratt is a 50-year-old male citizen of Liberia. He is detained by ICE at Clinton County Correctional Facility.  Mr. Pratt suffers from Type II diabetes and high blood pressure, for which he receives medication.  Mr. Pratt is at a high risk of severe illness or death if he contracts or COVID-19 because of his age and serious health conditions.[10]  *See* Pratt Decl. ¶ 3.

Petitioner-Plaintiff Mayowa Abayomi Oyediran is a forty-year-old male citizen of Nigeria who is detained by ICE at York County Prison.  Mr. Oyediran has severe asthma and has an infection in his lungs.  Yet while in detention, he has not

---

[10] Mr. Pratt currently has a writ of habeas corpus pending before this Court, although the last docket entry is from June 10, 2019. *See Pratt v. Doll*, 3:19-cv-00342-RDM-CA (M.D. Pa.).

been given an inhaler or any other kind of treatment for his asthma. He has not been treated for the lung infection either. As a consequence of his age and health conditions, Mr. Oyediran is at a high risk of severe illness or death if he contracts COVID-19. *See* Oyediran Decl. ¶¶ 4-9.

Petitioner-Plaintiff Mansyur is a 41-year-old male citizen of Indonesia. He is detained by ICE at Pike County Prison.  Mr. Mansyur has diabetes, thyroid issues, and high blood pressure.  Mr. Mansyur is at high risk of severe illness or death if he contracts COVID-19 because of his serious health conditions.   *See* Ex. 14, Declaration of Mansyur ¶¶ 3-5 [hereafter "Mansyur Decl."].

Petitioner-Plaintiff Agus Prajoga is a 48-year-old male citizen of Indonesia who is detained by ICE at Pike County Prison.  Mr. Prajoga has diabetes, cholesterol, high blood pressure, and hepatitis B. As a consequence of his age and serious health conditions, Mr. Prajoga is at a high risk of severe illness or death if he contracts COVID-19. *See* Prajoga Decl. ¶¶ 3-5.

Petitioner-Plaintiff Dexter Anthony Hillocks is a 54-year-old male lawful permanent resident from Trinidad & Tobago. He is detained at Pike County Correctional Facility. Mr. Hillocks suffers serious health problems, including diabetes, high blood pressure, high cholesterol, and anemia. He also was recently diagnosed with leukemia.  Mr. Hillocks is at high risk of severe illness or death

because of his age and serious health conditions if he contracts COVID-19.  *See* Ex.

16, Declaration of Dexter Anthony Hillocks ¶¶ 5-7, 9 [hereafter "Hillocks Decl."].

## VI.  Defendants are Aware that Releasing Detainees is the only Viable Option to Protect Vulnerable Individuals from COVID-19.

In addition to the chorus of public health experts, the Defendants have been

explicitly informed by their own medical advisors of the dangers of continuing to

detain inmates in light of COVID-19.  As early as February 25, 2020, Dr. Scott Allen

and Dr. Josiah Rich, medical experts to the Department of Homeland Security,

shared concerns about the specific risk to immigrant detainees as a result of COVID-

19 with the agency.  These experts warned of the danger of rapid spread of COVID-

19 in immigration detention facilities.  In a whistleblower letter to Congress, Dr.

Allen and Dr. Rich recommended that "[m]inimally, DHS should consider releasing

all detainees in high risk medical groups such as older people and those with chronic

diseases."  They concluded that "acting immediately will save lives not of only those

detained, but also detention staff and their families, and the community-at-large."[11]

## VII.  ICE has Discretion to Release Inmates for Medical Reasons

ICE has a track record of releasing vulnerable detainees like Plaintiffs,

especially for medical reasons.  Ex. 17, Declaration of Andrew Lorenzen-Strait

---

[11] *See* TRO-Ex. 9, Scott A. Allen, MD, FACP and Josiah Rich, MD, MPH, Letter to House and Senate Committees on Homeland Security (Mar. 19, 2020), *available at* https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-Congress.pdf.

