**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BHARATKUMAR G. THAKKER, *et al.*, | : | 1:20-cv-480 |
| Petitioners-Plaintiffs, | : | |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| CLAIR DOLL, *in his official capacity as Warden of York County Prison, et al.*, | : | |
| Respondents-Defendants. | : | |

## MEMORANDUM AND ORDER

### March 31, 2020

Pending before the Court is the Motion for Temporary Restraining Order and/or Preliminary Injunction filed by Petitioners-Plaintiffs Bharatkumar G. Thakker, Abedodun Adebomi Idowu, Courtney Stubbs, Rigoberto Gomez Hernandez, Rodolfo Augustin Juarez Juarez, Meiling Lin, Henry Pratt, Jean HErdy Christy Augustin, Mayowa Abayomi Oyediran, Agus Prajoga, Mansyur, Catalino Domingo Gomez Lopez and Dexter Anthony Hillocks (collectively "Petitioners").[1] (Doc. 7). The Motion has been briefed by the parties. (Docs. 12; 35; 46). The Court has received an *amicus* brief from a group of public health officials and human

---

[1] Petitioners' counsel advised that Mayansur and Agus Prajoga were released from immigration detention on March 27, 2020. (Doc. 33).  Accordingly, their request for release from custody is moot.

rights experts, (Doc. 36), as well as a factual update and supplemental authority filed by Petitioners. (Docs. 33 and 34). Thus, this matter is ripe for our review.

For the reasons that follow, the temporary restraining order shall be granted and the Respondents shall be directed to immediately release Petitioners today on their own recognizance.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Petitioners are a diverse group of individuals from around the world who are being held in civil detention by Immigration and Customs Enforcement (ICE) at York County Prison, Clinton County Correctional Facility and Pike County Correctional Facility, ("the Facilities"), while they await final disposition of their immigration cases.

Each Petitioner suffers from chronic medical conditions and faces an imminent risk of death or serious injury if exposed to COVID-19. Thakker is 65 years old and suffers from high blood pressure and cholesterol and has kidney failure. Further, he is currently suffering from symptoms similar to those of COVID-19.  (Doc. 12, Ex. 3). Idowu, 57, had type II diabetes as well as high blood pressure and cholesterol. He is also currently sick. (Doc. 12, Ex. 4). Stubbs is 52 years old and is immunocompromised due to a kidney transplant he received 6 years ago. He has a heart stent and also suffers from type II diabetes and blood clots. (Doc. 12, Ex. 5). Hernandez, 52, suffers from diabetes, dental problems and

an ulcer. (Doc. 12, Ex. 7). Juarez, 21, suffers from diabetes and is currently sick with COVID-19 type symptoms, including trouble breathing. (Doc. 12, Ex. 8). Lin is 45 years old and suffers from chronic pain due to a forced sterilization, as well as chronic hepatitis B and liver disease. (Doc. 12, Ex. 9). Pratt, age 50, suffers from diabetes and high blood pressure. (Doc. 12, Ex. 10). Augustin, 34 years old, suffers from multiple conditions including diabetes, high blood pressure, nerve pain, limited mobility and pain from a prior bladder and intestine reconstruction, anemia, PTSD and depression. (Doc. 12, Ex. 11). Oyediran is a 40-year-old asthmatic suffering from high blood pressure and cholesterol. (Doc. 12, Ex. 12). Lopez, age 51, has contracted the flu four times while in ICE custody since November of 2018 and is concerned that he is especially susceptible to contracting COVID-19. (Doc. 12, Ex. 15). Finally, Hillocks, age 54, has been diagnosed with leukemia. He also suffers from diabetes, anemia, high blood pressure and cholesterol. (Doc. 12, Ex. 16).

Several Petitioners have reported symptoms similar to those of COVID-19. None have been quarantined, isolated, or treated. (Doc. 12 Exs. 3; 4; 8).

