**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

BHARATKUMAR G. THAKKER,           :        1:20-cv-480
ADEBODUN ADEBOMI IDOWU            :
COURTNEY STUBS                    :
RIGOBERTO GOMEZ-HERNANDEZ         :
RODOLFO AUGUSTIN JUAREZ-JUAREZ    :        Hon. John E. Jones III
HENRY PRATT                       :
JEAN H. C. AUGUSTIN               :
MAYOWA ABAYOMI OYERDIRAN          :
CATALINO DOMINGO GOMEZ-LOPEZ      :
DEXTER ANTHONY HILLOCKS           :
      Petitioners-Plaintiffs,    :
                                  :
      v.                         :
                                  :
CLAIR DOLL, *in his official capacity as*   :
*Warden of York County Prison, et al*.,     :
      Respondents-Defendants.    :

## MEMORANDUM AND ORDER

### April 27, 2020

Pending before the Court is the Motion for Preliminary Injunction filed by

Petitioners-Plaintiffs Bharatkumar G. Thakker, Abedodun Adebomi Idowu,

Courtney Stubbs, Rigoberto Gomez Hernandez, Rodolfo Augustin Juarez Juarez,

Meiling Lin, Henry Pratt, Jean Herdy Christy Augustin, Mayowa Abayomi

Oyediran, Agus Prajoga, Mansyur, Catalino Domingo Gomez Lopez and Dexter

Anthony Hillocks (collectively "Petitioners").[1] (Doc. 7). The Motion has been

briefed by the parties, (Docs.12 and 35), and the Court has received numerous

Notices of supplemental authority, as well as factual updates from the parties

(Docs. 54, 58, 59, 61, 75, 76, 80, 81, 85, and 87).[2] Thus, this matter is ripe for our

review.

 For the reasons that follow, the Petitioner's Motion for a Preliminary

Injunction shall be granted in part and denied in part.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[3]

 On March 31, 2020, we granted the Petitioner's Motion for Temporary

Restraining Order and ordered that they be immediately released from immigration

detention.  (Doc. 47).  Thereafter, on April 13, 2020, we extended the TRO for a

period of 14 days, thereby continuing the Petitioners' release, subject to certain

---

[1] Three of the Petitioners initially named in this action, Meiling Lin, Agus Prajoga, and Mansyur were released from detention prior to our grant of the TRO, thus this Motion is moot as to them.  Further, on April 17, 2020, Petitioners filed an Amended Complaint (Doc. 62) adding eleven (11) individual petitioners to this action as well as presenting putative class claims. Because the record before us only encompasses evidence concerning the initial Petitioners, our decision herein is appropriately cabined to the original ten (10) Petitioners released by our TRO dated March 31, 2020.

[2] As noted in our April 13, 2020 Order, the parties had previously agreed that this matter shall be decided on the record filings and thus a hearing was not necessary. The parties were given leave to supplement the record and did so.

[3] As the parties are aware, in our Memorandum and Order granting the TRO, we wrote extensively on the factual background underpinning this matter.  To be sure, there are portions of the instant Memorandum and Opinion that mirror our prior recitation of the record.  However, at the risk of repeating ourselves, we find it appropriate to write comprehensively on the Petitioners' request for preliminary injunctive relief, which has caused us to borrow portions of our prior decision.

conditions. (Doc. 60).  At this juncture, we must decide whether to convert the TRO into a preliminary injunction, which would permit the continued release of Petitioners.

Petitioners are a diverse group of individuals from around the world who are being held in civil detention by Immigration and Customs Enforcement (ICE) at York County Prison, ("YCP"), Clinton County Correctional Facility, ("CCCF"), and Pike County Correctional Facility ("PCCF"), (collectively, "the Facilities"), while they await final disposition of their immigration cases. Each Petitioner suffers from chronic medical conditions and faces an increased risk of death or serious injury if exposed to COVID-19.

Named as Respondents are: Clair Doll, Warden of York County Prison; Angela Hoover, Warden of Clinton County Correctional Facility; Craig A. Lowe, Warden of Pike County Correctional Facility; Simona Flores-Lund, Field Office Director, ICE Enforcement and Removal Operations; Matthew Albence, Acting Director of ICE; and Chad Wolf, Acting Secretary of the Department of Homeland Security.

## II.   DISCUSSION

Prior to our fulsome discussion on the Petitioners' request for preliminary injunctive relief, we must first address two initial matters raised by Respondents.

## A. Threshold Questions: Standing and the Propriety of a Habeas Petition

Respondents have raised two threshold challenges to the Petitioners' Motion.  First, Respondents submit that Petitioners cannot challenge their conditions of confinement through a habeas petition.  Next, Respondents contend that Petitioners lack standing because they have not alleged an injury in fact.  The Court has previously considered these arguments in our rendering on the TRO, but for the sake of completeness we shall summarize our determinations herein.

