## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BHARATKUMAR G. THAKKER, *et al.,* | : | 1:20-cv-480 |
| Petitioners-Plaintiffs, | : | |
| | : | |
| | : | Hon. John E. Jones III |
| v. | : | |
| | : | |
| CLAIR DOLL, *in his official capacity as* | : | |
| *Warden of York County Prison, et al.,* | : | |
| Respondents-Defendants | : | |

## MEMORANDUM AND ORDER

### September 24, 2020

Presently pending before the Court is Petitioners' Motion for Class Certification and Appointment of Class Counsel, ("the Motion"). (Doc. 64). For the reasons that follow, we will deny the Motion.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The instant case arises from the COVID-19 pandemic currently affecting our nation. Petitioners, all ICE detainees, sought release from ICE detention facilities across central Pennsylvania as a means of avoiding potential infection. Their claims were based upon the allegedly poor conditions and infection control protocols at York County Prison, ("YCP"), Clinton County Correctional Facility, ("CCCF"), and Pike County Prison, ("PCCF"). In these facilities, the original Petitioners contended that they were all at high-risk for more severe complications

should they contract COVID-19 as a result of either advanced age or from comorbid conditions. (Doc. 1 at 2-3).

We note, however, that Petitioners' circumstances—both medical conditions and criminal records—differ in significant respects that must be considered in relation to their claims. Indeed, Petitioners suffer from myriad medical concerns, including, but not limited to diabetes, (Doc. 63-2 at ¶¶11-12), high blood pressure, (Doc. 63-8 at ¶¶ 4-5), H.I.V., (Doc. 63-10 at ¶ 5-6), PTSD, (Doc. 63-4 at ¶4-5), asthma, (Doc. 63-11), and chronic liver issues (Doc. 63-7 at ¶ 5-8). And, while some have committed nonviolent crimes, such as Thakker (theft), (Doc. 2-3), and Stubbs (conspiracy to distribute marijuana), (Doc. 2-5 at ¶ 5), others have been convicted of violent offenses, such as Gomez-Hernandez (domestic assault), (Doc. 54 at 16). Indeed, other Petitioners present no criminal history, such as Oyediran. (Doc. 54 at 18).  Furthermore, Petitioners are housed in three separate facilities, all of which utilize different testing procedures, cleaning methods, quarantine protocols, and mask requirements. *See supra* p. 13-20.

Nevertheless, we granted the Petitioners' Motion for Temporary Restraining Order and ordered that the individual Petitioners be immediately released from immigration detention on March 31, 2020. (Doc. 47). On April 13, 2020, we

extended the TRO for a period of 14 days, thereby continuing the Petitioners' release, subject to certain conditions. (Doc. 60).[1]

On April 17, 2020, Petitioners amended their Complaint to include new individual Petitioners and to add class allegations, to which they appended several new declarations and exhibits. (Doc. 62, 63). On the same day, Petitioners filed the instant Motion for Class Certification and Appointment of Class Counsel. (Doc. 64). Petitioners filed their brief in support on April 23, 2020. (Doc. 78). Respondents filed their brief in opposition on May 22, 2020, (Doc. 118), to which Petitioners replied on June 2, 2020. (Doc. 131).

On June 19, 2020, we convened a hearing to take the testimony of Dr. Joseph Amon, the expert witness proffered by Petitioners. (Doc. 156). On July 14, 2020, we convened a second hearing to take the testimony of Dr. Rebecca Lubelczyk, the Respondents' expert. (Doc. 190). On July 17, 2020, Petitioners re-called Dr. Amon as a rebuttal witness. (Doc. 197). At the conclusion of that proceeding, we directed the parties to file post-hearing submissions. (Doc. 198). Pursuant to our order, Petitioners filed their post-hearing submissions on July 29,

---

[1]    We are presently concerned solely with Petitioners' class claims and whether certification of that class is appropriate. For a more detailed recitation of the procedural history of Petitioners' individual claims, *see* Doc. 89.

2020. (Docs. 218, 220).[2] Respondents filed their post-hearing submissions on

August 7, 2020. (Docs. 232, 233).[3] We thus have before us an extensive record,

which we have thoroughly and fully considered. The matter is thus ripe for

review.[4]

---

[2]      Petitioners have filed copious supplemental submissions relating to the certification of the putative class, which have been fully considered by the Court in conjunction with their briefings. (Docs. 112, 125, 139, 149, 150 154, 180, 182, 196, 217, 219, 227, 242, 243).

[3]      Respondents have also supplemented the record on numerous occasions. We have fully considered all such filings along with their briefings. (Docs. 80, 81, 152, 174, 185, 191, 194, 208, 212, 231).