[hereafter "Lorenzen-Strait Decl."], ¶¶ 4–5.  Under ICE policies, individuals who did not yet have a serious physical illness but were vulnerable to medical harm were considered for release.  When deciding whether to release medically-vulnerable detainees from custody, ICE considered whether the detainees had any physical or mental condition that would make them more susceptible to medical harm while in ICE custody.  This could include individuals who were very old.  *See* Lorenzen-Strait Decl. ¶ 7.[12]

Nor is detention required for ICE to achieve its goals.  ICE has a range of highly effective tools at its disposal to ensure that individuals report for court hearings and other appointments, including conditions of supervision. For example, ICE's conditional supervision program, called ISAP (Intensive Supervision Appearance Program), relies on the use of electronic ankle monitors, biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting to supervise participants. A government-contracted evaluation of this program reported a 99% attendance rate at all immigration court hearings and a 95% attendance rate at final hearings.  *See* Lorenzen-Strait Decl. ¶ 15.

---

[12] Plaintiffs do not argue that they can force ICE to exercise discretionary authority to release them.  Rather, the point is that historically, ICE practice has been to release at-risk detainees.

## LEGAL STANDARD

On a motion for a preliminary injunction or temporary restraining order, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Cerro Fabricated Prod. LLC v. Solanick*, 300 F. Supp. 3d 632, 647 n.5 (M.D. Pa. 2018) ("The standard for granting a preliminary injunction under Rule 65 is the same as that for issuing a TRO."). A motion for a temporary restraining order requires the Court to "engage in a delicate balancing of all the elements, and attempt to minimize the probable harm to legally protected interests." *Miller v. Skumanick*, 605 F. Supp. 2d 634, 641 (M.D. Pa. 2009), *aff'd sub nom. Miller v. Mitchell*, 598 F.3d 139 (3d Cir. 2010). Courts have broad power to fashion equitable remedies to address constitutional violations in prisons, *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978), and "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata,* 563 U.S. 493, 511 (2011).

Immigrant detainees, even those with prior criminal convictions, are civil detainees entitled to the same Fifth and Fourteenth Amendment due process protections as any other pretrial detainee. *See Zadvydas v. Davis,* 533 U.S. 678, 690 (2001); *E. D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019). Due process rights

for civil detainees mean that they are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Aruanno v. Johnson*, 683 F. App'x 172, 175 (3d Cir. 2017) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)); *see also Bell v. Wolfish,* 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished."). As a result, conditions that would violate the Eighth Amendment are more than enough to also violate a civil detainee's due process rights. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (explaining that "the Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner'") (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

Courts "must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners [and] . . . may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown*, 563 U.S. at 511 (internal citations and quotations omitted).

## ARGUMENT

## I.    Plaintiffs Meet their Burden to Show the Need For A Temporary Restraining Order and Preliminary Injunction.

Because there is no vaccine or cure for COVID-19, the only way to protect the Plaintiffs' constitutional due process rights is to immediately release them from

detention so they can escape the onslaught of COVID-19 *before* it strikes.  Detention conditions that expose people to infectious disease are constitutionally intolerable even for convicted persons, let alone civil detainees entitled to due process protections.

Immediate injunctive relief is necessary because the danger here—vulnerable people with underlying health conditions condemned to prolonged illness and potentially death—is the quintessential irreparable harm.  There is also an overwhelming public interest in limiting the spread of COVID-19, both to minimize further infections and to reduce strain on overwhelmed health systems.  And, in light of the global COVID-19 pandemic, the balance of equities weighs heavily in favor of these older, vulnerable detainees, who must be released to self-isolate, and against Defendants' interest in indefinite confinement of Plaintiffs in life-threatening conditions.  The Court should order the Plaintiffs released from custody.

**A.    Plaintiffs Are Likely to Succeed on the Merits of Establishing a Constitutional Violation.**

**1.    Plaintiffs' Continued Detention at the ICE Facilities Violates Their Due Process Rights.**

Plaintiffs are likely to establish a violation of their constitutional Due Process rights through conditions of confinement that expose them to the serious risks associated with COVID-19.  "To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of

confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees.'" *Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). Put differently, to assess whether a condition constitutes impermissible punishment, "[w]e must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes." *Hubbard*, 538 F.3d at 232 (internal citations and quotation marks omitted). Conditions must be assessed in their totality. *Id.* at 233.