Named as Respondents are: Clair Doll, Warden of York County Prison; Angela Hoover, Warden of Clinton County Correctional Facility; Craig A. Lowe, Warden of Pike County Correctional Facility; Simona Flores-Lund, Field Office Director, ICE Enforcement and Removal Operations; Matthew Albence, Acting

Director of ICE; and Chad Wolf, Acting Secretary of the Department of Homeland
Security.

## II.   DISCUSSION

In a matter of weeks, the novel coronavirus COVID-19 has rampaged across
the globe, altering the landscape of everyday American life in ways previously
unimaginable. Large portions of our economy have come to a standstill. Children
have been forced to attend school remotely. Workers deemed 'non-essential' to our
national infrastructure have been told to stay home. Indeed, we now live our lives
by terms we had never heard of a month ago—we are "social distancing" and
"flattening the curve" to combat a global pandemic[2] that has, as of the date of this
writing, infected 719,700 people worldwide and killed more than 33,673.[3] Each
day these statistics move exponentially higher. It is against this increasingly grim
backdrop that we now consider the Petitioners' claims for habeas relief.

---

[2]     The World Health Organization ("WHO") officially declared COVID-19 as global
pandemic on March 11, 2020. *See WHO Director-General's opening remarks at the media
briefing on COVID-19 - 11 March 2020*, WORLD HEALTH ORGANIZATION, (March 11, 2020),
https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-
briefing-on-covid-19---11-march-2020.

[3]     *See Coronavirus Disease (COVID-19) Pandemic*, WORLD HEALTH ORGANIZATION,
https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last accessed March 31,
2020).

### A. Threshold Questions: Standing and the Propriety of a Habeas Petition

Respondents raise two threshold challenges to the Petitioners' Motion.  First, Respondents contend that Petitioners lack standing because they have not alleged an injury in fact.  Next, Respondents submit that Petitioners cannot challenge their conditions of confinement through a habeas petition.  Taking the latter challenge first, we note that federal courts, including the Third Circuit, have condoned conditions of confinement challenges through habeas.  *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *see also Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *see also Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978).  Accordingly, we find that Petitioners have appropriately invoked this court's jurisdiction through a 28 U.S.C. § 2241 petition for writ of habeas corpus.

Respondents' standing challenge can also be easily resolved.  Respondents essentially contend that because the Petitioners themselves do not have COVID-19 and their likelihood of contracting the illness is speculative, Petitioners cannot establish that they would suffer a concrete, non-hypothetical injury absent a temporary restraining order.  However, as the Supreme Court observed in *Helling v. McKinney*, 509 U.S. 25, 33 (1993), "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  The COVID-19 pandemic is moving rapidly and expansively throughout Pennsylvania. Vast regions of the

Commonwealth are now under stay-at-home orders, and social distancing the norm to prevent the spread of this deadly virus. And yet, Respondents would have us offer no substantial relief to Petitioners until the pandemic erupts in our prisons. We reject this notion. Since "[a] remedy for unsafe conditions need not await a tragic event," it is evident that the Petitioners have standing in this matter. *Id.*

### B. Temporary Restraining Order

#### i. Legal Standard

Courts apply one standard when considering whether to issue interim injunctive relief, regardless of whether a petitioner requests a temporary restraining order ("TRO") or preliminary injunction. *See Ellakkany v. Common Pleas Court of Montgomery Cnty.*, 658 Fed.Appx. 25, 27 (3d Cir. July 27, 2016) (applying one standard to a motion for both a TRO and preliminary injunction). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Apple Inc. v. Samsung Electronics Co.*, 695 F.3d 1370, 1373–74 (Fed. Cir. 2012) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365 (2008)).

The Supreme Court has emphasized that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the

movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Apotex Inc. v. U.S. Food and Drug Admin.*, 508 F.Supp.2d 78, 82 (D.D.C. 2007) ("Because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly."). "Awarding preliminary relief, therefore, is only appropriate 'upon a clear showing that the plaintiff is entitled to such relief.'" *Groupe SEC USA, Inc. v. Euro–Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter*, 555 U.S. at 22).