It is clear that federal courts, including the Third Circuit, have condoned conditions of confinement challenges through habeas.  *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *see also Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *see also Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978).  Moreover, in the past few weeks, several judges within this District have had occasion to consider this same question and have all concluded that a habeas remedy can address a conditions of confinement claim, particularly in the context of the COVID-19 pandemic.  *See Camacho Lopez v. Lowe*, No. 3:20-CV-563, 2020 WL 1689874, at*4-6 (M.D. Pa. Apr. 7, 2020); *Verma v. Doll*, No. 4:20-CV-14, 2020 WL 1814149, at *3-4 (M.D. Pa. Apr. 9, 2020); *Saillant v. Hoover*, No. 1:20-CV-00609, 2020 WL 1891854, at *3 (M.D. Pa. Apr. 16, 2020); *Engelund v. Doll,* No. 4:20-cv-00604 (Slip Op. at *30-31). Accordingly, we find that

Petitioners have appropriately invoked this court's jurisdiction through a 28 U.S.C. § 2241 petition for writ of habeas corpus.

Regarding standing, Respondents essentially contend that because the Petitioners themselves do not have COVID-19 and their likelihood of contracting the illness is speculative, Petitioners cannot establish that they would suffer a concrete, non-hypothetical injury absent a temporary restraining order. However, as the Supreme Court observed in *Helling v. McKinney*, 509 U.S. 25, 33 (1993), "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." The COVID-19 pandemic has spread throughout Pennsylvania, including inside its prisons and jails. Since "[a] remedy for unsafe conditions need not await a tragic event," it is evident that the Petitioners have standing in this matter. *Id.*

### B. Preliminary Injunction

#### i. Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Apple Inc. v. Samsung Electronics Co.*, 695

F.3d 1370, 1373–74 (Fed. Cir. 2012) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365 (2008)).

The Supreme Court has emphasized that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Apotex Inc. v. U.S. Food and Drug Admin.*, 508 F.Supp.2d 78, 82 (D.D.C. 2007) ("Because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly."). "Awarding preliminary relief, therefore, is only appropriate 'upon a clear showing that the plaintiff is entitled to such relief.'" *Groupe SEC USA, Inc. v. Euro–Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter*, 555 U.S. at 22).

### ii. Likelihood of Success on the Merits

Petitioners argue that their continued incarceration in ICE detention facilities exposes them to serious risks associated with COVID-19 which violate their due process rights. (Doc. 2 at 27). We find that there is a distinction in this respect between the Petitioners previously housed at YCP and CCCF and those at PCCF. We shall discuss accordingly.

To bring a Fifth Amendment due process claim, Petitioners must show that their conditions of confinement "amount[ed] to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "To determine whether challenged

conditions of confinement amount to punishment, this Court determines whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees.'" *E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). In other words, we must ascertain whether the conditions serve a legitimate purpose and whether the conditions are rationally related to that legitimate purpose. *Hubbard* 538 F.3d at 232.

The Supreme Court has held that ensuring a detainee's presence at hearings and "the effective management of the detention facility once the individual is confined" are legitimate governmental interests. *Bell*, 441 U.S. at 540. The Third Circuit has further stated that the Government has a "legitimate . . . interest[]in reducing the flight risk posed by prisoners facing removal." *Builes v. Warden Moshannon Valley Corr. Ctr.*, 712 F. App'x 132, 134 (3d Cir. 2017).

To determine whether these legitimate interests are reasonably related to the conditions imposed, the Supreme Court has specifically warned that "such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell*, 441

U.S. at 540 n.23. Under this standard, we recognize the legitimate government interests at play here: preventing Petitioners from absconding and protecting the public.[4]

We also note that these legitimate government interests are generally reasonably related to Petitioners' continued confinement. Resumed detention will ensure Petitioners' presence at deportation proceedings and potential removals and will protect the public from the aforementioned Petitioners with violent and concerning records.

We next consider whether the current conditions at the Facilities undercut this conclusion. Because the conditions at the Facilities are drastically different, we shall discuss each in turn. In so doing, we commend the Facilities for implementing the effective procedures that have largely alleviated our previous concerns. At the time of our writing nearly one month ago, it was reasonable to posit that it would only be a matter of time before COVID-19 decimated our prison populations. Thankfully, that feared outcome has generally not come to pass, largely due to the quick actions of Facility officials.

---

[4]     The vast majority of our Petitioners present little risk to the public. However, we note that some pose concerns. Petitioner Rigoberto Gomez-Hernandez has a violent conviction on his record for assaulting his wife in front of his children (Doc. 54 at 16). Petitioner Rodolfo Augustin Juarez-Juarez attempted to purchase a firearm by falsely indicating that he was a United States citizen. (*Id.* at 17). Petitioner H.C. Augustin was convicted for trafficking heroin while in possession of unlicensed firearms. (*Id.* at 18).

### a.  York County Prison

YCP has the capacity to house 2,245 inmates and historically operates near

capacity. (Doc. 54 at 13). However, there are currently only 1,376 inmates and

detainees housed at the facility. (Doc. 54 at 13). While it appears that detainees are

still housed in dormitory-like settings, such a reduction in inmate population makes

social distancing in this environment far more practicable at YCP. (Doc. 2, Ex. 18).