[4]      There is also a ripe Motion in Limine filed by Respondents, (Doc. 142), seeking the exclusion of unsworn declarations submitted by Petitioners describing the alleged conditions in the Facilities, their own medical conditions, and their current immigration statuses. They also ask us to exclude Dr. Joseph Amon's testimony, which is based on said declarations. We shall deny in part and dismiss without prejudice in part. First, we shall deny Respondents' Motion as it relates to Petitioners' declarations. As Respondents themselves note, it was impossible for Petitioners' counsel to meet with their clients in person to obtain signed declarations at the inception of this case. (Doc. 157 at 2). However, Respondents mistakenly believe that the logistical hurdles put in place by the pandemic have disappeared. To the contrary, there is currently a potential outbreak at YCP that could create a great barrier to in-person communication, as could visitor restrictions at all the Facilities. (Doc. 233 at ¶ 100). Respondents do not attack the credibility of Petitioners' declarations beyond arguing that their form does not conform to the indicia of reliability commonly required. These are not common times, however, and we will not hold Petitioners to unworkable standards in the face of a pandemic. Indeed, Respondents must not seriously believe the unsworn declarations are unreliable, as they have themselves cited them in their briefing. (Doc. 118 at 50). The Motion is thus denied with respect to Petitioners' declarations. Next, we have not relied upon any of Dr. Amon's opinions or testimony in deciding this class certification motion, but instead have cited the discovery materials produced by both parties in rendering our decision on the propriety of a class action in this case. Thus, to the extent Respondents' motion seeks to exclude Dr. Amon's testimony, we shall dismiss without prejudice. Respondents are free to raise these arguments again at a later date.

## II.    STANDARD OF REVIEW

A federal court may only certify a class for litigation if it determines, after a "rigorous analysis," that the party seeking class certification has met all of the prerequisites of Rule 23. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Beck v. Maximus*, 457 F.3d 291, 297 (3d Cir. 2006) ). "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *Hydrogen Peroxide*, 552 F.3d at 320. Thus, the "requirements set out in Rule 23 are not mere pleading rules," and the class certification inquiry "requires a thorough examination of the factual and legal allegations." *Id.* at 316; *Newton v. Merrill Lynch, Pierce, Fenner & Smith*, 259 F.3d 154, 166 (3d Cir. 2001). "An overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met." *Hydrogen Peroxide*, 552 F.3d at 316.

To obtain class certification under Rule 23, Plaintiff must satisfy both the conjunctive requirements of subpart (a) and one of the requirements of subpart (b). FED. R. CIV. P. 23; *In re Schering Plough Corp. ERISA Litigation*, 589 F.3d 585, 596 (3d Cir. 2009). The touchstones of subpart (a) are: "(1) numerosity (a

'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Amchem Prods.*, 521 U.S. at 613, 117 S.Ct. 2231. Petitioners here seek class certification pursuant to Rule 23(b)(2), which requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

## III.   DISCUSSION

At the outset, we note that "Plaintiffs' [must] show that [the elements of class certification] are capable of proof through evidence that is common to the class." *In re Actiq Sales & Mktg. Practices Litig.*, 307 F.R.D. 150, 163 (E.D. P, a. 2015). While there is certainly overlap between issues of class certification and the merits of the claims, we only consider disputes on the merits to the extent that they inform upon the certification determination. *Hydrogen Peroxide*, 552 F.3d at 316. Having laid the proper foundation, we now will consider each requirement of Rule 23 that Plaintiffs must satisfy to attain class certification.

### A. Numerosity

Rule 23 states that numerosity is satisfied when "the class is so numerous that joinder of all members is impracticable." FED R. CIV. P. 23(a)(1). Further, our Court of Appeals instructs that "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001).

Here, Respondents do not contest that the putative class would "most likely" meet the numerosity requirement should we certify one class to encompass all putative members. (Doc. 118 at fn. 12). Instead, they opine that there *may* be numerosity concerns if the Court devises subclasses. We need not consider every potential subclass that has the potential for certification, however. At this juncture, we are satisfied that the proposed class is "so numerous that joinder of all members is impracticable," regardless of any potential subclasses. (*Id.*); FED R. CIV. P. 23(a)(1).

As of August 7, 2020, YCP housed 63 detainees on the chronic care list for medical conditions listed by the CDC as having a "heightened risk" of complications from COVID-19.[5] (Doc. 233 at ¶ 80). CCCF housed 37 detainees on

---

[5]     We note that Petitioners' proposed class definition closely tracks the CDC's list of medical conditions that can cause a heightened risk of severe illness from COVID-19. *See People with Certain Medical Conditions,* CENTERS FOR DISEASE CONTROL AND PREVENTION,

that same list, while PCCF housed 12 such detainees. (*Id.* at ¶¶ 81-82). Noting that the Third Circuit has "relaxed" the numerosity requirement in cases seeking declaratory and injunctive relief, we find that these numbers are sufficient to satisfy the numerosity requirement.