Here, Plaintiffs are detained in conditions without adequate CDC-mandated social distancing, dramatically increasing the likelihood they will contract COVID-19 and fall ill. Plaintiffs and declarants describe overcrowded conditions, including a minimum of fifty detainees sleeping in one dormitory or housing unit with bunk beds positioned so close that people sleep just arm's length apart. *See* Pratt Decl. ¶¶ 6-7; Augustin Decl. ¶ 16; Idowu Decl. ¶ 11; Juarez Decl. ¶ 13; Thacker Decl. ¶ 11; Stubbs Decl. ¶ 13; Ruiz Decl. ¶ 7. Meals are taken at packed tables placed close together, seated shoulder to shoulder, Idowu Decl. ¶ 12; Augustin Decl. ¶ 17, leading some detainees to eat in their beds, Pratt Decl. ¶ 8. York and Clinton have communal bathrooms with limited sinks and showers, which are not cleaned with frequency. Augustin Decl. ¶ 20; Lin Decl. ¶ 16.

Plaintiffs also are detained in unhygienic conditions.  Detainees at York and Pike have no access to hand sanitizer or disinfectants, Augustin Decl. ¶ 21; Prajog Decl. ¶ 9; Mansyur Decl. ¶ 10; Juarez Decl. ¶ 16, while detainees at Pike are forced to share a small daily soap ration among cellmates, Stubbs Decl. ¶ 16.  When detainees are forced to carry out cleaning duties, they are not given any protective gear, and thus "are being exposed to bodily fluids."  Ruiz Decl. ¶ 9; *see also* Idowu ¶ 13.  And, despite the looming threat of COVID-19, many medical staff and correctional officers do not wear gloves or masks in the facilities.  Augustin Decl. ¶ 14; Juarez Decl. ¶ 17; Idowu Decl. ¶ 14; Lopez Decl. ¶ 12.  This is just the tip of the iceberg of the unsanitary conditions Plaintiffs face on a daily basis.

Unquestionably, in the face of ample medical evidence that social distancing is the only way to avoid COVID-19, Amon Decl. ¶¶ 10, 23, 24, 30, 47, keeping at-risk Plaintiffs detained in such close proximity to one another and without the sanitation necessary to combat the spread of the virus serves *no* legitimate purpose. Nor is detention under these circumstances rationally related to the enforcement of immigration laws.[13]  *See Brown v. May*, No. 2:16-cv-01973, 2019 WL 5445923, at *3-4 (E.D. Pa. Oct. 23, 2019) (exposing plaintiff to "limited space in the cells, blue

---

[13] ICE has a number of tools available—beyond physical detention—to meet its enforcement goals, as demonstrated by the enforcement measures already used when individuals with serious medical conditions are released from detention.  Lorenzen-Strait Decl. ¶¶ 14-15.  The situation presented by COVID-19 is no different.

boats [plastic sleeping shells] on the floor, uncovered toilets, and rodent and insect infestations" was "not rationally related to the interest in managing an overcrowded prison").

Courts in this Circuit have repeatedly found such "unsanitary, unsafe, or otherwise inadequate conditions" sufficient to state a Due Process claim. *Petty v. Nutter*, No. 15-3430, 2016 WL 7018538, at *2 (E.D. Pa. Nov. 30, 2016); *Grohs v. Lanigan*, No. 16-7083, 2019 WL 1500621, at *11 (D.N.J. Apr. 5, 2019) (allegations of exposure to "extreme heat combined with lack of potable water, as well as generally unsanitary conditions" sufficient to state a conditions-of-confinement claim under the Fourteenth Amendment).[14]   Under these circumstances, Plaintiffs' conditions of confinement violate Plaintiffs' due process rights.