### ii.  Irreparable Harm

To succeed on their Motion, Petitioners "must demonstrate. . .the probability of irreparable harm if relief is not granted." *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) (internal quotations omitted). "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial". . .the temporary restraining order. . ."must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). The moving party must demonstrate that it is likely to suffer "actual or imminent harm which cannot otherwise be compensated by money damages," or it "fail[s] to sustain its substantial burden of showing irreparable harm." *Frank's GMC*, 847 F.2d at 103. The mere risk of injury is insufficient. The moving party must establish that the harm is imminent and

probable. *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997). Additionally, "a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a clear showing of immediate irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992).

The Petitioners' claim is rooted in imminent, irreparable harm. Petitioners face the inexorable progression of a global pandemic creeping across our nation—a pandemic to which they are particularly vulnerable due to age and underlying medical conditions. At this point, it is not a matter of *if* COVID-19 will enter Pennsylvania prisons, but *when* it is finally detected therein. It is not unlikely that COVID-19 is already present in some county prisons—we have before us declarations that portions of the Facilities have been put under ineffective quarantines due to the presence of symptoms similar to COVID-19 among the inmate population.[4] Indeed, we also have reports that a correctional officer at Pike has already tested positive for COVID-19. (Doc. 33 at 1).

Public health officials now acknowledge that there is little that can be done to stop the spread of COVID-19 absent effective quarantines and social distancing procedures. But Petitioners are unable to keep socially distant while detained by

---

[4]     We also have allegations that prison guards have shown symptoms while interacting with inmates.

ICE and cannot keep the detention facilities sufficiently clean to combat the spread of the virus.  Based upon the nature of the virus, the allegations of current conditions in the prisons, and Petitioners' specific medical concerns, detailed below, we therefore find that Petitioners face a very real risk of serious, lasting illness or death. There can be no injury more irreparable.

### a.  Seriousness of the virus

COVID-19 is a type of highly contagious novel coronavirus that is thought to be "spreading easily and sustainably in the community." [5] Experts believe that it can live on some surfaces for up to 72 hours after contact with an infected person.[6] A simple sneeze or brush of the face without washing your hands is now known to easily spread the virus, which generally causes fever, cough, and shortness of breath. (*How Coronavirus Spreads*, CENTERS FOR DISEASE CONTROL; Doc. 12 at 15).

In most people, these symptoms are relatively mild. (Doc. 12 at 15). However, the effects of COVID-19 can be drastically more severe in older individuals or those with medical conditions. (Doc.10, Ex. 2). In some cases, COVID-19 can cause serious, potentially permanent, damage to lung tissue, and

---

[5]     *How Coronavirus Spreads*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last accessed March 31, 2020).
[6]     *New Coronavirus Stable for Hours on Surfaces*, NATIONAL INSTITUTE OF HEALTH (March 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces.

can require extensive use of a ventilator. (*Id.*). The virus can also place greater strain on the heart muscle and can cause damage to the immune system and kidneys. (*Id.*). These long-term consequences and the likelihood of fatality increase in those of advanced age and those with other medical conditions, like the Petitioners here. (*Id.*). For those in high-risk categories, the fatality rate is thought to be approximately fifteen percent. (*Id.*).

There is currently no vaccine for COVID-19, nor are there known, clinically-tested therapeutic treatments. (*Id.*). As a result, public health officials have touted the importance of maintaining physical separation of at least six feet between individuals, now commonly known as "social distancing." (*Id.*). Experts have also emphasized that proper hand hygiene with soap and water is vital to stop the spread. (*Id.*). Beyond these measures, health professionals can do little to combat this highly infectious disease. (*Id.*).

### b.  Prevalence of the virus

The United States now records more confirmed cases of COVID-19 than any other country in the world.[7] As of the date of this writing, there were in excess of

---

[7]     Nicole Chavez, Holly Yan, and Madeline Holcombe, *US has more Known Cases of Coronavirus than any Other Country*, CNN, https://www.cnn.com/2020/03/26/health/coronavirus-thousand-deaths-thursday/index.html (last accessed March 31, 2020).