Furthermore, YCP now requires all staff working within CERT activation, medical

transport, mail processing, admissions, intake, and temperature monitoring to wear

N95 masks. [5] (Doc. 54 at 20). All medical staff and those working in cohorted

housing units are also required to wear N95 masks. (*Id*.). Detainees who work in

the kitchen must wear surgical masks, as do all kitchen staff. (*Id*.). Detainees on

isolation are required to wear N95 masks when they leave their housing units. (*Id.*

at 21). Any detainee that must be transported is also required to wear a surgical

mask. (*Id.*). Detainees are provided with a second mask to use while the

previously-used masks are laundered. (Doc. 80 at 13). This is a drastic

---

[5]     *N95 Respirators and Sugical Masks (Face Masks)*, UNITED STATES FOOD AND DRUG
ADMINISTRATION (April 5, 202), https://www.fda.gov/medical-devices/personal-protective-
equipment-infection-control/n95-respirators-and-surgical-masks-face-masks. ("An N95
respirator is a respiratory protective device designed to achieve a very close facial fit and very
efficient filtration of airborne particles. The 'N95' designation means that when subjected to
careful testing, the respirator blocks at least 95 percent of very small (0.3 micron) test particles.
If properly fitted, the filtration capabilities of N95 respirators exceed those of face masks").

improvement in the conditions before us at the TRO stage, at which point we had allegations that not even medical staff wore personal protective equipment when interacting with detainees. (Doc. 47 at 14).

YCP is now also screening all incoming inmates for COVID-19 symptoms and sequestering any incoming detainees who may potentially have the virus. (Doc. 80 at 10). Even those who are asymptomatic but have known exposure are quarantined for 14 days. (*Id*.). YCP has dedicated housing units for those who are suspected or confirmed COVID-19 positive patients. (*Id.*). YCP also now screens all staff and vendors who enter the facilities, including body temperature checks. (*Id*. at 11). Furthermore, YCP has increased its sanitation frequency, allaying our previous concerns on this front as well. (*Id*.). YCP also conducts roving daily temperature checks and screening for influenza-like symptoms to ensure early detection and quarantine of potential new cases. (*Id.* at 12). Facility staff also provide information on COVID-19 transmission and infection prevention. (*Id*.).

Indeed, these enhanced procedures are working. YCP reports only one case of COVID-19 as of the date of this writing, which was confirmed on March 30, 2020. (*Id*. at 14). The individual has been in quarantine since that time in a negative pressure isolation room under medical observation. (*Id*.). Given that more than two weeks has passed since the beginning of the individual's quarantine, we

can safely assume that YCP's protocols have effectively prevented the transmission of COVID-19.

Considering the drastic changes put into effect at YCP, and the evidence that they are able to effectively control transmission from COVID-positive inmates, we find that the improved conditions therein do not negate the Government's legitimate interest in detention. Thus, we find that the Petitioners previously housed at YCP are now unlikely to succeed on the merits of their claims.

### b.  Clinton County

CCCF has the capacity to house 298 inmates. (Doc. 54 at 14). As of the date of this writing, however, there are only 153 inmates housed therein. While it appears that detainees are still housed in dormitory-like settings, such a reduction in inmate population makes social distancing in this environment far more practicable at CCCF. (Doc. 2, Ex. 10). Furthermore, CCCF now requires that transport and intake officers be properly fitted for and wear N95 masks. (Doc. 54 at 20). Those staff members must also wear goggles or safety glasses. (*Id.*). All staff are required to wear masks when in the secure portion of the facility. (Doc. 80 at 15).

CCCF has also increased sanitation frequency and provides sanitation supplies to inmates and staff, thereby allaying our previous concerns on this front. (*Id.* at 14). CCCF now provides soap, water, and hard surface disinfectant in every housing unit at the prison. (*Id.*). The Facility has also added 20 hand sanitizer

stations throughout the facility, which may be utilized by both detainees and staff. (*Id*.). Transport vehicles are disinfected after each use. (*Id*.).

Additional cleaning of tables, chairs, door handles, telephones, desks, remotes, railings, tablets, and microwaves in detainee housing units are conducted multiple times per day. (*Id.*). The medical department is cleaned a minimum of twice per day. (*Id*.) The Law Library, receiving and discharge holding cells are cleaned and sanitized after each use. (*Id*. at 14-15). Staff are instructed to sanitize equipment such as desks, telephones, keyboards, mouse, radios, etc. at the beginning of each shift and at least once during shifts. (*Id*. at 15). All detainees have been provided with a minimum of 2 washable masks and are encouraged to utilize the masks at all times. (*Id.*).

These enhanced practices are working. CCCF reports *no* confirmed cases of COVID-19 as of the date of our writing. (*Id.*). Considering the drastic changes put into effect at CCCF, and the evidence that they are able to effectively control COVID-19 transmission, we find that the improved conditions therein do not negate the Government's legitimate interest in detention. Thus, we find that the Petitioners previously housed at CCCF are now unlikely to succeed on the merits of their claims.

### c.  Pike County

PCF has the capacity to house 375 detainees. (Doc. 54 at 14). As of the date

of this writing, PCF houses 250 inmates. (*Id*.). Such a reduction in inmate

population makes social distancing in this environment far more practicable at

PCCF. However, it appears that detainees *do* still share cells, as was the case at the

issuance of our TRO. (Doc. 47 at 14-15). The Government updates us that "all

detainees must maintain social distancing *when not housed within the same cell.*"

(Doc. 54 at 21, emphasis added). Thus, one of our primary concerns regarding

PCCF, the inability to social distance, has not been alleviated. We reiterate that

social distancing is one of the primary effective means to prevent COVID-19

transmission, and that doing so is impossible when detainees share a cell.

Nevertheless, we do not discount the changes PCCF has implemented since

our last writing. PCCF has instituted a modified lockdown schedule. (Doc. 54 at 21).