Indeed, "with respect to (b)(2) actions, 'the numerosity requirement should not be rigorously applied when the requested relief is injunctive as the defendant will not be prejudiced if the action proceeds as a class action.'" *Death Row Prisoners of Pa. v. Ridge*, 169 F.R.D. 618, 621 (E.D. pa. 1996) (citing *Weiss v. York Hosp.*, 745 F.2d 786, 808 (3d. Cir. 1984). Thus, and no matter any potential subclasses that may be devised, the number of putative class members at play in this case supports class certification, particularly because Respondents will not be prejudiced as a result. Furthermore, as is the case here, "the fact that the membership and size of a class may vary over time [as detainees are transferred away from or introduced into the Facilities] enhances the desirability of using a plaintiff class." *T.B. v. Sch. Dist. of Philadelphia*, No. CIV. A. 97-5453, 1997 WL 786448, at *2 (E.D. Pa. Dec. 1, 1997). Consequently, we find that the numerosity

---

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed September 15, 2020).

requirement is here satisfied, though class certification is ultimately improper for the reasons discussed below.

### B. Commonality and Typicality[6]

#### 1. Commonality

"A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation marks omitted). The Third Circuit has found this requirement is "easily met" because a *single* issue of fact *or* law will suffice. *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). In fact, "class members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same

---

[6]     Rule 23 distinguishes between commonality and typicality, but the "analyses overlap, and therefore these concepts are often discussed together." *Hassine v. Jeffes*, 846 F.2d 169, 176 (3d Cir. 1988) (citing *Droughn v. F.M.C. Corp.,* 74 F.R.D. 639 (E.D.Pa.1977). Indeed, the Supreme Court has noted that:

> the commonality and typicality requirements of Rule 23(a) tend to merge ... [in that] [b]oth serve as guideposts for determining whether under particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*General Telephone Co. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982). Thus, despite the "conceptual distinction between these prerequisites ("commonality" like "numerosity" evaluates the sufficiency of the class itself, and "typicality" like "adequacy of representation" evaluates the sufficiency of the named plaintiff)," we address these issues simultaneously.

harm will suffice." *Id*. (citing *Hassine,* 846 F.2d at 177–78). "Moreover, because they do not also involve an individualized inquiry for the determination of damage awards, injunctive actions 'by their very nature often present common questions satisfying Rule 23(a)(2).'" *Kanter v. Casey,* 43 F.3d 48, 57 (3d Cir.1994) (quoting 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure Civil* § 1763, at 201 (2d ed.1986)).

Indeed, the Third Circuit has held that class actions in the prison context have been properly certified even when all inmates have not experienced harm. In *Hassine v. Jeffes*, the court reversed the district court's denial of certification, holding that plaintiffs' claims were sufficiently common when they asserted that they were *subject* to unconstitutional conditions of confinement, even if they had not been actually *harmed* by those conditions. *Hassine v. Jeffes*, 846 F.2d 169, 178 (3d Cir. 1988). *See also Hagan v. Rogers*, 570 F.3d 146, 158 (3d Cir. 2009) (holding that Petitioners' Eighth Amendment complaint was sufficiently common to warrant class certification even though some inmates had not yet suffered injury due to the spread of a communicable disease in the prison facility); *Dittimus-Bey v. Taylor*, 244 F.R.D. 284, 290 (D.N.J. 2007) ("Other courts have held that the 'commonality' requirement of Rule 23(a) is satisfied when inmates have a shared interest in enjoining objectionable conduct. . . [thus] the inmates have a common interest in reducing prison crowding").

Here, there is no common question of fact amongst Petitioners and the putative class. Petitioners are housed at different facilities and are subject to different infection control procedures. They allege a wide variety of medical conditions that give rise to vastly differing COVID-19 risk profiles. Nevertheless, Petitioners allege a "shared interest in enjoining objectionable conduct," which meets the threshold standard for showing commonality. *Dittimus-Bey v. Taylor*, 244 F.R.D. at 290.

Petitioners allege inferior infection control procedures at each of the Facilities which, they argue, constitute a violation of the Fifth, Eighth, and Fourteenth Amendments. (Doc. 102 at 38, 47). As a result, they maintain that they face harm in the form of serious COVID-19 complications. (Doc. 102 at 11). Petitioners do not need to demonstrate that every putative class member has been injured by the alleged conditions, nor that they have any more than a "shared interest" in enjoining the objected-to conduct. We thus find that the Petitioners here have met the "low bar" of commonality, though, as we will see, their certification must ultimately fail for lack of typicality and adequacy, as discussed below.[7]