---

[14] *See also Hargis v. Atlantic Cty. Justice Facility*, No. 10-1006, 2010 WL 1999303, at *10 (D.N.J. May 18, 2010) (cell conditions where plaintiff was frequently splashed with urine, feces, and toilet water while sleeping in a small cell with two inmates were sufficient to suggest a due process violation); *Wagner v. County of Montgomery*, No. 10-2513, 2014 WL 4384493, at *4 (E.D. Pa. Sept. 4, 2014) (sleeping in a quadruple bunk next to a toilet for just under a year, leading to physical altercations with cellmates, stated a plausible due process claim); *Inmates of Northumberland Cty. Prison v. Reish*, No. 08-cv-0345, 2009 WL 8670860, at *8 (M.D. Pa. Mar. 17, 2006) (triple-celling exacerbated conditions including "poor ventilation, extreme seasonal temperatures, regular vermin infestation, fire hazards, and access to physical and psychological medical care").

## 2. Defendants' Deliberate Indifference to Plaintiffs' Health and Safety Violates Even the Stricter Eighth Amendment Standards.

As noted above, civil detainees can establish a due process violation by demonstrating that the challenged conditions or conduct violate the Eighth Amendment's prohibition on cruel and unusual punishment.  Here, the Plaintiffs are likely to establish that Defendants violated Plaintiffs' constitutional rights by condemning them to living conditions that expose them to infectious disease with life-threatening potential complications, warranting a Court order requiring Plaintiffs' immediate release.

Plaintiffs' current conditions of confinement at the ICE facilities, with COVID-19 tearing through the United States and its places of detention, are unconstitutional.  The government has an affirmative duty to provide conditions of reasonable health and safety to the people it holds in its custody.  The government violates the Constitution when it "fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety" for those in custody. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989); *see also Union Cty. Jail Inmates v. Di Buono*, 713 F.2d 984, 999, 1008 (3d Cir. 1983) (explaining that conditions are cruel and unusual when they "deprive inmates of the minimal civilized measure of life's necessities," such as the "necessity" of "habitable

shelter," as measured under "contemporary standards of decency" (internal quotation marks omitted)).

To prevail on a claim that conditions of confinement violate the Eighth Amendment, a plaintiff must meet two requirements: (1) the deprivation alleged must objectively be "sufficiently serious," and (2) the "prison official must have a sufficiently culpable state of mind," such as deliberate indifference to the prisoner's health or safety. *See Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Leaving those in custody in the path of infectious disease violates the Eighth Amendment. The Supreme Court has recognized that the government violates the Eighth Amendment when it crowds prisoners into cells with others who have "infectious maladies," "even though the possible infection might not affect all of those exposed." *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (citing *Hutto v. Finney,* 437 U.S. 678, 682 (1978)). This Court has likewise recognized that a plaintiff states an Eighth Amendment claim when forced into living conditions where infectious disease is rampant. *See Stewart v. Kelchner*, No. 06-2463, 2007 WL 9718681, at *13 (M.D. Pa. May 11, 2007), *report and recommendation adopted*, 2007 WL 9718672 (M.D. Pa. June 1, 2007) (allowing conditions of confinement claim to proceed after the plaintiff was placed in a cell where he was exposed to and developed Methicillin-resistant Staphylococcus aureus (MRSA)).

Here, there is no question that the risk posed by COVID-19 is "serious" and that Defendants are being deliberately indifferent to that risk. The test for the "seriousness" of a medical need is flexible, and is satisfied either by expert medical testimony or when it is "so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Hinerman v. Karnes*, No. 14-0408, 2015 WL 268761, at *3 (M.D. Pa. Jan. 21, 2015). While a layperson would surely recognize the risks posed by COVID-19 under the circumstances, Plaintiffs have submitted expert evidence demonstrating the seriousness of the risk COVID-19 poses to Plaintiffs if they remain in the ICE Facilities. COVID-19 is highly contagious and can cause severe health problems and death, especially in vulnerable persons. *See supra* Factual Background, Part I. Moreover, there are already reported cases around the country of contagion inside of prisons and detention facilities. *See supra* Factual Background, Part III. The Plaintiffs in this case are at specific and heightened risk because of their age and underlying health conditions. *See supra* Factual Background, Part V.