164,458 cases of the virus in America, with 3,167 fatalities.[8] This represented an increase of 2,651 cases in only *twenty-four hours*. (*Id*).

Indeed, Pennsylvania currently reports 4,087 confirmed cases of COVID-19, with 48 fatalities.[9] Troublingly, that number represents nearly double the confirmed cases reported a mere four days ago—on March 27, 2020, Pennsylvania reported a total of 2,218 cases, with 22 deaths. *Id.* The three counties which house the Facilities are located in York County, Pike County, and Clinton County. They currently report a total of 93 cases: 54 in York County and 39 in Pike County.[10] Clinton County has not yet reported any confirmed cases of COVID-19. *Id.* As of March 27, 2020, the Governor of Pennsylvania placed both York County and Pike County under a stay-at-home order in an attempt to slow the spread of the virus.[11]

---

[8]     Niko Kommenda, Pablo Gutiérrez, and Juweek Adolphe, *Coronavirus Map of the US: Latest Cases State by State*, THE GUARDIAN, https://www.theguardian.com/world/ng-interactive/2020/mar/27/coronavirus-map-of-the-us-latest-cases-state-by-state (last accessed March 31, 2020).

[9]     *Coronavirus (COVID-19): Pennsylvania Overview,* PENNSYLVANIA DEPARTMENT OF HEALTH, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed March 31, 2020).

[10]     *Coronavirus (COVID-19): Pennsylvania Overview,* PENNSYLVANIA DEPARTMENT OF HEALTH, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed March 31, 2020).

[11]     *Governor Wolf and Health Secretary Expand 'Stay at Home' Order to Nine More Counties to Mitigate Spread of COVID-19, Counties Now Total 19*, WEBSITE OF THE GOVERNOR OF PENNSYLVANIA, https://www.governor.pa.gov/newsroom/governor-wolf-and-health-secretary-expand-stay-at-home-order-to-nine-more-counties-to-mitigate-spread-of-covid-19-counties-now-total-19/ (last accessed March 31, 2020).

Average Pennsylvanians in these counties can no longer leave their homes for anything but essential trips to gather supplies, medications, or to perform work essential to our national infrastructure—COVID-19 spreads so easily and rapidly that public health officials have determined that social isolation is necessary to keep our hospital systems from becoming overwhelmed. *Id*. The same rationale applies, perhaps even more so, to immigration detention facilities housing high-risk populations.

### c.  Unique nature of detention facilities

Various public health officials have warned that the nature of ICE detention facilities makes them uniquely vulnerable to the rapid spread of highly contagious diseases like COVID-19. COVID-19 is transmitted primarily through "close contact via respiratory droplets produced when an infected person coughs or sneezes." (Doc. 12 at 18; Doc. 12, Ex. 1). Immigration detention facilities are particularly at risk for such close contact because they are considered "congregate settings, or places where people live or sleep in close proximity." (Doc. 12, Ex. 1).  Such conditions provide "ideal incubation conditions" for COVID-19. (*Id.*).

Within the past few weeks, two medical experts for the Department of Homeland Security authored a letter to Congress warning of the unique dangers COVID-19 poses to ICE detention facilities. Specifically, they described the current ICE detention environment as a "tinderbox" in which:

> [a]s local hospital systems become overwhelmed by the patient flow from detention center outbreaks, precious health resources will be less available for people in the community. . .To be more explicit, a detention center with a rapid outbreak could result in multiple detainees — five, ten or more — being sent to the local community hospital where there may only be six or eight ventilators over a very short period. . .As [hospitals] fill up and overwhelm the ventilator resources, those ventilators are unavailable when the infection inevitably is carried by staff to the community and are also unavailable for all the usual critical illnesses (heart attacks, trauma, etc).[12]

The experts contrasted this scenario with a situation in which ICE detainees were released from "high risk congregate settings," allowing the "volume of patients sent to community hospitals to level out," which they believed would provide much more favorable outcomes, both for the detainees and the surrounding communities. *Id*. "At a minimum," these health experts urged, the government "should consider releasing all detainees in high risk medical groups such as older people and those with chronic diseases." *Id.* ICE detention facilities, they warned, are so poorly equipped to allow safe social distancing practices and are unlikely to have the ability to provide adequate medical care in the case of a COVID-19 outbreak. *Id.* The consequences, they maintain, could be disastrous. *Id.*

---

[12]     Catherine E. Shoichet, *Doctors warn of 'tinderbox scenario' if coronavirus spreads in ICE detention*, CNN, https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/ (last accessed March 28, 2020).