Detainees are permitted to leave their cells at staggered intervals to promote social

distancing. (*Id*.). Meals are now served within detainee cells. (*Id*.). All staff are

required to wear masks within the facility. (*Id*) ICE recently provided 500 masks to

the Facility for inmate use. (Doc. 80 at 13). Staff conduct daily body temperature

checks and screening for influenza-like symptoms. (Doc. 54 at 21). Once a detainee

displays symptoms, they *along with any cell mates*, are placed in quarantine. (*Id*.).

Staff has also increased the frequency of cleaning and disinfecting, including often-

touched surfaces. (*Id.*). PCCF also now screens any incoming staff and vendors for symptoms. (Doc. 80 at 11).

We commend PCCF on these updated procedures, but the data shows that they have been ineffective. Alarmingly, PCCF now reports 40 confirmed cases of COVID-19 amongst PCCF inmates and staff.[6] It appears 12 of those cases are currently quarantined. (*Id*). Two inmates have died. (*Id*).[7] These numbers show that there has been a sustained outbreak at PCCF, and that it has not yet been controlled. We find that detainees are still effectively unable to social distance within PCCF, and therefore find this Facility to be distinct from YCP and CCCF.

It is well established that social distancing and proper hygiene are the *only* effective means by which the spread of COVID-19 can be stopped. Petitioners at PCCF have shown that, despite their best efforts, they cannot practice these effective preventative measures. Indeed, a COVID-19 outbreak is currently underway therein as a result. Considering the grave consequences that will result from an outbreak of COVID-19, particularly to the high-risk Petitioners in this case, we cannot countenance physical detention in such tightly-confined, unhygienic spaces. Indeed,

---

[6]     *See Daily COVID-19 Status for M/PA Holding Facilities—4/24/20*. U.S. MARSHALS SERVICE AUTHORITY.

[7]     We believe that these are county inmates, not ICE detainees.

we cannot see the rational basis of such a risk and find that the legitimate

government interests of reinstated detention are thus negated.

We therefore find that PCCF Petitioners are likely to succeed on the merits of

their due process claim that their conditions of confinement expose them "to serious

risks associated with COVID-19." (Doc. 2 at 35). [8]

### iii.  Irreparable Harm

To succeed on their Motion, Petitioners "must demonstrate. . .the probability

of irreparable harm if relief is not granted." *Frank's GMC Truck Center, Inc. v.*

*General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) (internal quotations

---

[8]     We note that Petitioners have also alleged a claim under the more exacting standard of
the Eighth Amendment. To succeed in proving that conditions of confinement violate the Eighth
Amendment, a plaintiff must show: (1) the deprivation alleged must objectively be "sufficiently
serious," and (2) the "prison official must have a sufficiently culpable state of mind," such as
deliberate indifference to the prisoner's health or safety. See *Thomas v. Tice*, 948 F.3d 133, 138
(3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). COVID-19 has been
shown to spread in the matter of a single day and would well prove deadly for Petitioners. Such a
risk is objectively "sufficiently serious." Turning, then, to the second element of such an Eighth
Amendment claim, "an inmate shows that prison officials acted with deliberate indifference to
the inmate's health or safety or conditions of confinement that violated the inmate's
constitutional rights." Thomas, 948 F.3d at 138 (quoting *Wilson v. Seiter*, 501 U.S. 294, 302-03
(1991)). The Third Circuit has "adopted a subjective knowledge standard to establish deliberate
indifference, requiring a showing that prison officials actually knew of and disregarded
constitutional violations." *Id.* Although COVID-19 presents a serious medical issue, as
detailed above, we believe that the Facilities have overhauled their procedures to prevent
COVID-19 transmission, as discussed. These enhanced measure show that the Facilities
recognize the serious threat COVID-19 poses, and have taken reasonable steps to protect
inmates. While those procedures have been ineffective at PCCF, the Eighth Amendment standard
is more exacting. We see no evidence that Respondents have "evidence[d] an absence of any
concern for the welfare of [their] charges." *Verma v. Doll*, No. 4:20-CV-14, 2020 WL 1814149,
at *3-4 (M.D. Pa. Apr. 9, 2020). We thus find that any claim brought under the Eighth
Amendment is unlikely to succeed.

omitted). "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial". . .the preliminary injunction. . ."must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). The moving party must demonstrate that it is likely to suffer "actual or imminent harm which cannot otherwise be compensated by money damages," or it "fail[s] to sustain its substantial burden of showing irreparable harm." *Frank's GMC*, 847 F.2d at 103. The mere risk of injury is insufficient. The moving party must establish that the harm is imminent and probable. *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997). Additionally, "a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a clear showing of immediate irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992).

When we first considered Petitioners' claims nearly one month ago, the impact of COVID-19 on central Pennsylvania was largely prognostic. While confirmed cases had been reported in Pennsylvania, the gravity of COVID-19's effects on our communities was yet to be seen. Indeed, given the grim reports on the then-current conditions in the Facilities, combined with the potentially devastating effects of the virus on Petitioners in particular, it was reasonable to

apprehend that COVID-19 was inexorably marching towards the Facilities, tsunami-like in its looming catastrophic impact.