---

[7]    Mindful of recent Third Circuit precedent, we recognize that the issue of commonality is likely a closer question in the COVID-19 context than it would be in a different incarceration-related case, such as prison overcrowding, that affects all putative class members in a relatively equal manner. The potential effects of COVID-19 are highly individualized. While some fall seriously ill, others show no symptoms whatsoever. The Third Circuit has thus urged that a generalized fear of COVID-19 will not support a claim for compassionate release. *United States*

## 2. Typicality

As previously noted, "[t]he typicality and commonality inquiries tend to overlap." *Dittimus-Bey v. Taylor*, 244 F.R.D. 284, 291 (D.N.J. 2007) "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(A)(3). This element ensures that "the class representatives are sufficiently similar to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to

---

*v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release"). Indeed, the Circuit has dictated that each *individual's* circumstances are crucial in resolving COVID-19-related §1983 claims. *Hope v. Warden York Cty. Prison*, No. 20-1784, 2020 WL 5001785, at *13 (3d Cir. Aug. 25, 2020) ("Yet a fundamental problem pervades the District Court's analysis: it treated Petitioners as a unit instead of as individuals with their own unique medical histories, medical risks, healthcare access needs, detention conditions, and release circumstances. It should have assessed all of these factors for each Petitioner."). Nevertheless, current Third Circuit precedent relating to certification in prison cases dictates such a "low bar" that we think commonality is likely present, though the highly individualized nature of COVID-19 will ultimately thwart class certification.

the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009).

Finding typicality present requires us to ensure that "the claims and defenses of the representative [are] sufficiently similar not just in terms of their legal form, but also in terms of their factual basis and support." *Id.* at 598.  *See, e.g., E. Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403–04, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). "Complete factual similarity is not required; just enough factual similarity so that maintaining the class action is reasonably economical and the interests of the other class members will be fairly and adequately protected in their absence." *Id.*  at 598 (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 182-85 (3d Cir.2001); *Hassine,* 846 F.2d at 176–77). We must also consider the extent to which proposed representatives "may face significant unique or atypical defenses to [their] claims." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d, at 598.

Here, we find that the class representatives are so factually unique from the putative class that typicality is not satisfied. While "complete factual similarity" is not necessary, we struggle to find meaningful factual similarities between the named representatives and the putative class such that "the named plaintiff[s'] claim[s] and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of*

*the Southwest v. Falcon,* 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

The Third Circuit has indicated that, in COVID-19 cases, we must consider two specific characteristics of each Petitioner: medical conditions[8] and criminal history.[9] These characteristics show that a class action would not be "reasonably economical" here:

***Different Medical Conditions.*** Petitioners suffer from myriad medical concerns, ranging from diabetes, (Doc. 63-2 at ¶¶11-12), high blood pressure, (Doc. 63-8 at ¶¶ 4-5), and H.I.V., (Doc. 63-10 at ¶ 5-6), to PTSD, (Doc. 63-4 at ¶4-5), asthma, (Doc. 63-11), and chronic liver issues (Doc. 63-7 at ¶ 5-8). This recitation merely presents a small snapshot of the many medical concerns faced by Petitioners, and does not account for the large number of detainees that suffer from more than one "high risk" condition, thus presenting even more nuanced risk profiles.

---

[8]       *See Hope v. Warden York Cty. Prison*, No. 20-1784, 2020 WL 5001785, at *10 (3d Cir. Aug. 25, 2020) (citing *Palakovic v. Wetzel*, 854 F.3d 209, 224 (3d Cir. 2017)) (recounting previous Third Circuit opinions in which a detainee's "particular vulnerability" must be considered in determining whether prison officials were deliberately indifferent to serious medical needs in violation of due process).

[9] *Hope v. Warden York Cty. Prison*, No. 20-1784, 2020 WL 5001785, at *9 (3d Cir. Aug. 25, 2020) (citing *Hubbard v. Taylor (Hubbard II)*, 538 F.3d 229, 232 (3d Cir. 2008). ("The touchstone for the constitutionality of detention is whether conditions of confinement are meant to punish or are 'but an incident of some other legitimate governmental purpose'. . .Petitioners' confinement implicates multiple legitimate governmental objectives, including: (1) ensuring Petitioners' appearances at removal proceedings; (2) protecting the public; and (3) managing the detention facilities").

***Different Criminal Histories.*** As aforestated, Petitioners' criminal records also vary widely. Some have committed nonviolent crimes, such as Thakker (theft), (Doc. 2-3), and Stubbs (conspiracy to distribute marijuana), (Doc. 2-5 at ¶ 5), while others have been convicted of more serious crimes, such as Gomez-Hernandez (domestic assault), (Doc. 54 at 16). Indeed, other Petitioners present no criminal history, such as Oyediran. (Doc. 54 at 18).