Defendants are also aware of the serious risks that COVID-19 poses to detained populations. First, the Plaintiffs themselves have raised concerns at the ICE Facilities about the risks they face from COVID-19. Thakker Decl. ¶ 13; *see also* Pratt Decl. ¶¶ 12-15. Advocacy groups have also notified Defendants about the threat posed by COVID-19 in ICE detention centers. *See, e.g.*, Ex. 20, Witold

Walczak, Vanessa Stine, and Muneeba Talukder of the ACLU, March 13, 2020 Letter to Defendant Simona Flores-Lund.  ICE has also released guidance showing that it is aware of the spread of COVID-19, even if its procedures plainly fail to address the threat that it poses.  *See* Amon Decl. ¶¶ 43-46.

In addition to Defendants' actual knowledge of the risk, the Plaintiffs can establish that Defendants are aware of and deliberately indifferent to the risk of COVID-19 through circumstantial evidence that the risk is obvious.   The obviousness of the risk the Plaintiffs face, by itself, is enough to allow a factfinder to conclude that Defendants know of the risk.  *Phillips v. Superintendent Chester SCI*, 739 F. App'x 125, 129 n.7 (3d Cir. 2018) (citing *Farmer*, 511 U.S. at 842).  Put another way, deliberate indifference may be shown through circumstantial evidence. *Farmer*, 511 U.S. at 842 (explaining that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence").

Here, there is overwhelming evidence that Defendants are aware of this obvious risk.  Medical experts for the Department of Homeland Security have specifically identified the risk of COVID-19 spreading to ICE detention centers.[15]

---

[15] *See* TRO-Ex. 9, Scott A. Allen, MD, FACP and Josiah Rich, MD, MPH, Letter to House and Senate Committees on Homeland Security (Mar. 19, 2020), *available at*

An ICE detainee in Bergen County Jail has tested positive for COVID-19.[16]

Immigration courts in both New York and New Jersey were closed due to confirmed

cases.[17]   John Sandweg, a former acting director of ICE, has written publicly about

the need to release nonviolent detainees because ICE detention centers "are

extremely susceptible to outbreaks of infectious diseases" and "preventing the virus

from being introduced into these facilities is impossible."[18]   Prisons and jails around

the country are ***already*** releasing non-violent detainees because the risk of contagion

is overwhelming.[19]   Increasingly, the risk to detainees is obvious to Courts as well.

---

https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-Congress.pdf.

[16] TRO-Ex. 4, *ICE detainee tests positive for COVID-19 at Bergen County Jail*, U.S. Immigration & Customs Enforcement (Mar. 24, 2020), https://www.ice.gov/news/releases/ice-detainee-tests-positive-covid-19-bergen-county-jail.

[17] TRO-Ex. 10, Priscilla DeGregory, *Coronavirus shuts down some NYC and NJ immigration courts*, New York Post (Mar. 24, 2020), https://nypost.com/2020/03/24/coronavirus-shuts-down-some-nyc-and-nj-immigration-courts/.

[18] *See* TRO-Ex. 5, John Sandweg, *I Used to Run ICE. We Need to Release the Nonviolent Detainees*, The Atlantic (Mar. 22, 2020), https://www.theatlantic.com/ideas/archive/2020/03/release-ice-detainees/608536/.

[19] *See* TRO-Ex. 7, Order, Supreme Court of New Jersey, Docket No. 084230 (March 22, 2020) (ordering release of most county jail detainees), *available at* https://njcourts.gov/notices/2020/n200323a.pdf?c=4EF; *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (concluding that the "unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" constituted compelling circumstances to adjust a defendant's bail conditions and release him, even though there was "not yet a known outbreak among the jail and prison populations" when the order was issued).