Indeed, we have before us declarations stating that such high-risk conditions are present in the detention facilities at issue in this case. Both Petitioners and lawyers familiar with the ICE facilities at issue here have attested to overcrowding that makes social distancing impossible at all three facilities. At the York facility, for example, inmates are housed in dormitory-style conditions, in which 60 people reside in each housing block. (Doc. 12, Ex. 18). That space is used for both eating and sleeping. (*Id.*). Petitioners report that not even the medical staff wear gloves when in contact with inmates. (Doc. 12, Ex. 11). Detainees must eat their meals four-to-a-table, with approximately three feet of space between individuals. (*Id.*).

At Clinton, inmate bunks are often less than two feet apart, and inmate declarations show that it is difficult to keep more than a two feet distance between inmates, let alone the recommended six feet. (Doc. 12, Ex. 10). The laundry facilities at Clinton are also reported to be chronically broken, preventing detainees from keeping their clothes and bedding clean. (*Id.*). Indeed, for a total of 72 men, Clinton provides only four sets of sinks and showers. (*Id.*). The Facility is also reported to have bugs mice, and rats, which add to the unsanitary conditions experienced by detainees. (*Id.*).

At Pike, detainees share eight-by-ten or twelve foot cells with two other men. (Doc. 12, Ex. 13). Those cells also contain a sink and a shower. (*Id*). Some men at Pike report being forced to share cells with other individuals currently exhibiting

COVID-19 symptoms or report exhibiting symptoms themselves while housed with other inmates. (Doc. 12, Exs. 3; 4; 8). Inmates at Pike are also usually forced to remain within two feet of other individuals, even while in the common areas of the facility. (Doc. 12, Ex. 4). They are also required to buy their own soap, are not given hand sanitizer, and are forced to share cleaning supplies with an entire block of cells. (Doc. 12, Exs. 3; 13).

ICE guidance states that these types of risks are mitigated by quarantining detainees with symptoms and by housing those with a higher risk of exposure separately from the rest of the detainee population. (Doc. 12, Ex. 1). The Respondents further proffer that the Facilities are practicing "cohorting," an "infection prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic." (Doc. 35 at 12). This practice is meant to last for fourteen days, the duration of the virus's incubation period. The Petitioner's declarations, however, show that these practices are not being followed. At least two Petitioners aver that they are experiencing symptoms and have not been isolated from other individuals. (Doc. 12, Exs. 3; 4; 8). Furthermore, all Petitioners have a higher risk of exposure, and none have been moved to separate housing. Indeed, it does not even seem that ICE is providing detainees with proper information on how they can combat the virus on their own. (Doc. 12, Ex. 3). Troublingly, some facilities seem to have shut off detainee access

to news outlets, thereby preventing the detention facility's population from

informing themselves on best practices to prevent transmission. (Doc. 12, Ex. 5).

### d. **Petitioners are at uniquely high risk for contracting COVID-19**

Not only are the Facilities themselves uniquely suited to rapidly spread

COVID-19, but also Petitioners themselves are members of high-risk groups that are

likely to feel the effects of the virus more keenly than the average individual.[13] Each

of the Petitioners before us has an underlying medical condition that heightens their

risk of serious COVID-19 effects, among them asthma, diabetes, heart conditions,

hepatitis, and immunocompromising conditions such as leukemia and organ

transplants.

### e. **The threat to high-risk individuals posed by COVID-19 constitutes irreparable injury**

Various courts across the nation have found that COVID-19, coupled with the

lack of hygiene and overcrowding present in detention facilities, will pose a greatly

heightened risk to inmates. *See Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir.