This view was not unjustified. As of the date of this writing, COVID-19 has claimed 196,295 lives worldwide.[9] The United States now records more confirmed cases of COVID-19 than any other country in the world.[10] The most recently available statistics show that there were more than 965,767 cases of the virus in America, with 54,872 fatalities.[11] This represented an increase of 929 cases in only *twenty-four hours*. (*Id*).

Indeed, Pennsylvania currently reports 41,165 confirmed cases of COVID-19, with 1,550 fatalities.[12] The three counties which house the Facilities are located in York County, Pike County, and Clinton County. They currently report a total of

---

[9]      *Coronavirus Disease (COVID-19) Outbreak Situation,* WORLD HEALTH ORGANIZATION, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last accessed April 27, 2020).

[10]      Nicole Chavez, Holly Yan, and Madeline Holcombe, *US has more Known Cases of Coronavirus than any Other Country*, CNN, https://www.cnn.com/2020/03/26/health/coronavirus-thousand-deaths-thursday/index.html (last accessed April 27, 2020).

[11]      Niko Kommenda, Pablo Gutiérrez, and Juweek Adolphe, *Coronavirus Map of the US: Latest Cases State by State*, THE GUARDIAN, https://www.theguardian.com/world/ng-interactive/2020/mar/27/coronavirus-map-of-the-us-latest-cases-state-by-state (last accessed April 27, 2020).

[12]      *Coronavirus (COVID-19): Pennsylvania Overview,* PENNSYLVANIA DEPARTMENT OF HEALTH, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed April 27, 2020).

963 cases: 593 cases with 8 deaths in York County, 349 cases with 12 deaths in Pike County, and 21 cases in Clinton County. *Id.* All 67 Pennsylvania counties are currently under a stay-at-home order in an attempt to slow the spread of the virus.[13] All Pennsylvanians can no longer leave their homes for anything but essential trips to gather supplies, medications, or to perform work essential to our national infrastructure—COVID-19 spreads so easily and rapidly that public health officials have determined that social isolation is necessary to keep our hospital systems from becoming overwhelmed. *Id*.

Our concern was further supported by the nature of the virus itself. COVID-19 is a type of highly contagious novel coronavirus that is thought to be "spreading easily and sustainably in the community." [14] Experts believe that it can live on some surfaces for up to 72 hours after contact with an infected person.[15] A simple sneeze or brush of the face without washing your hands is now known to easily spread the virus, which generally causes fever, cough, and shortness of breath. (*How Coronavirus Spreads*, CENTERS FOR DISEASE CONTROL; Doc. 12 at 15).

---

[13]    *Stay at Home Order*, WEBSITE OF THE GOVERNOR OF PENNSYLVANIA, https://www.pa.gov/guides/responding-to-covid-19/#StayatHomeOrder (last accessed April 27, 2020).

[14]    *How Coronavirus Spreads*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last accessed April 27, 2020).
[15]    *New Coronavirus Stable for Hours on Surfaces*, NATIONAL INSTITUTE OF HEALTH (April 27, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces.

In the last month, however, YCP and CCCF have quickly and effectively implemented the guidelines published by the CDC such that they have stymied any potential outbreak within their walls. *See supra* Part II.B.ii.a; Part II.B.ii.b. The fears which we reasonably harbored of a "tinderbox" scenario have largely failed to appear within those Facilities. This again is a credit to the staffs at those institutions. Indeed, and as aforestated, there are no reported cases at CCCF and the single reported case at YCP appears to have been effectively contained. Thus, we find that any allegations of irreparable harm at YCP and CCCF are largely speculative and cannot satisfy the second element of our Preliminary Injunction analysis. *See Engelund v. Doll,* No. 4:20-cv-00604 (Slip Op. at *32-33). Furthermore, we note that the medical services of these Facilities are not inundated with COVID-19 patients as was previously feared. Thus, we are confident that YCP and CCCF will be able to provide adequate medical case to Petitioners and other detainees should the need arise, thus also mitigating irreparable harm. *Id.*

The same cannot be said of PCCF. There, *forty* individuals have confirmed COVID-19 diagnoses.[16] Despite PCCF's best efforts at transmission control, the nature of the prison, including the need to house multiple inmates together in one cell, means that the harm faced therein by vulnerable Petitioners is not speculative.

---

[16]     *Daily COVID-19 Status for M/PA Holding Facilities—4/24/20.* U.S. MARSHALS SERVICE AUTHORITY.

We commend PCCF on their efforts to control the virus's spread, but the rate of transmission within has not been sufficiently limited. We thus find that the harm faced by Petitioners previously housed therein is "actual or imminent" and that their comorbidities would likely cause severe COVID-19 complications that could well jeopardize their lives. We therefore find that the likely irreparable injury to Petitioners at PCCF, as high-risk individuals, satisfies the second element of our TRO analysis.

### iv.  Balancing of the Equities and Public Interest

Because each Petitioner presents a unique set of circumstances that we must balance against the public interest, we shall consider Petitioners individually regarding this last factor. Before doing so, we recognize several considerations that apply equally to all Petitioners. First, we recognize that ICE had legitimate, enumerated reasons that underpinned each Petitioner's continued detention. It is not our present concern to question those reasons. Second, we understand and agree that preventing Petitioners from absconding and ensuring their presence at immigration proceedings is an important public interest, as is protecting the public from potential recidivism. However, we also note that Petitioners' failure to appear at future immigration proceedings, or to commit crimes while released, would carry grave consequences of which Petitioners are surely aware. Further, it is our view that the risk of absconding is generally low, given the current restricted state of travel in the

United States and the world during the COVID-19 pandemic.  Within this framework, we now balance the equities and public interest as they apply to each Petitioner.