We are also required to consider the distinct conditions present at each Facility, [10] which present equally great impediments to a finding of typicality:

***Different Social Distancing Procedures.*** CCCF detainees live in large dormitories which are, at last count, at least 60% full. (Doc. 220 at ¶ 76 (citing Docs. 217-5; 217-9)); *see also* (Doc. 233 at ¶ 240 ("CCCF's population was 189, with no housing units at or near capacity") (citing Doc. 212 at 3)). Detainees in these cell blocks sleep less than six feet apart. (Doc. 220 at ¶ 77 (citing Doc. 185)); (Doc. 220 at ¶243). It appears that detainees also eat their meals in these cell blocks. (Doc. 220 at ¶ 79 (citing Doc. 182-6)). *Cf.* (Doc. 233 at ¶ 241 (citing 118-1 at ¶ 27(c)). Clinton detainees share both shower and toilet facilities with the rest of the men on their cell block. (Doc. 220 at ¶ 800); (Doc. 233 at ¶ 215).

---

[10]     *See Hope v. Warden York Cty. Prison*, No. 20-1784, 2020 WL 5001785, at *10 (3d Cir. Aug. 25, 2020) (finding that the Facilities' individual efforts to stop the spread of COVID-19 through social distancing efforts, cleaning protocols, testing procedures, and mask-wearing regulations were all "material to the District Court's assessment of the conditions challenged as punishment").

In contrast, detainees at PCCF are housed in smaller cells that can accommodate only two to three individuals. (Doc. 220 at ¶ 106); (Doc. 233 at ¶ 234). Respondents maintain that "where possible detainees are being housed in every other cell to create additional social distancing within the facility." (Doc. 233 at ¶ 234). Petitioners disagree, maintaining that several named Petitioners are being held in double cells. (Doc. 220 at ¶ 108). Pike detainees eat in their cells, whether or not they have cell mates. (Doc. 220 at ¶ 109); (Doc. 233 at ¶ 232). Detainees are permitted to leave their cells on a staggered basis to promote social distancing, and it appears that toilet facilities are housed within each cell. (Doc. 220 at ¶ 106); (Doc. 233 at ¶ 229).

At YCP, it appears that a widespread COVID-19 outbreak is currently underway. As such, over 150 individuals have been placed in quarantine or in segregated housing units. (Doc. 217-11). The remainder of detainees are held in larger dormitory-style housing units, though even within YCP there appears to be a great deal of variation in housing unit size. (Doc. 220 at ¶ 41("As of July 17, 2020, New North Block, with a capacity of 168, housed 140 individuals, and unit NNE, with a capacity of 16, had 14") (citing Doc. 217-33)). In each dormitory, bunks are spaced less than six feet apart. (Doc. 220 at ¶ 42); (Doc. 233 at ¶ 224). Detainees in YCP eat their meals in communal spaces that do not allow for six feet of distance from others. (Doc. 220 at ¶ 46). Detainees also share communal bathrooms. (Doc.

220 at ¶ 48). Detainees are required to wear masks when not eating, drinking, showering, or sleeping, though they are encouraged to wear them while sleeping. (Doc. 233 at ¶¶ 196; 198).

***Different Masking Requirements.*** While masks are provided at CCCF and their use is encouraged, it does not appear that mask use is required in any significant way. (Doc. 220 at ¶ 89-90) (noting that ICE provided a minimum of two washable masks to each detainee); (Doc. 233 at ¶ 214). At PCF, detainees are not required to wear their masks while in their cells, apparently even if they are housed in double cells. (Doc. 233 at 197). YCP has provided cloth masks to all detainees, which are regularly laundered. (Doc. 220 at ¶ 57); (Doc. 233 at ¶ 194-195).

***Different Testing and Screening Protocols.*** At CCCF, it appears that staff are only required to complete a COVID-19 questionnaire if they are currently exhibiting symptoms, though temperature checks are performed each time they enter the facility. (Doc. 220 at ¶ 94; Doc. 233 at ¶ 92). New detainees are subject to a "screening algorithm that incorporates testing as part of the intake process." (Doc. 233 at ¶ 284). *But see* (Doc. 220 at ¶ 99 (Clinton has performed only one intake test.")). CCCF detainees are subject to random temperature checks within the Facility, but it does not appear that widespread, routine testing is in place. (Doc. 220 at ¶ 98 (citing Doc. 217-30); (Doc. 233 at ¶ 286).

PCCF has "tested more individuals than the other two facilities," though routine testing of asymptomatic individuals has not yet taken place. (Doc. 220 at ¶ 117; Doc. 233 at ¶ 269). Antigen tests have been performed on any new inmates and on those previously quarantined. (Doc. 220 at ¶ 117; Doc. 233 at ¶ 270). Testing is now only performed on existing detainees if there is a "clinical concern." (Doc. 220 at ¶ 118 (citing Doc. 195)). PCCF staff are only subject to temperature checks if exhibiting symptoms (Doc. 220 at ¶ 120 (citing Doc. 217-29)).