*See, e.g., Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (Order); *Stephens*, 2020 WL 1295155; *Barkman*, 2020 U.S. Dist. LEXIS 45628; *Fellela*, 2020 U.S. Dist. LEXIS 49198; *In re Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109; *Raihan*, No. 20-cr-68, Dkt. No. 20.

In short, the evidence shows that COVID-19 poses a serious risk and that Defendants are aware of the risk both from direct notice and from circumstantial evidence that the risk is entirely obvious. Defendants' failure to release detainees from these intolerable conditions is deliberate indifference to that risk, in violation of the Plaintiffs' constitutional rights. *See Hinerman*, 2015 WL 268761, at *4 ("A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of harm and fails to take reasonable steps to avoid such harm.").

The evidence is overwhelming that the ***only*** way to abate the substantial risk of serious harm to Plaintiffs is immediate release from detention. Public health authorities agree that the only way to protect vulnerable individuals from COVID-19 is to practice "social distancing"—i.e., generally self-isolating and keeping a minimum distance from others— and improved hygiene practices that are utterly impossible in the ICE Facilities. *See* Amon. Decl. ¶¶ 23-24, 30, 32-34, 45. Against the mountain of evidence that social distancing is the only way to stem the tide of COVID-19, Defendants have failed to take the steps necessary to remove barriers

that prevent Plaintiffs from proactively engaging in social distancing, self-isolation, and appropriate hygiene.

The deliberate indifference of Defendants is therefore "manifest," for the refusal to protect Plaintiffs exposes them to "undue suffering or the threat of tangible residual injury." *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987) (internal quotation marks omitted); *Brigaerts v. Cardoza*, 952 F.2d 1399 (9th Cir. 1992) ("Repeated exposure to contagious diseases may violate the Eighth amendment if prison officials show deliberate indifference to serious medical needs.").

## B.   Infection With a Lethal Virus That Lacks Any Vaccine or Cure Constitutes Irreparable Harm.

Plaintiffs have moved for a temporary restraining order and preliminary injunction because the difference of even just a few days may be the difference between life and death.  Cases of COVID-19 have increased exponentially in a matter of weeks.  *See supra* Factual Background, Part I.  COVID-19 has already spread in detention facilities around the country.

Given the deadliness of the disease and the country's over-taxed medical system, there is a real possibility that absent immediate relief from the Court, Plaintiffs will be infected with COVID-19, and possibly die or suffer long-term health consequences as a result.  *See supra* Factual Background, Parts I, III. Plaintiffs are older adults or people with pre-existing medical conditions that

increase the likelihood of severe illness or death if they contract COVID-19.  *See supra* Factual Background, Part V.  Even for those infected who survive, there may be a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurologic damage, and the loss of respiratory capacity.  *See supra* Factual Background, Part I.

These life-and-death stakes are sufficient to establish a likelihood of irreparable harm in support of injunctive relief.  Even the failure to *test* for a disease has been sufficient to support a finding of irreparable harm.  *See Boone v. Brown*, No. 05-0750, 2005 WL 2006997, at *14 (D.N.J. Aug. 22, 2005) (allegation of refusal to provide adequate testing for highly contagious infectious disease sufficient to demonstrate irreparable harm); *Austin v. Pa. Dep't of Corr.*, No. 90-7497, 1992 WL 277511, at *7 (E.D. Pa. Sept. 29, 1992) (granting preliminary injunction for prison to develop testing and protocol for tuberculosis); *see also Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (correctional officers have an affirmative obligation to protect prisoners from infectious disease).

The risks here are even more extreme, and the ICE Facilities' ongoing failure to provide conditions of basic health and safety risks irreparable harm to the Plaintiffs.  *See Padilla v. U.S. Immigration & Customs Enforcement,* 387 F. Supp. 3d 1219, 1231 (W.D. Wash. 2019) (recognizing that "substandard physical conditions, [and] low standards of medical care" in immigration detention constitute

irreparable harm justifying injunctive relief).  The Constitution does not require that Plaintiffs may obtain a remedy only after they have been exposed to coronavirus, developed COVID-19, and suffered its grave consequences.  As the Supreme Court has explained, "a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

> ### C.  There is a Strong Public Interest in Minimizing the Spread of COVID-19 through Social Distancing and Hygiene Practices that are Impossible at the ICE Facilities.