---

[13]   *People at Risk for Serious Illness from COVID-19*, CENTERS FOR DISEASE CONTROL AND PREVENTION, (Mar. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html ("Older people and people of all ages with severe underlying health conditions—like heart disease, lung disease and diabetes, for example—seem to be at higher risk of developing serious COVID-19 illness"); *Information for Healthcare Professionals: COVID-19 and Underlying Conditions*, CENTERS FOR DISEASE CONTROL AND PREVENTION, (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html (stating that "moderate to severe asthma," "heart disease," "obesity," and "diabetes" are conditions that trigger higher risk of severe illness from COVID-19).

Mar. 23, 2020) ("[I]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers, the court *sua sponte* orders that Petitioner be immediately released from detention and that removal of Petitioner be stayed pending final disposition by this court."); *United States v. Stephens*, No. 15 Cr. 95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("[I]nmates may be at a heightened risk of contracting COVID-19 should an outbreak develop."); *United States v. Garlock*, 18 Cr. 418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) ("By now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided. Several recent court rulings have explained the health risks—to inmates, guards, and the community at large—created by large prison populations. Notably, the chaos has already begun inside federal prisons—inmates and prison employees are starting to test positive for the virus, quarantines are being instituted, visits from outsiders have been suspended, and inmate movement is being restricted even more than usual." (citations omitted)).

Courts have also acknowledged the particular risks facing older inmates and those with underlying medical conditions. *See United States v. Martin*, No. 19 Cr. 140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) ("[T]he Due Process Clauses of the Fifth or Fourteenth Amendments, for federal and state pretrial

detainees, respectively, may well be implicated if defendants awaiting trial can demonstrate that they are being subjected to conditions of confinement that would subject them to exposure to serious (potentially fatal, if the detainee is elderly and with underlying medical complications) illness."). At least one court has ordered the release on bail of an inmate facing extradition on the basis of the risk the pandemic poses to his health. *Matter of Extradition of Toledo Manrique*, No. 19 MJ 71055, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) ("These are extraordinary times. The novel coronavirus that began in Wuhan, China, is now a pandemic. The nine counties in the San Francisco Bay Area have imposed shelter-in-place orders in an effort to slow the spread of the contagion. This Court has temporarily halted jury trials, even in criminal cases, and barred the public from courthouses. Against this background, Alejandro Toledo has moved for release, arguing that at 74 years old he is at risk of serious illness or death if he remains in custody. The Court is persuaded. The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail.").

Indeed, courts have even specifically held that COVID-19 constitutes an irreparable harm that supports the grant of a TRO. *See Vasif "Vincent" Basank, et al v. Decker*, 2020 WL 1481503 at *4-5 (S.D.N.Y. March 26, 2020) ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO"); *Castillo v.*

*Barr*, CV-20-00605-TJH (C.D. Cal. 2020) (granting a TRO to immigration detainees due to the COVID-19 pandemic); *see also Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (finding irreparable harm "premised ... upon [the district court's] finding that [Petitioner] was subject to risk of injury, infection, and humiliation"); *Mayer v. Wing*, 922 F. Supp. 902, 909 (S.D.N.Y. 1996) ("[T]he deprivation of life-sustaining medical services. . .certainly constitutes irreparable harm.").

The painful new reality is that we are constantly at risk of contracting a deadly virus and are experiencing previously unimagined safety measures to stop its spread. This virus spares no demographic or race and is ruthless in its assault. The precautions being adopted to stop it should apply equally, if not more so, to the most vulnerable among us. Petitioners have shown that adequate measures are not in place and cannot be taken to protect them from COVID-19 in the detention facilities, and that catastrophic results may ensue, both to Petitioners and to the communities surrounding the Facilities. We therefore find that the likely irreparable injury to Petitioners, as high-risk individuals, satisfies the first element of our TRO analysis.