*Bharatkumar G. Thakker*. Petitioner Thakker is a native and citizen of India who was admitted to the United States as a Lawful Permanent Resident on March 13, 1973. (Doc. 54 at 14). He is 65 years old. (Doc. 2, Ex. 3). Petitioner Thakker lived in this country for approximately 30 years without incident, until he received his first conviction for a theft-related offense in 2003. (*Id*). He has since been convicted an additional eight times, all for nonviolent theft-related offenses. (*Id*.). Petitioner avers these convictions are a result of kleptomania and that he has sought treatment for this condition. (Doc. 2, Ex. 3). Before his release, Petitioner Thakker was detained at PCCF for approximately 27 months. (*Id*.). Petitioner Thakker has high cholesterol and blood pressure, his kidneys are not fully functioning, and he has a heart stent. (*Id*). Considering Petitioner's age and health conditions, he is at an elevated risk of serious complications should he contract COVID-19. This fact, combined with the widespread outbreak currently underway at PCCF, heavily favors Petitioner's continued release. We must also consider the weighty public interest in preventing future crime and in enforcing this country's immigration laws. However, Petitioner's crimes are all nonviolent misdemeanors, and we see very little risk to the public good in his continued release. Petitioner is also aware of the consequences of

absconding and of recidivism, and we recognize the efforts his counsel has agreed to undertake to ensure his continued compliance with his conditions of release. We thus find that the balance of equities in Petitioner Thakker's case favors his continued release.

*Adebodun Adebomi Idowu*. Petitioner Idowu is a native of Nigeria. (Doc. 54 at 15). He is 57 years old. (Doc. 2, Ex. 4). He was a Lawful Permanent Resident of this country until he failed to establish that his marriage was entered into in good faith. (Doc. 54 at 15). Petitioner Idowu was subsequently convicted for Conspiracy to Launder Monetary Instruments and served 16 months imprisonment. (*Id.*). Petitioner Idowu was detained at CCCF for approximately 17 months before his release (Doc. 2, Ex. 4). He has Type-II diabetes and high cholesterol. (*Id.*). Considering Petitioner's age and health conditions, he is at an elevated risk of serious complications should he contract COVID-19. This fact heavily favors Petitioner's continued release. However, we must also consider the weighty public interest in ensuring Petitioner's presence at immigration proceedings and in enforcing this country's immigration laws more generally. We now balance these competing interests. Noting that CCCF has no documented cases of COVID-19, in conjunction with the greatly enhanced infectious disease prevention measures now in place therein, we find that the public's interest in reinstated detention outweighs the lessened risk COVID-19 will pose to Petitioner Idowu.

22

*Courtney Stubbs*. Petitioner Stubbs is a native of Jamaica. (Doc. 54 at 16). He is 52 years old. (Doc. 2, Ex. 5). He was convicted of Conspiracy to Possess with Intent to Distribute Marijuana and served 46 months imprisonment. (Doc. 54 at 16). That offense occurred approximately 14 years ago. (Doc. 2, Ex. 5). We have no record of any further criminal activity by Petitioner Stubbs since that offense. Despite this, Petitioner Stubbs was detained at PCCF for approximately 10 months before his release. (*Id.*). Petitioner Stubbs has Type II diabetes, is immunocompromised as a result of a kidney transplant, has blood clots, and has a heart stent. (*Id.*). Considering Petitioner's age and health conditions, he is at an elevated risk of serious complications should he contract COVID-19. This fact, combined with the widespread outbreak currently underway at PCCF, heavily favors Petitioner's continued release. We must also consider the weighty public interest in ensuring Petitioner's presence at immigration proceedings and in enforcing this country's immigration laws more generally. However, Petitioner's crime was nonviolent, and occurred approximately 14 years ago, since which he has been an apparently law-abiding citizen. We thus see very little risk to the public good in his continued release. Petitioner is also aware of the consequences of absconding and of recidivism, and we recognize the efforts his counsel has agreed to undertake to ensure his continued compliance with his conditions of release. Therefore, the balance of equities in Petitioner Stubbs's case favors his continued release.

*Rigoberto Gomez-Hernandez*. Petitioner Gomez-Hernandez is a native of Mexico. (Doc. 54 at 16). He is 52 years old. He has been convicted of DUI, Disorderly Conduct, and Simple Assault. (*Id*.). The assault conviction was the result of a domestic violence incident during which Petitioner assaulted his wife in front of his children. (*Id*.). Petitioner was detained at PCCF for approximately 7 months before his release. (Doc. 2, Ex. 7). Petitioner has diabetes and an ulcer. (*Id*.). Considering Petitioner's age and health conditions, he is at an elevated risk of serious complications should he contract COVID-19. This fact heavily favors Petitioner's continued release. However, we must also consider the weighty public interest in preventing future crime and in enforcing this country's immigration laws more generally. Here, Petitioner has been convicted of a violent crime: the assault of his wife. (Doc. 54 at 16). Conviction of a violent crime weighs heavily in favor of returning Petitioner to detention. Therefore, and despite the reported cases at PCCF, we find that the public interest in preventing violent assaults outweighs the lessened risk COVID-19 will pose to Petitioner Gomez-Hernandez due to the greatly enhanced infectious disease prevention measures now in place within PCCF.