YCP staff and vendors are subject to temperature checks and questionnaires but are not subject to mandatory testing protocols. (Doc. 220 at ¶ 62; Doc. 233 at ¶ 92). New detainees are also screened with temperature checks, a questionnaire, and antibody testing. (Doc. 233 at ¶ 91; 250; 255). There is conflicting evidence as to whether new detainees are also tested for COVID-19 as a matter of course. (Doc. 220 at ¶ 64; Doc. 233 at ¶ 249). Existing detainees themselves are only tested if there is a "clinical concern." (Doc. 220 at ¶ 67; Doc 233 at ¶ 253-254).

***Different Quarantine Rules.*** At CCCF, new detainees are quarantined together for fourteen days. (Doc. 220 at ¶ 100 (citing Doc. 217-31); Doc. 233 at ¶ 131). If any detainee develops symptoms during that time period, they are moved to isolation and "the 14-day clock starts again for the remaining detainees in the unit." (Doc. 233 at ¶ 133). *But see* (Doc. 220 at ¶ 100 ("symptomatic detainees are only placed

in a medical isolation room 'if available'—otherwise these symptomatic individuals remain in a cohort.")). While in quarantine, all detainees are subject to daily symptom and temperature checks. (Doc. 233 at ¶ 135).

PCCF, on the other hand, has negative air flow areas for isolation and quarantine purposes—including the intake area and the routine quarantine units. (Doc. 233 at ¶ 128). While Petitioners maintain that proper cohorting is not in place within the small cells at PCCF, Respondents state that detainees that are double bunked have gone through intake together and thus were already in close contact. (Doc. 220 at ¶ 119; Doc. 233 at ¶ 130).

YCP also has negative air flow areas for quarantine and isolation. (Doc. 233 at ¶¶ 141-142). New detainees are routinely quarantined, even if asymptomatic. (Doc. 233 at ¶ 124 (citing Doc. 174)). Isolated detainees are assessed twice daily (Doc. 233 at ¶144 (citing Doc. 152)).

***Different Cleaning Measures.*** Hygiene protocols are hotly debated in all three Facilities. Petitioners argue that all three facilities fall well-below the standards set by prison administrators for cleanliness and hygiene, including in number of cleanings per day, amount of cleaning supplies provided to inmates, and number of facilities available. (*See* Doc. 220 ¶¶ 53-56; 81-88; 111-115). Respondents, on the other hand, maintain that adequate amounts of supplies are provided at each Facility, though there is wide variation in the amounts and types, and frequency.

(Doc. 233 ¶¶ 154-165 (stating that at YCP common areas are cleaned between uses and that units are cleaned four times a day by the detainees themselves); ¶¶ 166-173 (noting that PCCF detainees can request extra supplies to clean their units up to two times a day); ¶¶ 174-187 (maintaining that CCCF has provided 20 hand sanitizer stations through the facility and that common areas are cleaned "multiple times per day").

To be sure, we have the discretion to certify subclasses to resolve the typicality issues before us. *In re Cendant Corp. Sec. Litig.,* 404 F.3d 173, 202 (3d Cir.2005). ("[a] district court hearing a class action has the discretion to divide the class into subclasses and certify each subclass separately"). However, the myriad factual distinctions in this case quickly leads us to conclude that such subclasses would be tenuous at best, and would certainly not be economical for this Court.

Indeed, even were we to certify subclasses for Petitioners in each Facility, typicality would also require subclasses based upon medical conditions. *Hope v. Warden York Cty. Prison*, No. 20-1784, 2020 WL 5001785, at *10 (3d Cir. Aug. 25, 2020). Those medical conditions would necessarily need to be examined within the context of their treatment (or aggravation) within each individual facility. This could lead to, for example, at least three separate subclasses of Petitioners with asthma—one each at CCCF, PCF, and YCP. *Id.* Petitioners allege over thirty conditions in their suggested class definition, which could well mean that we may

20

be required to certify over *ninety* subclasses—without even considering those Petitioners with multiple conditions. (Doc. 64 at 1-2).

This hypothetical also does not contemplate the highly individualized criminal histories, risk of flight, and likelihood of recidivism for each individual Petitioner, which would require the formation of even more subclasses. This information must be considered in relation to the legitimate government objectives in each condition of confinement claim, but query: how would we delineate between Petitioners? *Hope v. Warden York Cty. Prison*, No. 20-1784, 2020 WL 5001785, at *9 (3d Cir. Aug. 25, 2020). Would we be required to mark off "levels" at which criminal histories and flight risks are roughly similar between Petitioners? Would we group like criminal histories together? What about Petitioners with long and varied criminal records?