"It is always in the public interest to prevent the violation of a party's constitutional rights."  *Buck v. Stankovic*, 485 F. Supp. 2d 576, 586-587 (M.D. Pa. 2007) (internal quotation marks and citation omitted).  In this case, however, the public interest in minimizing the spread of COVID-19 is overwhelming and nearly impossible to overstate.

First, the disease is highly contagious and has no vaccine or cure, meaning that each new infection may result in still more individuals becoming infected.  *See supra* Factual Background, Part I.  Healthcare professionals have accordingly—and nearly unanimously—agreed that the most critical actions that can be taken are preventive measures such as self-isolating, maintaining a distance of six feet from other persons, and frequent disinfection.  *See id.*  These measures are simply not possible in the conditions at the ICE Facilities, as detailed above.  Even with the

best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. Amon. Decl. ¶ 48. And because prisons and other detention facilities are among the largest employers in rural Pennsylvania counties, contagion within these facilities will almost certainly spread, via staff, to the surrounding communities.

Second, there is a strong public interest in minimizing the spread of COVID-19 to help address the overwhelmed state of the U.S. medical system. Recent estimates suggest that due to lack of available Intensive Care Unit beds, hospitals in York, Pike, and Clinton counties will be some of the most strained in all of Pennsylvania, with demand 26 times greater than the existing capacity in ICUs. *See supra* Factual Background, Part II.[20]  It is accordingly in the public interest to minimize the number of infections, or at the very least slow the spread of the virus to help allow the medical system time to treat current patients and expand its capacity. *See supra* Factual Background, Parts I-II.

Third, it is also in the public interest to release detainees with particular medical vulnerabilities. The release of people most vulnerable to COVID-19 reduces the overall health risk for detainees and facility staff alike at the ICE

---

[20] TRO-Ex. 11, Nathaniel Lash and Brett Sholtis, *Demand for ICU beds will greatly outstrip availability if coronavirus hits Pa. hard*, Bucks County Courier Times (Mar. 20, 2020), https://www.buckscountycouriertimes.com/news/20200320/demand-for-icu-beds-will-greatly-outstrip-availability-if-coronavirus-hits-pa-hard.

Facilities.  *See* Amon Decl. ¶ 49.  ICE has an interest in preventing any potential

spread of COVID-19 in its detention facilities, particularly because detainees face

great difficulty engaging in proper hygiene and social distancing in a detention

environment.  *See supra* Factual Background, Part III.  Immigration detention

facilities face greater risk of infectious spread because of crowding, the high

percentage of detained people vulnerable to serious illness in the event of COVID-

19 transmission, and limited availability of medical care.  Amon Decl. ¶¶ 29-35.

Public health officials have testified that the release of vulnerable individuals is key

to the risk mitigation strategy of any detention facility because it reduces the total

number of detainees, allows for greater social distancing, and prevents overloading

the work of detention staff.  *See supra* Factual Background, Part IV.  Plaintiffs'

release not only imposes minimal harm to the government, but also ***furthers*** ICE's

interests in maintaining a healthy and orderly environment at ICE Facilities.

### D.     The Balance of Equities Favors Releasing the Plaintiffs over Continued Detention In the Midst of this Public Health Crisis.

The balance of equities weighs heavily in favor of releasing the Plaintiffs—a

limited number of older civil detainees whose medical conditions place them at

heightened risk from COVID-19—from ICE custody.  Plaintiffs are not incarcerated

because they were convicted of or pleaded guilty to a crime.  They are civil detainees

awaiting their day in immigration court.  Most are not even subject to mandatory detention, but are merely being detained at ICE's discretion.