### iii.  Likelihood of Success on the Merits

Petitioners argue that their continued incarceration in ICE detention facilities exposes them to serious risks associated with COVID-19 which violate their due

process rights. (Doc. 12 at 27). We find that Petitioners are likely to succeed on the merits of their claim.[14]

To bring a Fifth Amendment due process claim, Petitioners must show that their conditions of confinement "amount[ed] to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "To determine whether challenged conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees.'" *E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). In other words, we must ascertain whether the conditions serve a legitimate purpose and whether the conditions are rationally related to that legitimate purpose. *Hubbard* 538 F.3d at 232.

Considering the Facility conditions previously discussed, we can see no rational relationship between a legitimate government objective and keeping Petitioners detained in unsanitary, tightly-packed environments—doing so would

---

[14]   The Respondents argue that Petitioners do not have a legitimate due process claim because they have no "liberty or property interest" in a purely "discretionary grant of humanitarian parole." (Doc. 35 at 28). We disagree. "Unsanitary, unsafe, or otherwise inadequate conditions" are sufficient to state a Due Process Claim and we shall thus proceed with our analysis. *Petty v. Nutter*, No. 15-3430, 2016 WL 7018538, at *2 (E.D. Pa. Nov. 30, 2016); *Grohs v. Lanigan*, No. 16-7083, 2019 WL 1500621, at *11 (D.N.J. Apr. 5, 2019) ("extreme heat combined with lack of potable water, as well as generally unsanitary conditions" are sufficient to state a conditions-of-confinement claim).

constitute a punishment to Petitioners. Despite the Respondents' protests to the contrary, we need not find that the Facilities had the "express intent" to punish Petitioners with the conditions alleged. (Doc. 35 at 37). Instead we ask whether the conditions are rationally related to a legitimate government objective. *Hubbard* 538 F.3d at 232. Here, they are not.

The Respondents maintain that "preventing detained aliens from absconding and ensuring that they appear for removal proceedings is a legitimate governmental objective." (Doc. 35 at 38). They cite a great deal of authority supporting this point, and we do not disagree. (*Id.*). However, we cannot find that unsanitary conditions, which include overcrowding and a high risk of COVID-19 transmission, are rationally related to that legitimate government objective.

Social distancing and proper hygiene are the *only* effective means by which we can stop the spread of COVID-19. Petitioners have shown that, despite their best efforts, they cannot practice these effective preventative measures in the Facilities. Considering, therefore, the grave consequences that will result from an outbreak of COVID-19, particularly to the high-risk Petitioners in this case, we cannot countenance physical detention in such tightly-confined, unhygienic spaces.

The global COVID-19 pandemic and the ensuing public health crisis now faced by American society have forced us all to find new ways of operating that prevent virus transmission to the greatest extent possible. We expect no less of ICE.

We note that ICE has a plethora of means *other than* physical detention at their

disposal by which they may monitor civil detainees and ensure that they are present

at removal proceedings, including remote monitoring and routine check-ins.

Physical detention itself will place a burden on community healthcare systems and

will needlessly endanger Petitioners, prison employees, and the greater community.

We cannot see the rational basis of such a risk.[15]

 We therefore find that Petitioners are likely to succeed on the merits of their

due process claim that their conditions of confinement expose them "to serious risks

associated with COVID-19." (Doc. 12 at 35).