*Rodolfo Augustin Juarez-Juarez*. Petitioner Juarez-Juarez is a native of El Salvador. (Doc. 54 at 17). He is 21 years old and has lived in this country since he was 16. (Doc. 2, Ex. 8). Petitioner was initially released on bond, but was subsequently placed on ARD for DUI. (Doc. 54 at 17). He also attempted to buy a

firearm, indicating that he was a United States Citizen. (*Id*). His bond was thus

revoked. (*Id*.). Before his release, he was detained in YCCP since February 26,

2020. (Doc. 2, Ex. 8). Petitioner Juarez-Juarez has diabetes and difficulty breathing.

(Doc. 2, Ex. 7).  Considering Petitioner's health conditions, he is at an elevated risk

of serious complications should he contract COVID-19. This fact heavily favors

Petitioner's continued release. However, we must also consider the weighty public

interest in preventing future crime and in enforcing this country's immigration laws

more generally. We now balance these competing interests. Noting that YCP has

only one documented case of COVID-19 from over two weeks ago, in conjunction

with the greatly enhanced infectious disease prevention measures now in place

therein, we find that the public's interest in reinstated detention outweighs the

lessened risk COVID-19 will pose to Petitioner Juarez-Juarez.

   ***Henry Pratt***. Petitioner Pratt is a native of Liberia. He is 50 years old. (Doc. 2,

Ex. 10). He has been convicted five times for various fraud-related offenses, all of

which were nonviolent crimes. (Doc. 54 at 17). Before his release, he was detained

at CCCF for approximately 3 years because he has been "uncooperative" in

obtaining necessary travel documents for his removal to Liberia.[17] Petitioner Pratt

has diabetes and high blood pressure. Considering Petitioner's age and health

---

[17]   We note that Petitioner avers he cannot obtain the documents ICE requests for his
removal because the appropriate records were destroyed in the Liberian Civil War. (Doc. 63, Ex.
48).

conditions, he is at an elevated risk of serious complications should he contract COVID-19. This fact heavily favors Petitioner's continued release. However, we must also consider the weighty public interest in preventing a detainee facing imminent removal from absconding and in enforcing this country's immigration laws more generally. We now balance these competing interests. Noting that CCCF has no documented cases of COVID-19, in conjunction with the greatly enhanced infectious disease prevention measures now in place therein, we find that the public's interest in reinstated detention outweighs the lessened risk COVID-19 will pose to Petitioner Pratt.

*Jean H.C. Augustin*. Petitioner Augustin is a native of Haiti. (Doc. 54 at 17). He is 34 years old. (Doc. 2, Ex. 11). Petitioner Augustin was convicted of heroin trafficking and unlicensed possession of firearms in 2017. (Doc. 54 at 18). Before his release, he was detained at YCCP since June 12, 2018. (Doc. 2, Ex. 11). Petitioner Augustin has diabetes and high blood pressure. (*Id*.). He also has limited mobility and chronic pain as a result of bullet fragments lodged close to his spine. (*Id*.). His hemoglobin levels are low and he is chronically anemic. (*Id*.). Considering Petitioner's health conditions, he is at an elevated risk of serious complications should he contract COVID-19. This fact heavily favors Petitioner's continued release. However, we must also consider the weighty public interest in preventing future crime and in enforcing this country's immigration laws more generally. We

now balance these competing interests. Noting that YCP has only one documented case of COVID-19 from over two weeks ago, in conjunction with the greatly enhanced infectious disease prevention measures now in place therein, we find that the public's interest in reinstated detention outweighs the lessened risk COVID-19 will pose to Petitioner Augustin.

    ***Mayowa Abayomi Oyerdiran***. Petition Oyerdiran is a native of Nigeria. He is 40 years old. (Doc. 2, Ex. 12). On September 7, 2013, he was refused entry into the United States because he presented a French Passport with an alias. (Doc. 54 at 18). Petitioner was detained at YCP before his release. (Doc. 2, Ex. 12). He has asthma that requires an inhaler. (*Id*.). Considering Petitioner's health conditions, he is at an elevated risk of serious complications should he contract COVID-19. This fact heavily favors Petitioner's continued release. However, we must also consider the weighty public interest in ensuring Petitioner's presence at immigration proceedings and in enforcing this country's immigration laws more generally. We now balance these competing interests. Noting that YCP has only one documented case of COVID-19 from over two weeks ago, in conjunction with the greatly enhanced infectious disease prevention measures now in place therein, we find that the public's interest in reinstated detention outweighs the lessened risk COVID-19 will pose to Petitioner Oyerdiran.