Thus, while the CDC provides standard guidance to detention centers on the effective prevention of COVID-19 spread,[11] our resulting analysis would be anything but uniform. Each Facility houses unique individuals and clearly implements CDC guidance in markedly different ways. Such disparity is, to an extent, understandable. Each Facility must adapt their unique infrastructure and

---

[11]     *Interim Guidance on Management of Coronavirus Disease (2019) (COVID-19) in Correctional and Detention Facilities,* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed September 22, 2020).

resources to best keep their individual detainees safe. Doing so must necessarily look different in each detention center. Consequently, we cannot find that typicality is met here. The named Petitioners vary too widely in their factual circumstances for a class action to be the appropriate vehicle for their claims. Certifying those individuals to represent the class would not be "fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009).

### C. Adequacy

Rule 23(a)(4) requires that plaintiffs must "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). Respondents do not present any argument questioning the adequacy of Petitioners' counsel but argue that the named Petitioners are inadequate class representatives. (Doc. 118 at 56-58).

"There are clear similarities between the components of the typicality inquiry relating to the absence of unique defenses and alignment of interests, and this second part of the adequacy inquiry that focuses on possible conflicts of interest. 'Because of the similarity of [the typicality and adequacy] inquiries,

certain questions—like whether a unique defense should defeat class

certification—are relevant under both.'" *In re Schering Plough Corp. ERISA Litig.*,

589 F.3d 585, 602 (3d Cir. 2009) (citing *Beck v. Maximus,* 457 F.3d 291, 296

(3d Cir.2006)).

For this reason, many of the same impediments Petitioners faced in the

typicality analysis repeat themselves here. Petitioners all face unique medical

conditions, which are addressed in different ways by each Facility. Their COVID-

19 risk profiles are likewise distinctively aggravated or mitigated by the different

procedures in place at CCCF, PCCF, and YCP. Thus, a Petitioner with diabetes at

PCF, for example, may well be subject to a unique defense as opposed to a

Petitioner with a similar condition at YCP.[12]

The same rationale applies to Petitioners' criminal histories and potential

risk of flight. While we initially found that Petitioners Thakker, Stubbs, and

Hillocks did not pose any significant harm to the public, nor did they pose a risk of

flight, the same may well *not* be the case for their putative class members—some,

---

[12]     The Third Circuit applies similar reasoning in finding a proposed named plaintiff to be an
inadequate class representative: "For this reason, many of the same questions regarding Wendel's
typicality also raise issues as to her adequacy. For example, if some or most members of the
class do not have releases or covenants not to sue, then Wendel may be subject to a unique
defense. If Wendel's release is held to bar her recovery in the form of individualized augmented
benefits, she may lack the same financial stake as the other members of the class. Also, Wendel
may have different incentives in terms of how much time, energy, and money she is willing to
spend pursuing the claim." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 602 (3d Cir.
2009)

like Petitioners Juarez, Pratt, Augustin, Oyediran, and Lopez, may have criminal histories that prevent them from availing themselves of the same arguments. (Doc. 89 at 31). We thus find that, while we see no outright conflict of interest,[13] Petitioners are nevertheless inadequate class representatives.

### D. Rule 23(b)(2)[14]

Plaintiffs seek class certification pursuant to Rule 23(b)(2), which provides for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). "Two showings must therefore be made in order to proceed under Rule 23(b)(2)." *Barabin v. Aramark Corp.*, 210 F.R.D. 152, 160 (E.D. Pa. 2002), *aff'd*, 2003 WL 355417 (3d Cir. Jan. 24, 2003). "First, the complaint must seek relief which is predominantly injunctive or declaratory. . .

---

[13]     Respondents argue that several named Petitioners are not adequate representatives because they have already been released from detention. Thus, they argue, class-wide injunctive relief would not "equally benefit the entire proposed class" and the existing Petitioners "would lack any motivation to continue prosecuting the action vigorously on behalf of the class." (Doc. 118 at 57). We disagree. Petitioners are at liberty on a *temporary* basis. (Doc. 89 at 31). Should either triggering event in our Order occur, Petitioners would be required to return to their respective detention centers. Thus, it is clear to us that they have ample motivation to continue litigating this case until they receive their requested injunctive relief declaring their detention unconstitutional.

[14] Because Petitioners' putative class does not satisfy Rule 23(a)(3) or (4), certification of their class must necessarily fail. FED. R. CIV. P. 23; *In re Schering Plough Corp. ERISA Litigation*, 589 F.3d 585, 596 (3d Cir. 2009) (noting that to obtain class certification under Rule 23, Plaintiff must satisfy both the conjunctive requirements of subpart (a) and one of the requirements of subpart (b)).  Nevertheless, in an abundance of caution, we consider Rule 23(b)(2) as well.