Defendants' countervailing interest in indefinitely detaining the Plaintiffs in dangerous conditions is weak at best.  To the contrary, ICE has in the past exercised its discretion to release vulnerable detainees like Plaintiffs, especially for medical reasons.  *See supra* Factual Background, Part VII.  That approach makes sense because ICE has many other methods to keep track of individuals other than keeping them in indefinite detention.  Lorenzen-Strait Decl. ¶ 15.  These methods are more than adequate to accomplish ICE's goals.[21]

## II. The Court Should Not Require Plaintiffs to Provide Security Prior to Issuing a Temporary Restraining Order.

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, Rule 65(c) invests the district court with discretion as to the amount of

---

[21] If anything, under the unusual circumstances of this pandemic, there are fewer concerns than normal about flight risk from releasing detainees.  *See In re Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, at *1 ("The Court's concern was that Toledo would flee the country, but international travel is hard now. Travel bans are in place, and even if Toledo got into another country, he would most likely be quarantined in God-knows-what conditions, which can't be all that tempting.").

security required and whether to waive the requirement altogether.  *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991).

In deciding whether to waive the security requirement in noncommercial cases, the Third Circuit considers the possible loss to the enjoined party, the hardship that a bond requirement would impose on the applicant, and the special nature of suits to enforce important federal rights or public interests.  *Id.*  District courts routinely exercise this discretion to require no security in cases brought by indigent and/or incarcerated people.  *See, e.g., S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 145 F. Supp. 446, 504 (D.N.J. 2001) (indigent and non-profit plaintiffs enforcing civil rights); *Simcox v. Delaware County*, No. 91-6874, 1992 WL 97896, at *6 (E.D. Pa. May 5, 1992).  This Court should do the same here.

## CONCLUSION

The country faces a public health crisis of epic proportions.  COVID-19 presents risks to all of us, and has forced us to come together as a country, put partisanship aside, and do what is right for the community and the public health.  We must allow and encourage everyone to engage in practices that flatten the curve— social distancing and vigorous hygiene.  This protects the most vulnerable among us and hopefully gives our overtaxed healthcare system the chance to treat those most gravely affected by COVID-19.  Plaintiffs are among the most vulnerable, sitting ducks who have no choice but to wait for this deadly virus to rip through the ICE

Facilities and leave havoc in its wake.  The only humanitarian and constitutional solution is to order the immediate release of these Plaintiffs so they can protect themselves to the greatest extent possible.  We plead with this Court to join the growing chorus of courts who have decided to act in an effort to save lives.  The time to act is now.  Plaintiffs' motion for a temporary restraining order and preliminary injunction should be granted.


Dated: March 25, 2020

/s/ Will W. Sachse
Will W. Sachse, Eq. (PA 84097)
Thomas J. Miller, Esq. (PA 316587)
Kelly Krellner, Esq. (PA 322080)*
Carla G. Graff, Esq. (PA 324532)*
**DECHERT, LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
T: 215-994-4000
E: will.sachse@dechert.com
E: thomas.miller@dechert.com
E: kelly.krellner@dechert.com
E: carla.graff@dechert.com


David Fathi (WA 24893)*
Eunice H. Cho (WA 53711)*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, NATIONAL PRISON
PROJECT
915 15th St. N.W., 7th Floor
Washington, DC  20005
T: 202-548-6616

Respectfully Submitted,

/s/ Witold J. Walczak
Witold J. Walczak (PA 62976)
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
247 Ft. Pitt Blvd., 2d Fl.
Pittsburgh, PA 15222
T:  412-681-7864
E:  vwalczak@aclupa.org

Vanessa L. Stine (PA 319569)
Muneeba S. Talukder (CA 326394)*
Erika Nyborg-Burch (NY 5485578)*
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
T:  215-592-1513
E:  vstine@aclupa.org
E:  mtalukder@aclupa.org
E:  enyborg-burch@aclupa.org

E: dfathi@aclu.org
E: echo@aclu.org

Michael Tan (NY 4654208)*
Omar C. Jadwat (NY 4118170) *
American Civil Liberties Union
Foundation, Immigrants' Rights
Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2600
E: mtan@aclu.org
E: ojadwat@aclu.org

*Petition for permission to file pro hac vice forthcoming*