---

[15] Moreover, not only have Petitioners established a likelihood of success on the merits on
their Fifth Amendment claim, but, in fact, they have also demonstrated that their claim is likely
to be successful under the more exacting Eighth Amendment standards as well. To succeed in
proving that conditions of confinement violate the Eighth Amendment, a plaintiff must show: (1)
the deprivation alleged must objectively be "sufficiently serious," and (2) the "prison official
must have a sufficiently culpable state of mind," such as deliberate indifference to the prisoner's
health or safety. See Thomas v. Tice, 948 F.3d 133, 138 (3d Cir. 2020) (quoting Farmer v.
Brennan, 511 U.S. 825, 834 (1994)). COVID-19 has been shown to spread in the matter of a
single day and would well prove deadly for Petitioners. Such a risk is objectively "sufficiently
serious." Furthermore, the Supreme Court has recognized authorities can be "deliberately
indifferent to an inmate's current health problems" where they "ignore a condition of
confinement that is sure or very likely to cause serious illness and needless suffering the next
week or month or year," including "exposure of inmates to a serious, communicable disease,"
even when "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*,
509 U.S. 25, 33 (1993). There is no requirement that Petitioners show that "they actually
suffered from serious injuries" to succeed on this claim. *See Helling*, 509 U.S. at 33. Instead, if
Petitioners can show that the conditions "pose an unreasonable risk of serious damage to their
future health," they may succeed on their claim. *Helling*, 509 U.S.at 35) (alteration omitted). The
current measures undertaken by ICE, including "cohorting" detainees, are patently ineffective in
preventing the spread of COVID-19. Indeed, we now have reports of a positive test amongst the
employees at Pike County prison, thereby greatly increasing the likelihood that COVID-19 is
present in the prison population.

### iv.  Balancing of the Equities and Public Interest

The equities at issue and public interest weigh heavily in Petitioners' favor. First, and as described, Petitioners face irreparable harm to both their constitutional rights and their health. Second, we find that the potential harm to the Respondents is limited. While we understand and agree that preventing Petitioners from absconding and ensuring their presence at immigration proceedings is important, we note that Petitioners' failure to appear at future immigration proceedings would carry grave consequences of which Petitioners are surely aware. Further, it is our view that the risk of absconding is low, given the current restricted state of travel in the United States and the world during the COVID-19 pandemic.

Finally, the public interest favors Petitioners' release. As mentioned, Petitioners are being detained for civil violations of this country's immigration laws. Given the highly unusual and unique circumstances posed by the COVID-19 pandemic and ensuing crisis, "the continued detention of aging or ill civil detainees does not serve the public's interest." *Basank,* 2020 WL 1481503, *6; *see also Fraihat v. U.S. Imm. and Customs Enforcement*, 5:19 Civ. 1546, ECF No. 81-11 (C.D. Cal. Mar. 24, 2020) (opining that "the design and operation of detention settings promotes the spread of communicable diseases such as COVID-19"); *Castillo v. Barr*, CV-20-00605-TJH (C.D. Cal. 2020). Efforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest, and

23

the release of these fragile Petitioners from confinement is one step further in a positive direction.

## III.   CONCLUSION

In times such as these, we must acknowledge that the *status quo* of a mere few weeks ago no longer applies. Our world has been altered with lightning speed, and the results are both unprecedented and ghastly. We now face a global pandemic in which the actions of each individual can have a drastic impact on an entire community. The choices we now make must reflect this new reality.

Respondents' Facilities are plainly not equipped to protect Petitioners from a potentially fatal exposure to COVID-19. While this deficiency is neither intentional nor malicious, should we fail to afford relief to Petitioners we will be a party to an unconscionable and possibly barbaric result. Our Constitution and laws apply equally to the most vulnerable among us, particularly when matters of public health are at issue. This is true even for those who have lost a measure of their freedom. If we are to remain the civilized society we hold ourselves out to be, it would be heartless and inhumane not to recognize Petitioners' plight. And so we will act.

Based on the foregoing, we shall grant the requested temporary restraining order.  Respondents, and the York County Prison, Clinton County Correctional Facility and Pike County Correctional Facility shall be ordered to immediately

release the Petitioners **today** on their own recognizance without fail.

 **NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1. The Petitioners' Motion for Temporary Restraining Order, (Doc. 7), is **GRANTED**.

2. Respondents, and the York County Prison, Clinton County Correctional Facility and Pike County Correctional Facility **SHALL IMMEDIATELY RELEASE** the Petitioners **TODAY** on their own recognizance.

3. This TRO will expire on April 13, 2020 at 5:00 p.m.

4. No later than noon on April 7, 2020, the Respondents shall **SHOW CAUSE** why the TRO should not be converted into a preliminary injunction.

5. The Petitioners may file a response before the opening of business on April 10, 2020.


 <u>s/ John E. Jones III</u>
 John E. Jones III
 United States District Judge