***Catalino Domingo Gomez-Lopez***. Petitioner Lopez is a native of Guatemala. (Doc. 54 at 18). He is 51 years old. (Doc. 2, Ex. 15). He attempted to enter this country fraudulently three times using aliases. (Doc. 54 at 18-19). He also has several DUIs and related convictions. (*Id.*). Before his release, he had been detained in YCP since November 2018. (Doc. 2, Ex. 15). Petitioner has chronic symptoms of influenza. (*Id.*). Considering Petitioner's age and health conditions, he is at an elevated risk of serious complications should he contract COVID-19. This fact heavily favors Petitioner's continued release. However, we must also consider the weighty public interest in ensuring Petitioner's presence at immigration proceedings and in enforcing this country's immigration laws more generally. We now balance these competing concerns. Noting that YCP has only one documented case of COVID-19 from over two weeks ago, in conjunction with the greatly enhanced infectious disease prevention measures now in place therein, we find that the public's interest in reinstated detention outweighs the lessened risk COVID-19 will pose to Petitioner Gomez-Lopez.

***Dexter Anthony Hillocks***. Petitioner Hillocks is a native of Trinidad and Tobago. (Doc 54 at 19). He is 54 years old. He has a 2015 conviction for criminal use of a communication facility involving heroin trafficking and a 2002 conviction for possession of marijuana. (*Id.*). Respondents admit that he was granted bond but failed to post the $18,000 that was required for his release. (*Id.*). Thus, the only

reason Petitioner Hillocks was still detained before our previous order was his lack

of funds. Before his release, Petitioner was detained at PCCF. (Doc. 2, Ex. 16).

Petitioner has diabetes, high blood pressure, and high cholesterol. (*Id.*). He also has

leukemia. (*Id.*). Considering Petitioner's age and health conditions, he is at an

elevated risk of serious complications should he contract COVID-19. This fact,

combined with the widespread outbreak currently underway at PCCF, heavily favors

Petitioner's continued release. We must also consider the weighty public interest in

in ensuring Petitioner's presence at immigration proceedings and in enforcing this

country's immigration laws more generally. However, Petitioner's crimes are all

nonviolent, and we see very little risk to the public good in his continued release.

Indeed, ICE appears to have seen little risk either, has Petitioner was granted bond.

Petitioner is also aware of the consequences of absconding and of recidivism, and

we recognize the efforts his counsel has agreed to undertake to ensure his continued

compliance with his conditions of release. We thus find that the balance of equities

in Petitioner Hillocks's case favors his continued release.

## III.   CONCLUSION

As we stated in our March 31, 2020 opinion, in times such as these, we

must acknowledge that the *status quo* of a mere few weeks ago no longer applies.

(Doc. 47 at 24). In granting the TRO, we appropriately erred on the side of great

caution given the facts as they then existed, and the clearly virulent nature of

COVID-19. But it is clear to the Court that in the nearly one month that has elapsed since we were first presented with this case, the Facilities have significantly and favorably altered their response to the COVID-19 pandemic. To be sure, CCCF remains free of any infections and YCP has limited its infection to one person, which we consider to be a significant success given the extremely contagious nature of the virus.  While PCCF has attempted to mitigate the risk within its walls, we still harbor significant concerns about the safety of that facility relative to certain of these compromised Petitioners as evinced by the number of infections that have occurred there, among staff and inmates alike. Petitioners Thakker, Stubbs, and Hillock would be at great risk should they be returned to PCCF.

Based on the foregoing, it is our considered decision to deny the preliminary injunction as to the Petitioners who were housed at CCCF and YCP, and we shall require that they voluntarily surrender themselves for detention at these institutions.  We shall further order that Petitioner Rigoberto Gomez-Hernandez voluntarily surrender himself to PCCF for continued detention.[18]  We shall grant continued release to Petitioners Thakker, Stubbs and Hillocks, subject

---

[18]     *See supra* Part II.B.iv, holding that, despite the elevated risk Petitioner Gomez-Hernandez faces from reinstated detention at PCCF, he poses a high level of risk to the public good due to his violent history. Thus, the public interest in his detention outweighs his lessened risk of contracting COVID-19.

to the conditions set forth hereinbelow.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1. The Petitioners' Motion for Preliminary Injunction (Doc. 7) is

   **GRANTED** in part and **DENIED** in part as follows:

   a. The Motion is **GRANTED** with respect to Petitioners Thakker,

   Stubbs and Hillocks.

   b. Petitioners Thakker, Stubbs and Hillocks shall remain released

   from custody until either (1) the Governor of the Commonwealth

   of Pennsylvania lifts the COVID-19 state of emergency or (2) the

   CDC lifts its guideline on social distancing; whichever comes

   first.  Should neither event occur within the intervening period,

   we shall conduct a telephonic status conference on July 6, 2020 at

   2:00 p.m.  Further instructions regarding the status call shall be

   given by future Order of Court.

   c.  Petitioners Thakker, Stubbs and Hillocks shall abide by all of the

   conditions of release previously set forth in our Order dated April

   13, 2020.  (Doc. 60).

   d. The Motion is **DENIED** with respect to Petitioners Idowu,

   Gomez-Hernandez, Juarez, Pratt, Augustin, Oyediran, and Lopez.

2. Petitioners Idowu, Gomez-Hernandez, Juarez, Pratt, Augustin,

Oyediran, and Lopez shall voluntarily surrender themselves to the institution from which they were released by 4:00 p.m. on April 28, 2020.

3. Upon their return to detention, Respondents shall individually quarantine Petitioners Idowu, Gomez-Hernandez, Juarez, Pratt, Augustin, Oyediran, and Lopez for a period of fourteen (14) days.

<u>s/ John E. Jones III</u>

John E. Jones III
United States District Judge