[and] [s]econd, plaintiffs must complain that defendants acted or refused to act on grounds generally applicable to the class." *Id.*

Rule 23(b)(2) is "almost automatically satisfied in actions, primarily seeking injunctive relief." *Baby Neal*, 43 F.3d at 58. Nevertheless, the second showing required by the Third Circuit incorporates a cohesiveness requirement. *Sourovelis v. City of Philadelphia*, 320 F.R.D. 12, 24 (E.D. Pa. 2017). In other words, "different factual circumstances" render Rule 23(b)(2) certification inappropriate. *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) (quoting *Geraghty v. United States Parole Comm'n*, 719 F.2d 1199, 1206 (3d Cir. 1983)).

The Third Circuit has previously recognized the importance of factual similarity in Rule 23(b)(2) class actions:

> [there are] two reasons why courts must determine whether a proposed (b)(2) class implicates individual issues. First, unnamed members with valid individual claims are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action. 'Thus, the court must ensure that significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representatives's claims present different individual issues than the claims of the absent members present.' Second, 'the suit could become unmanageable and little value would be gained in proceeding as a class action ... if significant individual issues were to arise consistently.'

*Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) (citing *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 628 (E.D.Pa.1976).

As has previously been discussed at length, individual issues pervade this case. We find that it would be unjust to bind absent class members to a decision that may not consider their personal circumstances. We cannot determine whether a Facility was deliberately indifferent *with regards to COVID-19* without considering an individual's medical issues because COVID-19 has been shown to affect people in drastically different ways, based largely upon previous medical history. Individual medical concerns are thus integral to this case, and it would be unfair to hold any one Petitioner to the same standard as another, especially considering the vastly different conditions present at each Facility.

Indeed, it would also be patently unfair to paint Petitioners' criminal histories with a broad brush, as would be required in a class action of this nature. The Third Circuit has dictated that protecting the public and ensuring court appearances are legitimate government objectives that must be considered in Petitioners' conditions of confinement claims. *Hope v. Warden York Cty. Prison*, No. 20-1784, 2020 WL 5001785, at *9 (3d Cir. Aug. 25, 2020). But Petitioners present varying levels of risk in this regard as well.

While Petitioners ostensibly seek injunctive and declaratory relief that *could* potentially apply to the class as a whole, we find that they lack the necessary cohesiveness to satisfy Rule 23(b)(2).

## IV.   CONCLUSION

In light of the foregoing, we shall deny the motion for class certification. Petitioners' claims vary too widely in their factual circumstances for a class action to be appropriate, and we would do them a disservice by considering them as a whole. COVID-19 affects each individual differently. It is closely tied to a person's overall health and the conditions in which they live, work, and interact with others. To ignore these significant differences would be akin to disregarding the realities of the pandemic itself. *See Hope v. Warden York Cty. Prison*, No. 20-1784, 2020 WL 5001785, at \*13 (3d Cir. Aug. 25, 2020) ("Yet a fundamental problem pervades the District Court's analysis: it treated Petitioners as a unit instead of as individuals with their own unique medical histories, medical risks, healthcare access needs, detention conditions, and release circumstances. It should have assessed all of these factors for each Petitioner.").[15]

Furthermore these meaningful factual differences mean that judicial economy is not served by a class action. Both Petitioners and this Court are better

---

[15]      Indeed, courts across the country have taken a similar stance, focusing on the *individual* circumstances surrounding ICE detainees. *See Barrera v. Wolf*, No. 4:20-CV-1241, 2020 BL 360098 (S.D. Tex. Sept. 21, 2020) (granting individual bail hearings to Petitioners but declining to grant provisional class certification as unnecessary "to assuage the risks to those in detention [] who are most vulnerable to death or serious medical illness").

served by examining each claim on its merits, considering all the facts and legal

theories applicable to each individual Petitioner.[16]

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Petitioners' Motion for Class Certification and Appointment of Class

   Counsel, (Doc. 64), is **DENIED**.

2. Petitioners' Motion for Class-Wide Preliminary Injunction, (Doc. 98), is

   **DISMISSED AS MOOT**.

3. Respondents' Motion in Limine, (Doc. 142) is **DENIED** to the extent it

   seeks exclusion of Petitioners' unsworn declarations and is **DISMISSED**

   without prejudice to the extent it seeks to exclude the testimony of Dr.

   Joseph Amon, PhD.


                                            s/John E. Jones III

                                            John E. Jones III
                                            Chief Judge
                                            United States District Court
                                            Middle District of Pennsylvania

---

[16]     We are satisfied that the courts of the Middle District are well-equipped to efficiently and fully consider all COVID-19-related individual claims that may come before them. Since the inception of this pandemic, 90 COVID-19 habeas petitions have been filed in the Middle District. As of September 24, 2020, our able colleagues have already resolved 42 of them. We thus harbor no concerns that Petitioners and similarly-situated ICE detainees will receive full and prompt consideration of their claims.